**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 1 3 2024

TAMMY H. DOWNS, CLERK
By: _____
                    DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**JONES EAGLE, LLC** *f/k/a*
**JONES DIGITAL, LLC**                                          **PLAINTIFF**

**v.**                          CASE NO.: 4:24cv-000-KGB

**WES WARD, in his official capacity as the Secretary of the**          **DEFENDANTS**
**Arkansas Department of Agriculture; TIM GRIFFIN in his**
**official capacity as the Attorney General of Arkansas; and**
**STATE OF ARKANSAS**

### COMPLAINT

Plaintiff Jones Eagle, LLC ("Jones Eagle"), formerly known as Jones Digital, LLC, brings

this complaint against defendants Wes Ward, in his official capacity as the Secretary of Agriculture

of Arkansas, Tim Griffin, in his official capacity as the Attorney General of Arkansas, and the State

of Arkansas ("Defendants").

## I.    INTRODUCTION

1.    This action seeks injunctive and declaratory relief against Defendants' imminently

threatened enforcement of two unconstitutional laws: Act 636 of 2023 ("Act 636") and Act 174 of

2024 ("Act 174") (jointly, "Acts 636 and 174").

2.    Acts 636 and 174 are unconstitutional on their face and as applied to Jones Eagle.

3.    Acts 636 and 174 discriminate based on race, alienage, and national origin in

violation of Jones Eagle's rights to equal protection.

4.    Acts 636 and 174 violate Jones Eagle's rights to due process of law.

5.    Acts 636 and 174 discriminate against interstate and foreign commerce in violation

of the commerce clause.

This case assigned to District Judge Baker
and to Magistrate Judge Ervin

6.    Acts 636 and 174 invite enforcement efforts undertaken in the absence of reasonable suspicion and based on the perceived race, alienage, and national origin of investigative targets, which has resulted in ongoing and foreseeable future harm against Jones Eagle.

7.    Acts 636 and 174 are preempted by federal law.

8.    Acts 636 and 174 threaten takings of Jones Eagle's private property without just compensation.

## II.    JURISDICTION, VENUE, AND PARTIES

9.    This Court has original jurisdiction under 28 U.S.C. § 1331 because the claims arise under the Constitution, laws, or treaties of the United States.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b).

11.    Jones Eagle is a limited liability company which was formed under Delaware law as Jones Digital, LLC. Plaintiff amended its name from Jones Digital, LLC on October 4, 2024, through the submission of an amendment to the Delaware Secretary of State.

12.    Wes Ward ("Secretary Ward") is a natural person and citizen of Arkansas and is sued in his official capacity as the Secretary of Arkansas Department of Agriculture ("Department"). Ark. Code Ann. § 25-23-202. Secretary Ward is the chief executive officer of the Department and exercises superintending authority over the activities of its agents, designees, employees, and representatives, including their conduct relating to Acts 636 and 174.

13.    Tim Griffin ("Attorney General Griffin") is a natural person and citizen of Arkansas and is sued in his official capacity as the Attorney General of Arkansas. Attorney General Griffin exercises superintending authority over the activities of his agents, designees, employees, and representatives, including their conduct relating to Acts 636 and 174.

14.     The State of Arkansas is a constituent political subdivision of the United States of America.

15.     Jones Eagle brings federal claims for prospective injunctive relief and declaratory judgment against all Defendants under U.S. Const., amend. V and XIV; Fed. R. Civ. P. 57; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. §§ 1981 and 1983, and *Ex parte Young*, 209 U.S. 123 (1908).

16.     Jones Eagle brings its taking claim for damages against the State of Arkansas, which lacks sovereign immunity applicable to claims for just compensation arising directly under the Fifth and Fourteenth Amendments to the Constitution of the United States in the absence of an adequate and available state cause of action. *DeVillier v. Texas*, 601 U.S. 285, 144 S. Ct. 938 (2024).

### III.     BACKGROUND

17.     In May 1882, the United States passed the Chinese Exclusion Act, which banned all Chinese laborers from immigrating to the United States. The Chinese Exclusion Act was the first and only major U.S. law ever implemented to prevent all members of a specific racial group from immigrating to the United States. The law remained in force until 1943, when China became a wartime ally of the United States against Japan.

18.     But Arkansas chose a different path. The Arkansas Constitution provides that "[n]o distinction shall ever be made by law, between resident aliens and citizens, in regard to the possession, enjoyment or descent of property." Ark. Const. Art. 2, § 20.

19.     As the Arkansas Constitution makes clear, Arkansas law affords no compelling state interest to discriminate based on race, alienage, or national origin with respect to property rights.

20.    In 1927, the Arkansas Supreme Court applied the Arkansas Constitution to strike down a state law called Act 249 of 1925, known as the "Alien Land Act." *Applegate v. Lum Jung Luke*, 173 Ark. 93, 291 S.W. 978 (1927).

21.    The Arkansas Alien Land Act attempted to prohibit certain aliens from acquiring, possessing, enjoying, using, cultivating, occupying, or transferring real estate. *Id.*, at 979.

22.    The Arkansas Supreme Court struck down the Arkansas Alien Land Act by applying Ark. Const. Art. 2, § 20. *Id.*, at 979 ("The manifest and only intent which can be extracted from the language is that all resident aliens in Arkansas, whether eligible to naturalization and citizenship under the laws of the United States, have the same right to acquire and enjoy the possession of property in this state, either by purchase or descent, that any natural citizen has.").

23.    However, equal justice under law has not always been enjoyed by Asian-Americans in Arkansas.

24.    During World War II, the United States War Relocation Authority established two internment camps in Arkansas: Jerome and Rohwer.

25.    The Rowher internment camp was located in Desha County, Arkansas, less than 50 miles south from Jones Eagle's data center in Arkansas County, Arkansas.

26.    In *Korematsu v. United States*, the Supreme Court found that certain wartime powers of the ***federal*** government allowed Congress and the President "to exclude those of Japanese ancestry from the West Coast war area at the time they did." 323 U.S. 214, 217, 65 S. Ct. 193, 194 (1944).

27.    However, in 1948, the U.S. Supreme Court held that the 14th Amendment rights of Fred Oyama, a U.S. citizen and the son of Japanese immigrants, had been violated when the State of California moved to repossess land purchased by Oyama's non-citizen father in Oyama's name

while the family was incarcerated in an internment camp. *Oyama v. California*, 332 U.S. 633, 68 S. Ct. 269 (1948).

28.    As a result of the *Oyama* decision and other developments in equal protection case law, most of the country's Alien Land Laws were repealed or struck down in the 1950s.

29.    On August 10, 1988, President Reagan signed into law the Civil Liberties Act of 1988, which provided monetary restitution to surviving victims of Japanese-American internment camps during World War II. 50 U.S.C. §§ 4201, *et seq.*

30.    At the signing ceremony, President Reagan recalled, "America stands unique in the world—the only country not founded on race but on a way, on an ideal. Not in spite of, but because of our polyglot background, we have had all the strength in the world. That is the American way. And yes, the idea of liberty and justice for all, that is still the American way."

31.    On March 24, 2023, Jones Eagle, through its predecessor-in-interest, entered a commercial lease for real property in Arkansas County, Arkansas for the purpose of engaging in the business of operating a data center, including mining digital assets such as cryptocurrency.

32.    Since entering into that lease agreement, Jones Eagle has taken concrete steps and expended considerable funds to plan and build a facility and conducts ongoing operations of its data center on the parcel.

33.    Jones Eagle's data center operations on the parcel are lawful business operations that comply with facially non-discriminatory Arkansas laws. *See* Ark. Code Ann. § 14-1-602.

34.    Thus, as to non-discriminatory legal requirements, Jones Eagle has complied "with every requisite deemed by the law, or by the public officers charged with its administration[.]" *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886).

35.     Through government overreach, Defendants now seek to interfere with Jones Eagle's continued business operations and deprive Jones Eagle of its lawful business expectancies.

36.     Defendants have launched a prolonged, pretextual investigation under a facially discriminatory statute that does not apply to Jones Eagle's leasehold interest.

37.     Defendants have no reasonable likelihood of success in any proceedings that could be initiated under Act 636.

38.     Act 636 does not apply to Jones Eagle's real property interest in Arkansas County, Arkansas because it is not "agricultural land" as defined by Act 636.

39.     Qimin "Jimmy" Chen ("Mr. Chen") is an American citizen who exercises control over Jones Eagle as the sole owner of Eagle Asset Holding, Inc.

40.     Mr. Chen was born in China and immigrated to the United States as a child.

41.     Mr. Chen exercises control over the operations of Jones Eagle through his ownership of its majority interest-holding member, Eagle Asset Holding, Inc.

42.     Despite actual notice of these facts, Defendants continue to threaten enforcement actions against Jones Eagle under Act 636 of 2023 and, potentially, Act 174 of 2024.

43.     However, both Act 636 and 174 are unconstitutional.

44.     Therefore, through this action, Jones Eagle requests that the Court enter judgment declaring that Acts 636 and 174 violate the U.S. Constitution and federal statutory law, and an injunction to restrain Defendants from efforts to enforce these discriminatory and unconstitutional laws against Jones Eagle.

A.    **The legislative history of Act 636 of 2023**

45.    On March 14, 2023, the Arkansas Senate Agriculture, Forestry, and Economic Development Committee first considered SB 383 of 2023 ("SB 383"), which ultimately became enacted into law as Act 636 of 2023 ("Act 636").

46.    SB 383 was sponsored by Arkansas State Senator Blake Johnson.

47.    Within the first minute of Senator Johnson's committee speech in support of SB 383, Senator Johnson specified that the legislation was intended to apply to citizens and residents of China, stating "this prohibition is for those ITAR nations, and I'm gonna give you a few of those that are on the list: China, Cuba, Iran, North Korea, Syria, Venezuela, Afghanistan, Haiti, Iraq, Lebanon, Libya, Russia, Somalia, that's just a piece—there's 24 of those nations that are on the ITAR list that we don't do defense secrets or trading with."

48.    Senator Johnson made clear that the real purpose of Act 636 was to discriminate against persons believed to be Chinese, stating, "we have recently seen a balloon fly over our land and there is great concern over that, and I think the concern as well should be on the land that's below where that balloon was that's in Arkansas, and I feel like it's a defense—I mean if we can't feed or clothe ourselves as a nation, it's a defense issue for our nation and for Arkansas."

49.    Senator Johnson's reference to a "balloon" was a reference to a Chinese high-altitude surveillance balloon that was shot down by the U.S. Air Force off the coast of South Carolina on February 4, 2023. F-22 Safely Shoots Down Chinese Spy Balloon Off South Carolina Coast. U.S. Department of Defense, *available at* https://www.defense.gov/News/News-Stories/Article/Article/3288543/f-22-safely-shoots-down-chinese-spy-balloon-off-south-carolina-coast/

50.    After Senator Johnson's comments in support of SB 383, the Arkansas Senate Agriculture, Forestry, and Economic Development Committee passed SB 383 by voice vote to be submitted for consideration on the floor of the Arkansas Senate.

51.    On March 27, 2023, Senator Johnson introduced SB 383 on the floor of the Arkansas Senate.

52.    In support of the bill, Senator Johnson stated, "I'm gonna read a few of those nations: China, Iran, North Korea, Syria, Venezuela, Afghanistan, Haiti, Iraq, Lebanon, Libya, Russia, Somalia, that's just a few of those nations, there's 24 in all. This limits those nations. We had a balloon fly over. And everybody was worried about the balloon taking pictures of the land below it. If we don't want a balloon flying over our nation, we shouldn't want them owning land. We can't go over there and buy property, so this is what this bill does."

53.    Following Senator Johnson's floor speech, the Arkansas Senate passed SB 383, which was transmitted to the Arkansas House.

54.    On April 5, 2023, the Arkansas House considered SB 383 and passed it with a minor amendment.

55.    On April 6, 2023, the Arkansas Senate reconsidered the House's amendment to SB 383 and passed it for approval by the governor.

56.    On April 11, 2023, SB 383 was enacted as Act 636, which is codified as Ark. Code Ann. §§ 18-11-110 and 18-11-801, *et seq.*

**B.    The text of Act 636 of 2023**

57.    Through the enactment of Act 636, Subchapter 8 of Title 18 of the Arkansas Code became entitled "Foreign Ownership of Agricultural Land."

58.    Act 636 purports to criminalize foreign ownership of an "interest in agricultural land," defined by Ark. Code Ann. § 18-11-802(1)(A).

59.    Act 636 criminalizes ownership of agricultural land by a "prohibited foreign party," and defines "prohibited foreign party" in a manner intended to facially discriminate against persons perceived to be citizens or residents of China, by incorporating the International Traffic in Arms Regulations ("ITAR"). 22 C.F.R. § 126.1.

60.    Act 636 facially discriminates against persons based on race, alienage, and national origin. Ark. Code Ann. § 18-11-802(5).

61.    Act 636 purports to prohibit any "prohibited foreign party" from holding "significant interest" or "substantial control" in any "party other than an individual or government," to include corporations, limited liability companies, and other business organizations. Ark. Code Ann. § 18-11-802(8)(A)(i).

62.    Criminal sanctions under Act 636 include imposition of a conviction of "a felony punishable by not more than two (2) years' imprisonment in the custody of the Division of Correction or a fine of fifteen thousand dollars ($15,000), or both." Ark. Code Ann. § 18-11-804(e).

63.    Act 636 creates the Office of Agricultural Intelligence within the Arkansas Department of Agriculture, which is "authorized and directed to collect and analyze information concerning the unlawful sale or possession of agricultural land by prohibited foreign parties; and administer and enforce the provisions of this subchapter, including without limitation the reporting of a violation of this subchapter to the Attorney General under 18-11-804(c)." Ark. Code Ann. § 18-11-805.

64.    Act 636 provides that "the office shall operate under the direction of" the Arkansas Secretary of Agriculture. Ark. Code Ann. § 18-11-805(d).

65.     Act 636 provides no constraint or limitation on the discretion of the Secretary of Agriculture when "reporting of a violation of this subchapter to the Attorney General." Ark. Code Ann. § 18-11-805(b)(2).

66.     Act 636 contains no limitations or guidelines to govern a finding of reasonable suspicion sufficient to sustain a referral by the Secretary of Agriculture for a criminal investigation by the Attorney General.

67.     Act 636 invites and has caused harmful disparate treatment to Mr. Chen and Jones Eagle based on their perceived race, alienage, and national origin, including discrimination based on the perceived national origin of the names of persons affiliated with businesses and companies, such as Mr. Chen and Jones Eagle, many of whom have been subjected to criminal investigations in the absence of reasonable suspicion.

68.     Acts 636 and 174 threaten substantial risk of persistent and recurring criminal investigations without reasonable suspicion or probable cause as against persons such as Mr. Chen, Jones Eagle, and others similarly situated.

69.     Act 636 provides an affirmative defense for "a prohibited foreign party" that "is a resident alien of the State of Arkansas," which facially discriminates against resident aliens outside Arkansas. Ark. Code Ann. § 18-11-804(f).

70.     Defendants have improperly exercised perceived statutory authority under Act 636 to target Jones Eagle, and others, on the basis of perceived race, alienage, and/or national origin of Jones Eagle and its affiliates.

71.     Act 636 confers to the Attorney General a power to cause a taking of Jones Eagle's property rights through judicial foreclosure to be "disbursed to lien holders" without providing just

compensation to Jones Eagle as the original owner of the taken property. Ark. Code Ann. § 18-11-804(d)(1).

**C.      The legislative history of Act 174**

72.      On April 18, 2024, the Arkansas Senate City, County – Local Affairs committee first considered SB 78 and SB 79, which were sponsored by Arkansas State Senators Josh Bryant and Missy Irvin, respectively.

73.      During his comments at the committee hearing, Senators Bryant and Irvin repeatedly emphasized the prohibition on "foreign ownership" to be imposed by SB 78 and SB 79.

74.      During the legislative process, multiple state senators and witnesses, including local public officials, asserted that data asset mining businesses operating in Arkansas were controlled in whole or in part by the government of the People's Republic of China.

75.      The Arkansas Senate City, County – Local Affairs committee passed SB 78 and 79 by voice vote to be submitted for consideration on the floor of the Arkansas Senate.

76.      On April 24, 2024, SB 78 and SB 79 were submitted to the full Arkansas Senate after certain minor amendments.

77.      Legislative discussion on SB 78 and SB 79 focused specifically on China.

78.      Discussing SB 78 before the full Senate, Senator Bryant stated, "The last piece deals with foreign ownership. I think a commonality of the industry that is not playing well in Arkansas is the fact that they are not Arkansas-owned or American-owned.

79.      Senator Bryant stated, "[t]hose that do not, we're going to ask them to leave our state and that includes all foreign adversarially-owned facilities and business models for this crypto-mining industry."

80.     Senator Bryant continued, "On those particular examples, if they're foreign-owned, they'll have to divest to become American-owned at least and hopefully Arkansan-owned."

81.     In directing a question to Senator Bryant on the Senate floor, Arkansas State Senator Bryan King stated, "I mean, to me it's almost like, on this foreign-ownership, ten months after Pearl Harbor, well we may need to look into the Japanese Navy."

82.     Senator King stated, "Harrison was Pearl Harbored," in reference to a proposed crypto-mining development that was intended to be constructed in Harrison, Arkansas.

**D.     The text of Act 174**

83.     On or about May 3, 2024, the Arkansas General Assembly passed Act 174 of 2024 ("Act 174"), which effectuated amendments to Act 851 of 2023, known as the Arkansas Data Centers Act of 2023 ("Act 851").

84.     Act 174 created a new section, 14-1-606, which is entitled "Ownership of digital asset mining business by prohibited foreign-party-controlled business prohibited—Definitions— Penalty—Reporting." Ark. Code Ann. § 14-1-606.

85.     Act 174 defines "interest" as "an ownership interest of greater than zero percent (0%). Ark. Code Ann. § 14-1-606(a)(1).

86.     Act 174 prohibits *any* interest in a "digital asset mining business" being held by a "prohibited foreign party." Ark. Code Ann. § 14-1-606(a)(2).

87.     By virtue of ownership—even *de minimis* ownership—by a "prohibited foreign party," an otherwise lawful digital asset mining business is transformed into a "prohibited foreign-party-controlled business." *See id.*

88.     Ark. Code Ann. § 14-1-606 provides a four-part definition of "prohibited foreign party," which is in turn defined "subject to § 126.1 of the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 120.1 et seq., as existing on January 1, 2024."

12

89.     However, Act 174's definitions of "interest" and "foreign party" are inconsistent with the federal definitions under the ITAR.

90.     The Attorney General has essentially boundless discretion to "conduct an investigation" under Act 174, provided that "a person" makes a "request" or "upon receipt of information that leads the Attorney General to believe that a violation of this section may exist[.]. Ark. Code Ann. § 14-1-606.

91.     Act 174 purports to give the Attorney General the power to "order" a "prohibited foreign party to divest all interest in the digital asset mining business." Ark. Code Ann. § 14-1-606(e)(1).

92.     If the prohibited foreign party "fails to divest all interest in the digital asset mining business within three hundred sixty five (365) calendar days," then the Attorney General has a right of action to seek judicial foreclosure.

93.     Proceeds of such a judicial foreclosure "shall be disbursed to the lienholders, in order of priority, except for liens that under the terms of the sale are to remain." Ark. Code Ann. 14-1-606(e)(B).

94.     Act 174 makes no provision for any compensation to a "prohibited foreign party" whose property is actually taken by the government and sold by forced judicial foreclosure.

**E.     History of discriminatory enforcement efforts under Act 636**

95.     The short history of enforcement attempts under Act 636 is a history of failure due to the recurring absence of reasonable suspicion and probable cause.

96.     On numerous occasions, Defendants' Act 636 referrals and investigations have been undertaken in the absence of reasonable suspicion. *See e.g.*, State's Investigation Determines Ownership of Property Near Ebbing Air National Base Doesn't Have Illegal Ties to Chinese

Government, Snyder, Josh, *Arkansas Democrat-Gazette*, Aug. 13, 2024, *available at* https://www.arkansasonline.com/news/2024/aug/13/states-investigation-determines-ownership-of/; China-based Company Risever Machinery's Jonesboro Factory Found Not to Be In Violation of Law on Land Ownership, Earley, Neal, *Arkansas Democrat-Gazette*, Dec. 26, 2023, *available at https://www.arkansasonline.com/news/2023/dec/26/china-based-companys-jonesboro-factory-found-not/.*

97.     The Attorney General's investigation of 4811 S. Zero Street, LLC revealed that the principal of that Arkansas limited liability company had Taiwanese heritage, not Chinese heritage.

98.     Filings by that company with the Arkansas Secretary of State contained a listed individual whose name appears to be of Chinese origin.

99.     The Attorney General has not publicly disclosed any basis for reasonable suspicion of a violation of Act 636 by 4811 S. Zero Street, LLC.

100.     As a staunch American ally, the Republic of China (Taiwan) is not a foreign nation listed on the ITAR.

101.     The Attorney General's investigation of Risever Machinery LLC ("Risever") was an investigation into a company that Governor Asa Hutchinson had personally recruited from China.

102.     Governor Hutchinson attended Risever's grand opening in Jonesboro, Arkansas on October 23, 2019, where Governor Hutchinson stated, "We're thrilled that the Risever plant is in production. It is one of several Chinese companies that are choosing to locate in Arkansas thanks in large part to our skilled workforce and low business costs." Risever to Begin Trial Operations in Jonesboro, *Talk Business & Politics*, October 23, 2019, *available at https://talkbusiness.net/2019/10/risever-to-begin-trial-operations-in-jonesboro/.*

103.    To secure Risever's investment in Arkansas, Governor Hutchinson offered $1 million from the Governor's Quick Action Closing Fund, which was the culmination of a ten-month negotiation with the Arkansas Economic Development Commission and Jonesboro Unlimited, a private partnership organization that focuses on economic development in Jonesboro. *Id.*

**F.    Defendants' pretextual Act 636 investigation of Jones Eagle**

104.    On December 13, 2023, Governor Sarah Huckabee Sanders issued a press release entitled "Sanders Administration Holds China Accountable." *See* *https://governor.arkansas.gov/news_post/sanders-administration-holds-china-accountable/.*

105.    That press release stated that Governor Sanders's "Administration today alerted Attorney General Tim Griffin's office of two companies that may be in violation of Act 636, which prohibits foreign-party-controlled businesses from owning Arkansas land." *Id.*

106.    That press release announced an investigation under Act 636 into Risever, and also an otherwise wholly unrelated entity: Jones Digital, LLC, Jones Eagle's predecessor-in-interest.

107.    Secretary Ward wrote, "A review of Jones Digital's ownership indicates that the entity may have significant ties to China." *Id.*

108.    However, upon information and belief, Secretary Ward had done no "review of Jones Digital's ownership" on December 13, 2023.

109.    Secretary Ward referred "potential violations" of Act 636 to Attorney General Griffin's office and requested that Attorney General Griffin "utilize the authority granted under

A.C.A. 18-11-704(c)(2) to determine if a violation of Act 636 has in fact occurred, and if so, commence appropriate legal action." *Id.*

110.    Jones Eagle's real property interest is not "agricultural land" as defined under Ark. Code Ann. § 18-11-802(1)(A).

111.    Therefore, Act 636 does not apply to Jones Eagle.

112.    Since January 2, 2024, Jones Eagle and its predecessor-in-interest has been in frequent correspondence with the Attorney General's Office seeking to conclude that office's investigation based on Secretary Ward's referral under Act 636.

113.    Jones Eagle has made numerous requests to meet and confer with the Attorney General's Office, but all those requests have been refused.

114.    On January 12, 2024, Jones Eagle's predecessor-in-interest provided evidence, including specific third-party land surveys, which showed its leasehold interest was less than 10 acres and therefore could not meet the statutory definition of "agricultural land." Ark. Code Ann. § 18-11-802(1)(A).

115.    Jones Eagle provided that evidence in response to the Attorney General's specific request for "documentation that shows Jones Digital is in compliance with Act 636 – specifically that its leasehold is less than 10 acres."

116.    Despite actual knowledge that Jones Eagle's leasehold interest is not "agricultural land" as defined under Act 636, the Attorney General has refused to conclude the investigation under Act 636.

117.    The Attorney General has refused to protect Jones Eagle's confidential business records from public disclosure, and the Attorney General has refused to a clawback request of Jones Eagle's privileged materials obtained from a third party without Jones Eagle's consent.

118.    Jones Eagle's controlling interest is held by Mr. Chen, who is a U.S. citizen and domiciliary of Brooklyn, New York.

119.    Mr. Chen's exercise of control over Jones Eagle extends back to its predecessor-in-interest, Jones Digital.

120.    Mr. Chen is a naturalized American citizen with Chinese ancestry.

121.    Defendants' coordinated efforts under Act 636 have been pretextual and discriminatory.

122.    Defendants have no reasonable expectation of obtaining a valid conviction under Act 636 against Jones Eagle. *Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988) (citing *Kugler v. Helfant*, 421 U.S. 117, 126 n.6, 95 S. Ct. 1524, 1531 n. 6 (1975)).

123.    Jones Eagle is suffering present and foreseeably compounding prejudice caused by Defendants' pretextual and discriminatory investigative efforts.

124.    Jones Eagle will sustain irreparable harm if Defendants' unconstitutional activities are allowed to continue.

**F.    The Federal Government's role in foreign affairs, foreign investment, and national security**

125.    At the time of the Revolution, "the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America." *United States v. Curtis-Wright Export Corp.*, 299 U.S. 304, 316, 57 S. Ct. 216, 219 (1936).

126.    The federal government manages foreign affairs, foreign investment, and national security in the United States, including through two systematic federal regimes: (i) the Committee on Foreign Investment in the United States ("CFIUS"), which has been empowered to review foreign investment transactions, and (ii) the Office of Foreign Assets Control ("OFAC") within the

U.S. Treasury Department, which administers and enforces economic regulations and trade sanctions.

127.    The U.S. Department of State occupies the field of regulating the International Traffic in Arms Regulations ("ITAR"), based on Congressional statutory delegation to the President, consistent with the supremacy of federal power in the arena of national defense policy in exercise of "the powers of external sovereignty." *Curtis-Wright*, 299 U.S. at 316.

128.    Acts 636 and 174 intrude on fields occupied by Congress and the President in violation of the Supremacy Clause.

### i.    History of CFIUS

129.    CFIUS was established on May 7, 1975, by President Ford through an executive order. E.O. 11858, 40 F.R. 20263. CFIUS became the interagency body of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment, including real estate transactions. CFIUS was directed to, *inter alia*, monitor trends and developments in foreign investment in the United States, prepare guidance for foreign governments and consult regarding prospective major foreign governmental investments in the United States, review foreign investments that could have major implications for the national security interests of the United States, and consider proposals for new legislation or regulations relating to foreign investment as necessary.

130.    Later, Congress enacted the Exon-Florio amendment to the Defense Production Act, included in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425-26. It established a mechanism for the federal executive branch to engage in a retrospective review of foreign investments. On December 27, 1988, President Reagan delegated that power to CFIUS by executive order, empowering it to conduct reviews, undertake

investigations, and make recommendations with respect to foreign investment data and policies. E.O. 12661, 54 F.R. 779. By 1991, the U.S. Treasury Department promulgated federal regulations implementing the Exon-Florio amendment, which were codified at 31 C.F.R. Part 800.

131.    The next year, Congress amended the Exon-Florio provision with the Byrd Amendment to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 837, 106 Stat. 2315, 2463-65 (1992). The Byrd Amendment broadened CFIUS's duties to investigate certain foreign investments, in particular, those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce within the United States that could affect national security.

132.    Eventually, Congress passed, and President Bush signed, the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight of CFIUS. FINSA also expanded the national security prerogatives within CFIUS's purview and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also concretized CFIUS's position as a permanent federal agency by codifying it and granting it statutory authority, including certifying to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings, as well as annual classified and unclassified reports.

133.    Most recently, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. No. 115-232, §§ 1701-28, 132 Stat. 2174-2207, which President Trump signed into law. The impetus for FIRRMA was the concern by many members of Congress over Chinese companies' growing investment in the United States. In response, Congress significantly expanded CFIUS's authority to investigate and review foreign

19

investments. Most notably, CFIUS was granted jurisdiction to review certain real estate transactions by foreign persons, specifically, those in close proximity to a military installation, or to a U.S. government facility, or property sensitive to national security. Congress also empowered CFIUS to review changes in foreign investor rights regarding U.S. businesses, as well as transactions in which a foreign government has a direct or indirect substantial interest. FIRRMA further authorized CFIUS to designate some countries as "countries of special concern" based on CFIUS's assessment as to whether that country has demonstrated or declared a strategic goal of acquiring a type of critical technology or critical infrastructure that would affect U.S. national security interests. In that regard, FIRRMA also formalized CFIUS's use of risk-based assessments to determine whether certain transaction pose threats to national security.

134.    At the same time, Congress carefully calibrated the regulation of real estate purchases. For example, Congress constrained the President's power to prohibit transactions by exempting those involving only "a single 'housing unit.'" 50 U.S.C. § 4565(a)(4)(C)(i); *see* 31 C.F.R. §§ 802.223 (defining term), 802.216 (includes "adjacent land" incidental to use as housing unit.). That exception reflects the marginal national security implications of such transactions. In addition, the federal process is individualized, with the government reviewing particular transactions and purchasers to assess whether they pose any national security threat. 50 U.S.C. § 4565(d)(4). Penalties are narrowly tailored. Criminal liability attaches only where a person has made a false statement to CFIUS. 31 C.F.R. § 802.901(a)-(c), (g).

    ii.    *History of OFAC*

135.    In addition to the CFIUS regime, the Treasury Department, through OFAC, is heavily involved with administering and enforcing economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the

President pursuant to the International Emergency Economic Powers Act of 1977 ("IEEPA"), Pub. L. No 95-223, §§ 201-08, 91 Stat. 1625, 1626-29. The Division of Foreign Assets Control, OFAC's immediate predecessor, was established under the Treasury Department in 1950. OFAC derives its authority from a variety of federal laws regarding economic sanctions and embargoes, particularly IEEPA.

136.    OFAC is intended to prevent "prohibited transactions," which it defines as "trade or financial transactions and other dealings in which U.S. persons may not engage unless authorized by OFAC or expressly exempted by statute." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals. It maintains and regularly updates several sanction lists identifying countries, entities, and individuals considered to be threats to national security.

### iii.    History of ITAR

137.    The International Traffic in Arms Regulations ("ITAR") are regulations promulgated by the State Department pursuant to authority vested in the President by the Arms Export Control Act of 1976 ("AECA"), Pub. L. 90-629, 90 Stat. 729, codified at 22 U.S.C. §§ 2278, *et seq*.

138.    On March 8, 2013, President Obama delegated via executive order that statutory authority to the Secretary of State to oversee the export and temporary import of certain defense articles and services. E.O. 13637, 78 F.R. 16129.

139.    The ITAR strikes a deliberate, delicate balance as to the application of federal criminal statutes and regulatory controls over an assortment of federal agencies.

140.    The ITAR contains its own definitions of foreign ownership and foreign control over firms "owned by one or more foreign persons," and "foreign control is presumed to exist where foreign persons own 25 percent or more of the outstanding voting securities unless one U.S. person controls an equal or larger percentage." 22 C.F.R. § 120.65.

141.    22 C.F.R. § 126.1(d)(1) contains specific prohibitions "for defense articles and defense services," which presently includes the foreign states of Belarus, Burma, China, Cuba, Iran, North Korea, Syria, and Venezuela.

142.    But the State Department has chosen to distinguish between foreign states for which "defense articles and defense services" "have a policy of denial," without limitation, and those foreign states which have "a policy of denial" "as specified." 22 C.F.R. § 126.1(d)(2).

143.    The latter category includes 16 separate foreign states, including Cyprus.

144.    No member of the General Assembly mentioned Cyprus at any point during consideration of Acts 636 and 174, nor any interest in regulating any conduct by Cypriots.

145.    In sum, the federal government—through statutes, executive orders, executive agencies, and inherent powers—occupies the fields of foreign affairs, foreign investment, national security, and the intersection thereof.

146.    Acts 636 and 174 conflict with the deliberate, delicate balance that the federal government has struck with respect to these matters.

### Count One: Violation of Equal Protection

147.    The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall […] deny to any person within its jurisdiction the equal protection of the laws."

148.    The Equal Protection Clause protects all persons in the United States, regardless of their race, alienage, or national origin, including Jones Eagle and its affiliates.

149.    The Equal Protection Clause prohibits the States from denying any person equal protection of the laws based on the person's race, alienage, or national origin. This includes laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or disparate treatment due to race, alienage, or national origin.

150.    Acts 636 and 174 target Jones Digital and its affiliates based on their perceived race, alienage, and national origin.

151.    Defendants have undertaken discriminatory and pretextual efforts to target Jones Eagle with investigations under Act 636 in the absence of reasonable suspicion.

152.    Acts 636 and 174 were enacted with the purpose and intent to discriminate against persons based on race, alienage, and national origin, in particular, Chinese nationals and naturalized U.S. Citizens of Chinese heritage, such as Mr. Chen.

153.    Acts 636 and 174 make impermissible classifications based on race, alienage, and national origin that are not justified by a compelling state interest.

154.    Acts 636 and 174 are not narrowly tailored to meet a compelling state interest.

155.    As a matter of Arkansas constitutional law, discriminatory classifications regulating property rights based on race, alienage, or national origin are not a legitimate governmental interest. Ark. Const. Art. 2, § 20; *Applegate v. Lum Jung Luke*, 173 Ark. 93, 291 S.W. 978 (1927).

156.    Intentional discrimination against out-of-state business is not a legitimate state purpose. *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985).

157.    Acts 636 and 174, and Defendants' history of enforcement efforts, invidiously target Jones Digital, and persons similarly situated, based on their perceived race, alienage, and national origin, which has resulted in Defendants' discriminatory practices and disparate treatment.

158.    Acts 636 and 174 deprive Chinese persons, naturalized U.S. Citizens of Chinese heritage, and persons perceived to be Chinese, from the equal protection of the laws, including laws relating to their fundamental rights.

159.    No action to enforce either Act 636 or 174 has yet been commenced; however, Jones Eagle believes such enforcement efforts are imminent.

160.    The imminent enforcement efforts of Acts 636 and 174 will cause ongoing and irreparable harm to Jones Eagle.

161.    Acts 636 and 174 have caused Jones Eagle to be discriminated against and subject to disparate treatment by Defendants and others based on Jones Eagle and its affiliates' perceived race, alienage, and national origin.

162.    Acts 636 and 174 deprive Jones Eagle of the opportunity to grow business expectancies by limiting their ability to attract capital investment and reducing the value of Jones Eagle's business expectancies and current and potential real property interests, causing irreparable harm to Jones Eagle's goodwill.

163.    In implementing and enforcing the provisions of these laws, Defendants are acting under color of state law to deprive Jones Eagles, its affiliates, and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

**Count Two: Violation of the Right to Procedural Due Process**

164.    The Due Process Clause of the 14th Amendment provides: "No State shall […] deprive any person of life, liberty, or property, without due process of law[.]"

165.    The protections of the Due Process Clause apply to all persons in the United States, regardless of their race, alienage, and national origin, including Jones Eagle.

166.    The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. This entails the right to procedural due process, which consists, at a minimum, of the right to fair notice and an opportunity to be heard.

167.    The new prohibitions imposed under Acts 636 and 174 target Jones Eagle and other persons based on their perceived race, alienage, or national origin by attempting to prevent Jones Eagle from owning its leasehold interest and operating its lawful business operations.

168.    Acts 636 and 174 violate the Due Process Clause under the 14th Amendment to the U.S. Constitution, both facially and as applied to Jones Eagle, on the following grounds:

a.    Act 636 is impermissibly vague, indefinite, and ambiguous because it fails to clearly define "agricultural land"; and it therefore fails to provide sufficient notice about which properties and persons are subject to its classifications, prohibitions, penalties, and requirements.

b.    Acts 636 and 174 are impermissibly vague, indefinite, and ambiguous because they do not state whether they have retroactive application to existing interests in land or business expectancies; and they therefore fail to provide sufficient notice about which properties and persons are subject to their classifications, prohibitions, penalties, and requirements.

c.  Acts 636 and 174 set no standards to define "reasonable suspicion," "probable cause," or any other guardrails against arbitrary and discriminatory enforcement efforts, many of which have already been undertaken.

169.  The vagueness and lack of adequate guidelines under Acts 636 and 174 authorizes and encourages arbitrary and discriminatory enforcement across Arkansas, including with respect to Jones Eagle.

170.  The enactment and enforcement of Acts 636 and 174 have caused and will continue to cause ongoing and irreparable harm to Jones Eagle.

171.  In implementing and enforcing the provisions of this law, Defendants are acting under color of state law to deprive Jones Eagle, its affiliates, and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

**Count Three: Violation of the Commerce Clause**

172.  The commerce clause prohibits the enforcement of state laws driven by economic protectionism.

173.  Acts 636 and 174 facially discriminate against out-of-state commerce in favor of in-state commerce.

174.  Ark. Code Ann. § 18-11-804(a) expressly discriminates against resident aliens of the United States who reside outside Arkansas.

175.  Conversely, Ark. Code Ann. § 18-11-804(a) expressly favors resident aliens of the United States who reside within Arkansas.

176.  Act 636 provides an affirmative defense to resident aliens who reside in Arkansas but withholds that affirmative defense from resident aliens who reside outside Arkansas. Ark. Code Ann. § 18-11-804(f).

**Count Four: Violation of the Supremacy Clause of the U.S. Constitution**
**Preemption of Acts 636 and 174 by Federal Regimes Governing Foreign Affairs, Foreign**
**Investment, and National Security**

177.    The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Para. 2.

178.    The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal alw or objectives.

179.    Acts 636 and 174 are preempted by federal regimes governing foreign affairs, foreign investment, and national security, including CFIUS, OFAC, and ITAR. Under federal law, CFIUS is authorized, *inter alia*, to review foreign investment transactions with respect to national security concerns, as well as to review real estate transactions by foreign persons, specifically, those pertaining to properties in close proximity to military installations, U.S. government facilities, or properties of national security sensitivity. OFAC is responsible for administering and enforcing economic regulations. And the ITAR sets carefully crafted restrictions on transactions with foreign parties with sensitive implications for national security and foreign affairs.

180.    Foreign relations, the power to deal with national security threats posed by foreign countries, and foreign commerce are the exclusive powers of the federal government. The U.S. Constitution vests the federal government the primary powers to manage foreign affairs and to

regulate foreign commerce. *See, e.g.*, U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (commerce with foreign nations).

181.    The federal government has long occupied the fields of foreign affairs, foreign investment, national security, and the intersection thereof, especially with respect to foreign relations with China.

182.    Given the comprehensiveness of federal statutory, regulatory, and administrative schemes, federal law has "occupied" the entire field, thus precluding any state regulation such as attempted under Acts 636 and 174.

183.    The State of Arkansas has explicitly stated its intent to regulate in these areas of foreign affairs and foreign investment, as they bear on national security, when enacting Acts 636 and 174.

184.    The Governor of Arkansas and members of the Arkansas General Assembly have repeatedly emphasized the need to legislate based on "the defense issue for our nation" and to "hold China accountable."

185.    In so doing, Acts 636 and 174 attempt to regulate through state law a field exclusively occupied by the federal government, specifically, the intersection between foreign affairs, national security, and foreign investment, including foreign real estate transactions and interstate and foreign commerce.

186.    The prohibitions and penalties imposed under Acts 636 and 174 usurp the power vested by the Constitution and by Congress in the federal government to investigate, review, and take action with respect to foreign investments, including real estate transactions, that implicate national security policy.

187.    Acts 636 and 174 intrude upon the federal government's power to govern foreign affairs generally.

188.    Act 174 locks its definition of "prohibited foreign party" to the ITAR's classification list under 22 C.F.R. § 120.1 as to a specific date: January 1, 2024, even as Act 174 attempts to supplant the ITAR's definition of "foreign party," as defined by the ITAR. Ark. Code Ann. § 14-1-606(a)(3).

189.    In so doing, Act 174 would continue to apply to a foreign nation, even if that nation is removed from the ITAR by the State Department; conversely, Act 174 could not apply to a foreign nation that the State Department later adds to the ITAR, resulting in foreseeable inconsistency between state and federal law.

190.    Thus, Act 174 seeks to establish Arkansas's own foreign policy, thereby intruding upon the federal government's exclusive power to govern foreign affairs. *See Zschering v. Miller*, 389 U.S. 429 (1968).

191.    Acts 636 and 174 intrude upon the federal government's power to govern foreign commerce, generally. By prohibiting "prohibited foreign parties" from specific countries from owning and acquiring agricultural land and business interests in Arkansas, both laws discriminate against out-of-state individuals and entities based on race, alienage, and national origin, in particular, Chinese persons. They therefore burden international commerce, especially with respect to foreign investment.

192.    Acts 636 and 174 unavoidably conflict with the deliberate, delicate balance that the federal government has struck with respect to foreign affairs, foreign investment, and national security, and accordingly, they are preempted by federal law.

193.    By their plain text, Acts 636 and 174 would punish a non-resident Cypriot for acquiring an interest in "agriculture land" in Arkansas, or for buying even a single share in a public company that conducts data asset mining activities in Arkansas.

### Count Five: Taking Without Just Compensation

194.    Acts 636 and 174 threaten to take Jones Eagle's property without just compensation.

195.    "The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 582 U.S. 383, 392, 137 S. Ct. 1933, 1942 (2017) (citing U.S. Const. amend. V.).

196.    A property owner has the right to bring a taking claim against a State directly under the Fifth Amendment in the absence of an adequate and available state cause of action. *See DeVillier v. Texas*, 601 U.S. 285, 144 S. Ct. 938 (2024).

197.    There is no adequate and available cause of action available to Jones Eagle under Arkansas law to bring a taking claim against the State of Arkansas.

198.    Jones Eagle's acquisition and use of its real property was lawful when it was established.

199.    Acts 636 and 174 attempt to criminalize Jones Eagle's pre-existing lawful use of its property, which constitutes a taking of Jones Eagle's property without compensation in violation of due process of law. *Blundell v. City of West Memphis*, 258 Ark. 123, 522 S.W.2d 661 (1975).

200.    Acts 636 and 174 intentionally, discriminatorily, and specifically interferes with Jones Eagle's distinct investment-backed expectations.

201.    Acts 636 and 174 provide for forced divestiture of private property with no requirement to make just compensation to the owner.

202.    The State of Arkansas has given no compensation to Jones Eagle, and neither Act 636 nor Act 174 obligates the State of Arkansas to do so.

203.    In the absence of just compensation, all Defendants must be enjoined from proceeding with any enforcement measures under Acts 636 and 174 that would deprive Jones Eagle of its private property or its distinct investment-backed expectations.

204.    Jones Eagle has already expended substantial capital investments to construct and operate its data center facility in Arkansas County, Arkansas.

205.    If either Act 636 or Act 174 is allowed to be enforced, then Jones Eagle is entitled to recover from the State of Arkansas just compensation in the amount of its past capital expenditures and the anticipated net revenue from its distinct investment-backed expectations for the reasonable duration of its anticipated business expectancies.

## **REQUESTS FOR RELIEF**

WHEREFORE, plaintiff Jones Eagle, LLC requests that the Court enter judgment in its favor and:

A.    Declare Acts 636 and 174 unconstitutional under the 14th Amendment to the U.S. Constitution because they violate Jones Eagle's rights to equal protection.

B.    Declare Acts 636 and 174 unconstitutional under the 14th Amendment to the U.S. Constitution, facially and as applied, because they violate Jones Eagle's rights to due process.

C.    Declare Acts 636 and 174 unconstitutional under the commerce clause as they facially discriminate in favor of in-state commerce to the detriment of interstate commerce.

D.    Declare Acts 636 and 174 unconstitutional under the Supremacy Clause of the U.S. Constitution as preempted by federal law.

E.      Declare Acts 636 and 174 unconstitutional as takings without just compensation under the 5th and 14th Amendments to the U.S. Constitution.

F.      Preliminarily and permanently enjoin Defendants from implementing and enforcing Acts 636 and 174 against Jones Eagle.

G.      Order Defendants to destroy all records obtained concerning Jones Eagle, including affidavits and registrations, that Defendants have acquired pursuant to Acts 636 and 174.

H.      Award Jones Eagle their reasonable attorneys' fees, costs, and expenses.

I.      Grant all other relief this Court deems just and proper.

Dated:  November 13, 2024                **KUTAK ROCK LLP**

By: _____
Frederick H. Davis, Ark. Bar No. 2012271
Alexander T. Jones, Ark. Bar No. 2015246
124 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
frederick.davis@kutakrock.com
alex.jones@kutakrock.com

*Attorneys for Plaintiff Jones Eagle, LLC*