IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JONES EAGLE, LLC *f/k/a*                                     PLAINTIFF
JONES DIGITAL, LLC

v.                              CASE NO.: 4:24-CV-00990-KGB

WES WARD, in his official capacity as the Secretary of the          DEFENDANTS
Arkansas Department of Agriculture; TIM GRIFFIN in his
official capacity as the Attorney General of Arkansas; and
STATE OF ARKANSAS


BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

Page(s)

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................ 2

III.   STANDARD OF REVIEW .................................................................................. 7

IV.    ARGUMENT ........................................................................................................ 7

      A.     Jones Eagle is likely to succeed on the merits of its claims ................................ 7

            1.     Acts 636 and 174 violate Jones Eagle's right to equal protection ............. 7

            2.     Acts 636 and 174 violate Jones Eagle's right to procedural due process ................................................................................................... 15

            3.     Acts 636 and 174 threaten takings without just compensation ................ 17

            4.     Acts 636 and 174 violate the Commerce Clause .................................... 18

            5.     Federal law governing foreign affairs, foreign investment, and national security preempts Acts 636 and 174 under the Supremacy Clause ................................................................................................... 19

      B.     If Acts 636 and 174 are enforced, Jones Eagle will sustain irreparable harm and will have no adequate remedy at law ................................................... 28

      C.     The balance of harms favors Jones Eagle .......................................................... 31

      D.     Granting the preliminary injunction is in the public's interest ........................... 32

      E.     There is no need for Jones Eagle to provide security ......................................... 32

V.     CONCLUSION .................................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aaron v. Target Corp.*,
   357 F.3d 768 (8th Cir. 2004) .................................................................................7

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) .........................................................................................24

*Arizona v. United States*,
   567 U.S. 387 (2012) .........................................................................................27

*Baker Elec. Co-op. v. Chaske*,
   28 F.3d 1466 (8th Cir. 1994) ............................................................................31

*Barrett v. Claycomb*,
   705 F.3d 315 (8th Cir. 2013) .......................................................................7, 28

*Boyle v. Mannesman Demag Corp.*,
   991 F.2d 794 (6th Cir. 1993) ............................................................................13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).........................................................................23, 24, 25, 27

*Cuyahoga River Power Co. v. City of Akron*,
   240 U.S. 462 (1916).........................................................................................30

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981).........................................................................................27

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
   640 F.2d 109 (8th Cir. 1981) .................................................................7, 28, 31, 32

*Delaware, L. & W.R. Co. v. Town of Morristown*,
   276 U.S. 182 (1928).........................................................................................30

*DeVillier v. Texas*,
   601 U.S. 285 (2024).....................................................................................17, 30

*English v. General Elec. Co.*,
   496 U.S. 72 (1990)...........................................................................................27

*Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*,
   426 U.S. 572 (1976)...........................................................................................9

*Gearhart v. Uniden Corp. of America*,
781 F.2d 147 (8th Cir. 1986) .................................................................13

*Glenwood Bridge, Inc. v. City of Minneapolis*,
940 F.2d 367 (8th Cir. 1991) ................................................................31

*In re Griffiths*,
413 U.S. 717 (1973).................................................................................9

*Guy v. Baltimore*,
100 U.S. 434 (1880)...............................................................................18

*Hale v. Henkel*,
201 U.S. 43 (1906).................................................................................16

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ........................................................................ *passim*

*Hunt v. Cromartie*,
526 U.S. 541 (1999)...............................................................................11

*Knapp v. Hanson*,
183 F.3d 786 (8th Cir. 1999) ................................................................10

*Landgraf v. USI Film Products*,
511 U.S. 244 (1994)...............................................................................16

*McKiver v. Murphy-Brown, LLC*,
980 F.3d 937 (4th Cir. 2020) ................................................................13

*McLaughlin v. Florida*,
379 U.S. 184 (1964)...............................................................................10

*Metropolitan Life Ins. Co. v. Ward*,
470 U.S. 869 (1985)...........................................................................8, 14

*Middle South Energy, Inc. v. Ark. Public Service Commission*,
772 F.2d 404 (8th Cir. 1985) ..................................................................7

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
78 F.4th 1011 (8th Cir. 2023) ...............................................................28

*MSM Farms, Inc. v. Spire*,
927 F.2d 330 (8th Cir. 1991) ..............................................................8, 9

*Murr v. Wisconsin*,
582 U.S. 383 (2017)...............................................................................17

*National Pork Producers Council v. Ross,*
    598 U.S. 356 (2023)................................................................18, 19

*Northern States Power Co. v. State of Minn.,*
    447 F.2d 1143 (8th Cir. 1971) ........................................................21

*Nyquist v. Mauclet,*
    432 U.S. 1 (1977).......................................................................9, 10

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 375 (2015)........................................................................20

*Parada v. Anoka County,*
    54 F.4th 1016 (8th Cir. 2022) ........................................................10

*Pembina Consol. Silver Mining & Milling Co. v. Pennsylvania,*
    125 U.S. 181 (1888)..........................................................................8

*Pennsylvania R. Co. v. Public Service Comm'n,*
    250 U.S. 566 (1919)........................................................................20

*Phelps-Roper v. Nixon,*
    545 F.3d 685 (8th Cir. 2008) ........................................................32

*Planned Parenthood Minnesota v. Rounds,*
    530 F.3d 724 (8th Cir. 2008) ........................................................28

*Powell v. Ryan,*
    855 F.3d 899 (8th Cir. 2017) ........................................................28

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947)..................................................................20, 27

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,*
    826 F.3d 1030 (8th Cir. 2016) ......................................................32

*Sessler v. City of Davenport, Iowa,*
    990 F.3d 1150 (8th Cir. 2021) ......................................................28

*Steffel v. Thompson,*
    415 U.S. 452 (1974)..........................................................................7

*Truax v. Raich,*
    239 U.S. 33 (1915)............................................................................8

*United States v. Calandra,*
    414 U.S. 338 (1974)..................................................................16, 17

*United States v. Curtiss-Wright Corp.*,
299 U.S. 304 (1936) ................................................................................................20

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ................................................................................................11

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ................................................................................................15

**State Cases**

*Applegate v. Lum Jung Luke*,
173 Ark. 93, 291 S.W. 978 (1927) ..........................................................................14

*Ark. State Highway Comm. v. Bush*,
195 Ark. 920, 114 S.W.2d 1061 (1938) ..................................................................30

*Austin v. Ark. State Highway Comm.*,
320 Ark. 292, 895 S.W.2d 941 (1995) ....................................................................30

*Bean v. Office of Child Support Enforcement*,
340 Ark. 286, 9 S.W.3d 520 (2000) ........................................................................16

*Blundell v. City of West Memphis*,
258 Ark. 123, 522 S.W.2d 661 (1975) ....................................................................18

*Federal Land Bank of St. Louis v. Ark. State Highway Comm.*,
194 Ark. 616, 108 S.W.2d 1077 ..............................................................................30

**Federal Statutes**

8 U.S.C. § 451 ..............................................................................................................21

50 U.S.C. § 4565(a)(4)(B)(ii) ......................................................................................25

50 U.S.C. § 4565(a)(4)(C)(i) ........................................................................................25

50 U.S.C. § 4565(d)(4) ................................................................................................25

Arms Export Control Act of 1976, 22 U.S.C. §§ 2278, *et seq.* ..................................26

Alien Registration Act ..................................................................................................21

132 Stat. 1636 § 1702 ..................................................................................................25

**State Statutes**

Alien Land Law ............................................................................................................14

Ark. Code Ann. § 14-1-606 .................................................................... *passim*

Ark. Code Ann. § 18-11-104 ....................................................................7

Ark. Code Ann. § 18-11-802 ..................................................................3, 6

Ark. Code Ann. § 18-11-804 ............................................................ *passim*

Ark. Code Ann. § 18-11-805 .................................................................4, 26

California's Holocaust Victim Insurance Relief Act ...................................24

Foreign Investment Risk Review Modernization Act ...........................21, 25

Pennsylvania's Alien Registration Act .....................................................21

**Regulations**

22 C.F.R. § 120.1 et seq. ...........................................................................4

22 C.F.R. § 120.65 ...................................................................................26

22 C.F.R. § 126.1 ..............................................................................3, 4, 26

31 C.F.R. § 802.701 .................................................................................25

31 C.F.R. § 802.901(a)-(c), (g) ................................................................25

Exec. Order No. 13637, 78 Fed. Reg. 16129 ...........................................26

**Constitutional Provisions**

Fourth Amendment ..............................................................................16, 17

Fifth Amendment ................................................................................17, 30

Fourteenth Amendment ............................................................................8

Ark. Const. Article 2, § 20.......................................................................14

U.S. Const., Article I, § 8.........................................................................20

U.S. Const., Article I, § 10.......................................................................20

U.S. Const., Article VI.............................................................................20

U.S. Const. amend. V..............................................................................17

U.S. Const. amend. XIV ......................................................................7, 15

**Other Authorities**

Earley, Neal, *China-based Company Risever Machinery's Jonesboro Factory Found Not to Be In Violation of Law on Land Ownership*, ARKANSAS DEMOCRAT-GAZETTE, Dec. 26, 2023, *available at* https://www.arkansasonline.com/news/2023/dec/26/china-based-companys-jonesboro-factory-found-not/ .................................................................................... 14

Governor Sarah Huckabee Sanders, "Sanders Administration Holds China Accountable," Dec. 13, 2023, https://governor.arkansas.gov/news_post/sanders-administration-holds-china-accountable/ ....................................................................................................... 5, 6

U.S. DEPARTMENT OF DEFENSE, *F-22 Safely Shoots Down Chinese Spy Balloon Off South Carolina Coast*, Feb. 4, 2023, *available at* https://www.defense.gov/News/News-Stories/Article/Article/3288543/f-22-safely-shoots-down-chinese-spy-balloon-off-south-carolina-coast/ ....................................... 11

Snyder, Josh, *State's Investigation Determines Ownership of Property Near Ebbing Air National Base Doesn't Have Illegal Ties to Chinese Government*, ARKANSAS DEMOCRAT-GAZETTE, Aug. 13, 2024, *available at* https://www.arkansasonline.com/news/2024/aug/13/states-investigation-determines-ownership-of/; .......................................................................................... 14

## I.  INTRODUCTION

Jones Eagle is substantially likely to prevail on its claims in this action. Acts 636 and 174 facially discriminate based on race, alienage, and national origin in violation of Jones Eagle's right to equal protection. They are so impermissibly vague and rudderless as to violate Jones Eagle's rights to due process of law. They unconstitutionally favor in-state commerce over interstate and foreign commerce. They invite retaliatory enforcement efforts untethered to reasonable suspicion or probable cause. They are preempted by federal law. And they intend to allow the State of Arkansas to dispossess disfavored persons of their private property without any compensation.

Pursuant to Fed. R. Civ. P. 65, the allegations of the complaint and attestations of declaration of Qimin "Jimmy" Chen ("Chen Declaration or Chen Decl.") establish the irreparable harm Plaintiff Jones Eagle, LLC, formerly known as Jones Digital, LLC, ("Jones Eagle") will suffer by threatened enforcement of Act 636 of 2023 ("Act 636"), codified as §§ 18-11-110 and 18-11-801, *et seq.*, and Act 174 of 2024 ("Act 174"), codified as § 14-1-606 (jointly, "Acts 636 and 174"). Jones Eagle has been subjected to unreasonable and pretextual pre-enforcement investigative efforts. Jones Eagle fears that this unfortunate situation will soon worsen, as unconstitutional enforcement efforts under Acts 636 and 174 appear imminent.

Therefore, Jones Eagle seeks a temporary restraining order and preliminary injunction to restrain Defendants from imminent foreseeable unconstitutional conduct. The balance of the equities favors Jones Eagle. So does the public interest. For the following reasons, Jones Eagle requests that the Court enter an *ex parte* temporary restraining order restraining Defendants from any acts to enforce Acts 636 and 174. And Jones Eagle requests that the Court enter a preliminary injunction to extend those restraints for the duration of this action.

## II.  FACTUAL BACKGROUND

Pursuant to Rules 10(c) and 65, Jones Eagle incorporates by reference the facts as alleged in its complaint (Dkt. No. 1) and as attested by the Chen Declaration. Since beginning operations at its facility, Jones Eagle has substantially complied with all applicable non-discriminatory legal requirements. Yet now, through pretextual investigations and threatened enforcement of Act 636 and 174, Defendants seek to interfere with Jones Eagle's continued business operations and deprive Jones Eagle of its lawful business expectancies. Defendants have launched a coordinated pretextual investigation under Act 636 of 2023, which is a facially discriminatory statute that does not apply to Jones Eagle's leasehold interest.

Jones Eagle leases "around 2 acres of land," Chen Decl. ¶ 12; thus, its leased property is not "agricultural land" as defined by Act 636. Mr. Chen is an American citizen who exercises control over Jones Eagle as the sole owner of Eagle Asset Holding, Inc. Chen Decl. ¶¶ 2, 6, 7. Mr. Chen was born in China and immigrated to the United States as a child. *Id.* ¶¶ 2, 3. Mr. Chen exercises control over the operations of Jones Eagle through his sole ownership of its majority-interest-holding member, Eagle Asset Holding, Inc. *Id.* ¶ 7. Defendants have known these facts for almost a year as Jones Eagle voluntarily provided information seeking to conclude the investigation while avoiding litigation. *Id.* ¶¶ 11–14. Jones Eagle's efforts to avoid litigation have failed. Despite actual knowledge that Act 636 does not apply to Jones Eagle, and that Mr. Chen is an American citizen, Defendants now threaten enforcement actions against Jones Eagle.

For nearly a year, Jones Eagle has attempted to resolve this matter through dialogue and cooperation, including by providing the Attorney General proof that Act 636 does not apply to its lease. Chen Decl. ¶ 13. On numerous occasions, Jones Eagle has offered to present Defendants with documentary proof of Mr. Chen's American citizenship as well as Jones Eagle's confidential corporate documents. *Id.* ¶ 16. Jones Eagle has sought reasonable protections against disclosure of

non-public, privileged, and confidential commercial information and trade secrets. In response, Defendants have refused to meet and confer. *Id.* ¶ 17.

Jones Eagle's efforts to resolve these issues by reaching agreement have failed. Based on recent escalatory actions by Defendants, Jones Eagle believes unconstitutional enforcement actions are imminent. Such actions threaten Jones Eagle from operating and will result in severe economic harm as well as irreparable damage to its reputation and goodwill in the industry. Chen Decl. ¶¶ 29–36.

Accordingly, Jones Eagle seeks a temporary restraining order restraining Defendants from enforcement activities under Acts 636 and 174 until the Court can convene an evidentiary hearing on Jones Eagle's motion for preliminary injunction. Fed. R. Civ. P. 65(b)(1). Jones Eagle seeks entry of a preliminary injunction ensuring preservation of the status quo ante during this action.

Act 636 purports to criminalize foreign ownership of an "interest in agricultural land," defined by Ark. Code Ann. § 18-11-802(1)(A). Act 636 criminalizes ownership of agricultural land by a "prohibited foreign party," and defines "prohibited foreign party" in a manner intended to discriminate against persons perceived to be citizens or residents of China, by incorporating the International Traffic in Arms Regulations ("ITAR"). 22 C.F.R. § 126.1. Thus, Act 636 discriminates based on race, alienage, and national origin. Ark. Code Ann. § 18-11-802(5).

Act 636 purports to prohibit any "prohibited foreign party" from holding "significant interest" or "substantial control" in any "party other than an individual or government," to include corporations, limited liability companies, and other business organizations. Ark. Code Ann. § 18-11-802(8)(A)(i). Criminal sanctions under Act 636 include imposition of a conviction of "a felony punishable by not more than two (2) years' imprisonment in the custody of the Division of Correction or a fine of fifteen thousand dollars ($15,000), or both." Ark. Code Ann. § 18-11-804(e).

Act 636 creates the Office of Agricultural Intelligence within the Arkansas Department of Agriculture, which is "authorized and directed to collect and analyze information concerning the unlawful sale or possession of agricultural land by prohibited foreign parties; and administer and enforce the provisions of this subchapter, including without limitation the reporting of a violation of this subchapter to the Attorney General under 18-11-804(c)." Ark. Code Ann. § 18-11-805. Act 636 purportedly empowers the Attorney General to take Jones Eagle's property rights through judicial foreclosure to be "disbursed to lien holders" without providing just compensation to Jones Eagle as the property owner.

On or about May 3, 2024, the Arkansas General Assembly passed Act 174 of 2024 ("Act 174"). Act 174 created a new code section, 14-1-606, which is entitled "Ownership of digital asset mining business by prohibited foreign-party-controlled business prohibited—Definitions—Penalty—Reporting." Ark. Code Ann. § 14-1-606. Act 174 defines "interest" as "an ownership interest of greater than zero percent (0%). Ark. Code Ann. § 14-1-606(a)(1). Act 174 prohibits ***any*** interest in a "digital asset mining business" from being held by a "prohibited foreign party." Ark. Code Ann. § 14-1-606(a)(2).

By virtue of any ownership—even *de minimis* ownership—by a "prohibited foreign party," an otherwise lawful digital asset mining business is transformed into a "prohibited foreign-party-controlled business." *Id.* Ark. Code Ann. § 14-1-606 provides a four-part definition of "prohibited foreign party," which is in turn defined "subject to § 126.1 of the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 120.1 et seq., as existing on January 1, 2024." However, Act 174's definitions of "interest" and "foreign party" are inconsistent with the federal definitions under the ITAR.

Under Act 174, the Attorney General has essentially boundless discretion to "conduct an investigation," provided that "a person" makes a "request" or "upon receipt of information that leads the Attorney General to believe that a violation of this section may exist[.]" Ark. Code Ann. § 14-1-606. Act 174 purports to give the Attorney General the power to "order" a "prohibited foreign party to divest all interest in the digital asset mining business." Ark. Code Ann. § 14-1-606(e)(1). If the prohibited foreign party "fails to divest all interest in the digital asset mining business within three hundred sixty five (365) calendar days," then the Attorney General can file suit for judicial foreclosure. Ark. Code Ann. § 14-1-606(e)(2). Proceeds of such a judicial foreclosure "shall be disbursed to the lienholders, in order of priority, except for liens that under the terms of the sale are to remain." Ark. Code Ann. § 14-1-606(e)(3)(B). But no compensation is afforded to the property owner. Nor is there any consideration of the practicality of compelling a sale of a leasehold, as in this case, rather than a fee simple interest.

On December 13, 2023, Governor Sarah Huckabee Sanders issued a press release entitled "Sanders Administration Holds China Accountable." *See* https://governor.arkansas.gov/news_post/sanders-administration-holds-china-accountable/. That press release stated that Governor Sanders's "Administration today alerted Attorney General Tim Griffin's office of two companies that may be in violation of Act 636, which prohibits foreign-party-controlled businesses from owning Arkansas land." *Id.* It announced a referral by defendant Ward to defendant Griffin for an investigation under Act 636 into Jones Digital, LLC, Jones Eagle's predecessor-in-interest. Secretary Ward wrote, "A review of Jones Digital's ownership indicates that the entity may have significant ties to China." *Id.* However, upon information and belief, Secretary Ward had done no "review of Jones Digital's ownership" on December 13, 2023. Secretary Ward referred "potential violations" of Act 636 to Attorney General Griffin's office and

requested that Attorney General Griffin "utilize the authority granted under A.C.A. 18-11-704(c)(2) to determine if a violation of Act 636 has in fact occurred, and if so, commence appropriate legal action."[1] *Id.*

But Act 636 does not apply to Jones Eagle because Jones Eagle's leasehold is not "agricultural land" as defined by Act 636. Since January 2, 2024, Jones Eagle and its predecessor-in-interest has sent frequent correspondence with the Attorney General's Office seeking to conclude that office's investigation under Act 636. Jones Eagle has made numerous requests to meet and confer with the Attorney General's Office, but each one of those requests has been refused. On January 12, 2024, Jones Eagle's predecessor-in-interest provided evidence, including a third-party land survey, which showed its leasehold interest was less than 10 acres and therefore could not meet the statutory definition of "agricultural land." Ark. Code Ann. § 18-11-802(1)(A). Jones Eagle supplied proof in response to the Attorney General's specific request for "documentation that shows Jones Digital is in compliance with Act 636 – specifically that its leasehold is less than 10 acres."

Despite receiving that proof, the Attorney General refuses to conclude the investigation under Act 636. The Attorney General refuses to protect Jones Eagle's confidential business records from public disclosure, despite protections afforded to them under Arkansas law. And the Attorney General refuses a clawback request by Jones Eagle regarding privileged materials the Attorney General obtained without Jones Eagle's consent.

Rather than meet and confer with Jones Eagle regarding issues of confidentiality and privilege, defendant Griffin filed suit arising from an investigative subpoena directed to Jones

---

[1] Secretary Ward's letter referred to section 18-11-704(c)(2) but likely intended to cite Ark. Code Ann. § 18-11-804 ("Interest in Agricultural Land Owned by Prohibited Foreign Parties—Exceptions—Penalty").

Eagle's predecessor-in-interest. See Circuit Court of Baxter County, Arkansas Case No. 03CV-24-421.[2] That action seeks no relief under Act 636; nor could it. *See* Ark. Code Ann. § 18-11-104(c)(3). However, the Attorney General's subpoena suggests imminent substantive enforcement proceedings. See *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petition first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

### III.  STANDARD OF REVIEW

To obtain preliminary injunctive relief, Jones Eagle must establish: (1) that it is likely to succeed on the merits of its claim; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities favors Jones Eagle; and (4) that an injunction would serve the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Of these four factors, the most significant is likelihood of success on the merits. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). The grant of preliminary relief under Rule 65 lies largely within the discretion of the district court. *Dataphase*, 640 F.2d at 109; *also Aaron v. Target Corp.*, 357 F.3d 768 (8th Cir. 2004).

### IV.  ARGUMENT

**A.    Jones Eagle is likely to succeed on the merits of its claims.**

> *1.    Acts 636 and 174 violate Jones Eagle's right to equal protection.*

The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall […] deny to any person within its jurisdiction the equal protection of the laws."

---

[2] Jones Eagle does not seek an injunction against state court proceedings related to that investigative subpoena. Jones Eagle reserves all defenses available to it under Arkansas and federal law. However, to the extent Arkansas later seeks substantive enforcement proceedings, it lacks a legitimate state interest because any articulable interest has been preempted by federal law. *Middle South Energy, Inc. v. Ark. Public Service Commission*, 772 F.2d 404, 417 (8th Cir. 1985).

The Equal Protection Clause protects all persons in the United States, regardless of their race, alienage, or national origin, including Jones Eagle and its affiliates. The Equal Protection Clause prohibits Arkansas from denying any person equal protection of the laws based on the person's race, alienage, or national origin.

Jones Eagle is a "person" for purposes of equal protection. *See Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, n. 9 (1985) ("It is well established that a corporation is a 'person' within the meaning of the Fourteenth Amendment"); *see also MSM Farms, Inc. v. Spire*, 927 F.2d 330, 331 (8th Cir. 1991) (citing *Pembina Consol. Silver Mining & Milling Co. v. Pennsylvania*, 125 U.S. 181 (1888) ("Under the designation of 'person' there is no doubt that a private corporation is included.")). The Equal Protection Clause protects Jones Eagle against laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or disparate treatment due to race, alienage, or national origin.

Under binding precedent, this Court should apply strict scrutiny review in assessing Acts 636 and 174's textually discriminatory classifications on the basis of alienage. The Supreme Court has long rejected state discrimination based on alienage in the context of the right to make a living through the pursuit of lawful business activities. *Truax v. Raich*, 239 U.S. 33 (1915) (striking down Arizona law that required employers to hire a quota of qualified voters or native-born citizens). As the Supreme Court put it, "[t]he discrimination is against aliens as such in competition with citizens in the described range of enterprises, and in our opinion it clearly falls under the condemnation of the fundamental law." *Id.* at 43.

In *Takahashi v. Fish & Game Commission*, the Supreme Court struck down a California law restricting Japanese persons from the right to do business as fishermen. 334 U.S. 410 (1948). California had attempted to prohibit Japanese persons from working as fishermen, based on

California's purported "proprietary interest in fish and the ocean waters within 3 miles of the shore." *Id.* at 414. But the Supreme Court held that any state interest in "ownership" of fish was inadequate to justify California's exclusion of aliens "from making a living by fishing in the ocean off its shores while permitting all others to do so." *Id.* at 421.

In *Graham v. Richardson*, the Supreme Court applied strict scrutiny to strike down state statutes that disqualified or imposed heightened restrictions on aliens who sought welfare assistance. 403 U.S. 365 (1971). "The Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Id.* at 371-372. *Accord In re Griffiths*, 413 U.S. 717, 729 (1973) (applying *Takahashi* and *Graham* to strike down a Connecticut regulation that excluded Dutch citizen from becoming licensed attorney); *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572 (1976) (striking down Puerto Rico's citizenship requirement for engineers); *Nyquist v. Mauclet*, 432 U.S. 1 (1977) (striking down New York's law that classified based on citizenship to confine the availability of scholarships and financial aid only to U.S. citizens, applicants for U.S. citizenship, and those who had declared an intention to become U.S. citizens).

In *Nyquist*, the Supreme Court quoted *Otero* to state the standard of review, finding that "the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn." *Id.* at 7 (quoting *Otero*, 426 U.S. at 605)). "Alienage classifications by a State that do not withstand this stringent examination cannot stand." *Nyquist*, 423 U.S. at 7.

In *City of Cleburne, Tex. v. Cleburne Living Center*, the Supreme Court noted that alienage discrimination required strict scrutiny review. 473 U.S. 432, 440 (1985). The Court reasoned:

> [Rational basis review] gives way, however, when a statute classifies by race, alienage, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.

*Id.* (citing *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964); *Graham*, 403 U.S. 365)).

The Eighth Circuit applies strict scrutiny to alienage classifications. *Parada v. Anoka County*, 54 F.4th 1016 (8th Cir. 2022) (holding that classification based on alienage are "suspect, meaning they are subject to strict scrutiny") (citing *City of Cleburne*, 473 U.S. at 440; *Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999)).

Acts 636 and 174 fail strict scrutiny because Arkansas has no compelling state interest to vindicate, and the means it has chosen to employ are not narrowly tailored to achieve any compelling governmental interest. *See Parada*, 54 F.4th at 1021. Arkansas had myriad less restrictive means to achieve any state interest it might assert (though any such end is dubious given Arkansas's own constitutional provisions). As in *Parada*, the State of Arkansas has myriad less-restrictive "alternatives at its disposal." 54 F. 4th at 1021. Acts 636 and 174 are plainly overbroad in pursuit of whatever limited interest the State of Arkansas may have in attempting to regulate foreign affairs, foreign relations, and national security.

With respect to Act 174, a single purchase of publicly available stock in a publicly traded company by a citizen of China (or Cyprus) would transform an otherwise lawful business into one subject to the exercise of forced-divestiture powers of the State of Arkansas. As to Act 636, myriad less-restrictive investigative avenues could be available. A statutory safeguard to ensure the existence of reasonable or probable cause would be a start. As would built-in safeguards for

confidentiality and privilege rights of investigative targets. But there is no indication that the State of Arkansas undertook any consideration of less-restrictive alternatives.

But the onerous and discriminatory burdens of Acts 636 and 174 are their very point. Acts 636 and 174 were enacted with the intent to discriminate against persons based on race, alienage, and national origin. The plain text of Acts 636 and 174 impose impermissible discriminatory classifications based on race, alienage, and national origin. Acts 636 and 174 facially apply to citizens or persons domiciled in some countries, such as China and Cyprus, but not to others.

Beyond the facial discrimination of their text, the history of Acts 636 and 174 reveal that both employ pretext to achieve purposeful discrimination on account of actual or perceived race, national original, and ethnic identity. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) (holding, inter alia, that in assessing pretext, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports.")).

In sponsoring Act 636, Arkansas State Senator Blake Johnson repeatedly revealed its true purpose was to discriminate against certain persons based on alienage. For example, he made the follow statements:

- "We have recently seen a balloon[3] fly over our land and there is great concern over that, and I think the concern as well should be on the land that's below where that balloon

---

[3] Senator Johnson's reference to a "balloon" was a reference to a Chinese high-altitude surveillance balloon that was shot down by the U.S. Air Force off the coast of South Carolina on February 4, 2023. U.S. DEPARTMENT OF DEFENSE, F-22 Safely Shoots Down Chinese Spy Balloon Off South Carolina Coast, Feb. 4, 2023, *available at* https://www.defense.gov/News/News-Stories/Article/Article/3288543/f-22-safely-shoots-down-chinese-spy-balloon-off-south-carolina-coast/.

was that's in Arkansas, and I feel like it's a defense—I mean if we can't feed or clothe ourselves as a nation, it's a defense issue for our nation and for Arkansas." March 14, 2023, the Arkansas Senate Agriculture, Forestry, and Economic Development Committee.

- "I'm gonna read a few of those nations: China, Iran, North Korea, Syria, Venezuela, Afghanistan, Haiti, Iraq, Lebanon, Libya, Russia, Somalia, that's just a few of those nations, there's 24 in all. This limits those nations. We had a balloon fly over. And everybody was worried about the balloon taking pictures of the land below it. If we don't want a balloon flying over our nation, we shouldn't want them owning land. We can't go over there and buy property, so this is what this bill does." March 27, 2023, the Arkansas Senate.

Thus, Senator Johnson's floor speech advocated for Act 636 based on his claim that Arkansas possessed authority to exercise in the field of foreign affairs, foreign relations, and national defense. However, at no point did Senator Johnson or any other legislator address the impact of Act 636 on the Republic of Cyprus, which is also subject to restrictions under the International Traffic of Arms Regulations ("ITAR").

The legislative history of Act 174 reveals an identical purpose to discriminate against persons believed to be Chinese. For example, Arkansas State Senator Josh Bryant, in sponsoring the Act, stated:

- "The last piece deals with foreign ownership. I think a commonality of the industry that is not playing well in Arkansas is the fact that they are not Arkansas-owned or American-owned."

- "[t]hose that do not, we're going to ask them to leave our state and that includes all foreign-adversarially-owned facilities and business models for this crypto-mining industry."

- "On those particular examples, if they're foreign-owned, they'll have to divest to become American-owned at least and hopefully Arkansan-owned."

During the floor debate in the Arkansas Senate, Arkansas State Senator Bryan King stated:

- "I mean, to me it's almost like, on this foreign-ownership, ten months after Pearl Harbor, well we may need to look into the Japanese Navy;" and

- "Harrison was Pearl Harbored."

Under Eighth Circuit precedent, repeated references to the perceived foreign nationality of a business demonstrate impermissible and prejudicial appeals to xenophobia. *See Gearhart v. Uniden Corp. of America*, 781 F.2d 147, 153 (8th Cir. 1986), *abrogated in part on subsequent state law grounds by Faries v. Atlas Truck Body Mfg. Co.*, 797 F.2d 619, 621 (8th Cir. 1986) (holding that "repeated references to Far Eastern parent corporations and 'foreign goods' or 'foreign products' could prejudicially appeal to xenophobia and the current United States-Japanese trade imbalance"); *see also Boyle v. Mannesman Demag Corp.*, 991 F.2d 794, at *3 (6th Cir. 1993) (unpublished table decision) (citing *Gearhart* to find that "repeated references to a party's citizenship or nationality can be unduly prejudicial to that party"); *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 999 (4th Cir. 2020) (Agee, J., concurring) (citing *Gearhart* to caution courts "against such bias-baiting arguments" seeking to capitalize on anti-China bias).

13

The history of investigative activities and threatened enforcement under Act 636 show disproportionate and disparate treatment targeting persons of Asian ancestry.[4] Acts 636 and 174 have resulted in state discrimination against naturalized U.S. citizens of Chinese heritage, such as Mr. Chen. Acts 636 and 174 deprive Chinese persons, naturalized U.S. citizens of Chinese heritage, and persons perceived to be Chinese, from their fundamental right to equal protection of law.

As to the present case, Defendants have undertaken discriminatory and pretextual efforts to target Jones Eagle under Act 636 in the absence of reasonable suspicion. Acts 636 and 174 deprive Jones Eagle of the opportunity to grow business expectancies by limiting their ability to attract capital investment and reducing the value of Jones Eagle's business expectancies and current and potential real property interests, causing irreparable harm to Jones Eagle's goodwill.

But Acts 636 and 174 also fail even rational basis review. Intentional discrimination against an out-of-state business is not a legitimate state purpose. *Metropolitan Life*, 470 U.S. at 880. As a matter of Arkansas constitutional law, discriminatory classifications regulating property rights based on race, alienage, or national origin are not a legitimate governmental interest. Ark. Const. Art. 2, § 20 ("No distinction shall ever be made by law, between resident aliens and citizens, in regard to the possession, enjoyment or descent of property"); *Applegate v. Lum Jung Luke*, 173 Ark. 93, 291 S.W. 978 (1927) (applying that constitutional provision to strike down the Alien Land Law). Therefore, because there is no legitimate governmental interest to restrict property rights

---

[4] *See* Complaint at 13-14 (citing Snyder, Josh, *State's Investigation Determines Ownership of Property Near Ebbing Air National Base Doesn't Have Illegal Ties to Chinese Government*, ARKANSAS DEMOCRAT-GAZETTE, Aug. 13, 2024, *available at* https://www.arkansasonline.com/news/2024/aug/13/states-investigation-determines-ownership-of/; also citing Earley, Neal, *China-based Company Risever Machinery's Jonesboro Factory Found Not to Be In Violation of Law on Land Ownership*, ARKANSAS DEMOCRAT-GAZETTE, Dec. 26, 2023, *available at* https://www.arkansasonline.com/news/2023/dec/26/china-based-companys-jonesboro-factory-found-not/).

based on race, citizenship, or national origin, Acts 636 and 174 cannot withstand even rational basis scrutiny.

### 2.    *Acts 636 and 174 violate Jones Eagle's right to procedural due process.*

The Due Process Clause of the 14th Amendment provides: "No State shall […] deprive any person of life, liberty, or property, without due process of law[.]" The protections of the Due Process Clause apply to all persons in the United States, regardless of their race, alienage, or national origin. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Due Process Clause applies to Jones Eagle, which is a limited liability company organized under the laws of Delaware. Dkt. No. 11, ¶ 11; *see* Chen Decl. at ¶ 8. And it equally applies to Mr. Chen, who is the American citizen who exercises control over the operations of Jones Eagle. Chen Decl., ¶¶ 2-7.

The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. This entails the right to procedural due process, which includes the right to fair notice and an opportunity to be heard. Acts 636 and 174 violate the Due Process Clause under the 14th Amendment to the U.S. Constitution, both facially and as applied to Jones Eagle, on the following grounds.

*First*, Act 636 is impermissibly vague, indefinite, and ambiguous because does not clearly define "agricultural land." It therefore does not provide sufficient notice about which properties and persons are subject to its classifications, prohibitions, penalties, and requirements. That said, Jones Eagle has demonstrated to the Attorney General that any reasonable definition of "agricultural land" would not apply to its lease. Jones Eagle has submitted third-party proof of that fact, including a land survey by a third-party surveying firm.

*Second*, Acts 636 and 174 are impermissibly vague, indefinite, and ambiguous because they do not state whether they have retroactive application to existing interests in land or business

expectancies; and they therefore do not provide sufficient notice about which properties and persons are subject to their classifications, prohibitions, penalties, and requirements. Under both federal and Arkansas law, statutes are presumptively non-retroactive. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than the Republic." *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* The Arkansas Supreme Court observes "a strict rule of construction against retroactive operation and indulge in the presumption that the legislature intended statutes, or amendments thereof, enacted by it, to operate prospectively only and not retroactively." *Bean v. Office of Child Support Enforcement*, 340 Ark. 286, 296, 9 S.W.3d 520 (2000). And yet Defendants seek to impose restrictions under Act 636 on a leasehold that precedes the existence of Act 636 and to apply Act 174 to lawful business operations that precede the existence of Act 174.

*Third*, Acts 636 and 174 set no standards to define "reasonable suspicion," "probable cause," or any plausible guardrail against arbitrary and discriminatory enforcement efforts, many of which have already been undertaken. These effectuate an impermissible end-run around constitutional safeguards guaranteed by the Fourth Amendment. *See United States v. Calandra*, 414 U.S. 338, 346 (1974) ("A grand jury's subpoena duces tecum will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment.") (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). In such instances, "[j]udicial supervision is properly exercised in such cases to prevent the wrong before it occurs." *Id.*

The lack of guardrails under Acts 636 and 174 enables and encourages arbitrary and discriminatory investigation and enforcement across Arkansas, including as against Jones Eagle.

The history of Act 636 is a clear pattern of arbitrary and capricious investigations by Defendants. And not just against Jones Eagle: Defendants have invoked Act 636 to investigate persons with Taiwanese ancestry and companies directly solicited to do business by the State of Arkansas itself. Throughout, the common thread is the lack of reasonable statutory guardrails on what is essentially boundless discretion conferred in the Secretary of Agriculture and Attorney General.

Defendants have employed investigative measures intended to avoid the warrant requirement of the Fourth Amendment. But the warrant requirement is not an end in and of itself, rather, it is to "effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Calandra*, 414 U.S. at 347. Acts 636 and 174, as applied, impermissibly undermine guaranteed Fourth Amendment protections, which safeguard "persons, houses, papers, and effects" against unreasonable searches and seizures. That too constitutes a violation of Jones Eagle's due process of law.

As to Jones Eagle, Defendants have not asserted any basis for reasonable suspicion or probable cause. Those are fundamental constitutional safeguards against government overreach. And they are necessary to protect Jones Eagle's right to due process of law. Accordingly, any enforcement activities by Defendants should be preliminarily enjoined to protect Jones Eagle against imminent violation of its rights to due process of law.

### 3. *Acts 636 and 174 threaten takings without just compensation.*

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (quoting U.S. Const. amend. V.). A property owner has the right to bring a taking claim against a State directly under the Fifth Amendment in the absence of an adequate and available state cause of action. *See DeVillier v. Texas*, 601 U.S. 285 (2024).

Acts 636 and 174 attempt to effectuate unconstitutional takings in the absence of just compensation. As such, enforcement of Acts 636 and 174 violates Jones Eagle's right to due process of law through the absence of any guarantee for the right of just compensation. Enforcement under Acts 636 and 174 threatens substantial and burdensome restrictions on Jones Eagle's pre-existing use of its property, which implicates a fundamental right under Arkansas law. *Blundell v. City of West Memphis*, 258 Ark. 123, 522 S.W.2d 661 (1975). Acts 636 and 174 intentionally, discriminatorily, and specifically interfere with Jones Eagle's distinct investment-backed expectations. They threaten forced divestiture of private property with no obligation to make just compensation to the owner.

The State of Arkansas has given no compensation to Jones Eagle, and neither Act 636 nor Act 174 would obligate the State of Arkansas to do so—even if Jones Eagle's property were seized and sold at judicial foreclosure. In the absence of any provision for just compensation, Defendants should be enjoined from proceeding with enforcement measures under Acts 636 and 174 that would deprive Jones Eagle of its private property or its distinct investment-backed expectations.

### 4.    *Acts 636 and 174 violate the Commerce Clause.*

The Commerce Clause prohibits the enforcement of state laws driven by economic protectionism. The fundamental purpose of the commerce clause is to prohibit purposeful discrimination against out-of-state commerce in favor of in-state commerce. *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) ("state laws offend the Commerce Clause when they seek to 'build up [...] domestic commerce' through 'burdens upon the industry and business of other States") (quoting *Guy v. Baltimore*, 100 U.S. 434 (1880)).

By their text, Acts 636 and 174 discriminate against out-of-state commerce in favor of in-state commerce. Ark. Code Ann. § 18-11-804(a) expressly discriminates against resident aliens of the United States who reside outside Arkansas and favors resident aliens of the United States who

reside within Arkansas. Act 636 provides an affirmative defense to resident aliens who reside in Arkansas but withholds that affirmative defense from resident aliens who reside outside Arkansas. Ark. Code Ann. § 18-11-804(f).

The upshot is absurd: a Cypriot national could lawfully own and operate a data asset mining facility in Arkansas, so long as he or she lived in Texarkana, Arkansas. But that otherwise lawful business would become illegal if that Cypriot national moved across State Line Avenue to a home in Texarkana, Texas. Statements from the legislative sponsors make clear that this sort of impermissible discrimination was the entire point. Advocating for Act 174 on the Senate floor, Senator Bryant stated, "I think a commonality of the industry that is not playing well in Arkansas is the fact that they are not Arkansas-owned or American-owned." Senator Bryant continued, "on those particular examples, if they're foreign-owned, they'll have to divest to become American-owned at least and hopefully Arkansan-owned."

The text and history are plain: discriminating against interstate and foreign commerce was the clear purpose of Acts 636 and 174. Accordingly, both statutes violate the "antidiscrimination principle" that "lies at the 'very core' of our dormant commerce clause jurisprudence." *National Pork*, 598 U.S. at 356. Acts 636 and 174 constitute protectionist governmental overreach which violates the Commerce Clause. Accordingly, Jones Eagle requests prospective injunctive relief against their enforcement.

### 5.   *Federal law governing foreign affairs, foreign investment, and national security preempts Acts 636 and 174 under the Supremacy Clause.*

The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any

State to the Contrary notwithstanding." U.S. Const., art. VI, Para. 2. The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 375, 376 (2015).

The power to regulate foreign affairs, foreign investment, and national security belongs to the federal government, not Arkansas. That has been true since the founding of the Republic. *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 316 (1936) ("As a result of the separation from Great Britain by the colonies, acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America."). The Constitution confers authority to regulate foreign affairs in Congress. U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (power to regulate foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (power to regulate commerce with foreign nations).

"When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land." *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941). "The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (citing *Pennsylvania R. Co. v. Public Service Comm'n*, 250 U.S. 566 (1919)). As applied to foreign relations law, "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230 (citing *Hines*, 312 U.S. 52)).

While the Eighth Circuit has not cited *Hines* for the specific purpose of foreign-affairs preemption, the Eighth Circuit has cited *Hines* to apply federal preemption to regulate the construction and operation of nuclear power plants, as "a dual system of licensing and regulation with control exerted by both the states and the federal government" would create "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Northern States Power Co. v. State of Minn.*, 447 F.2d 1143, 1154 (8th Cir. 1971).

At issue in *Hines* was the Commonwealth of Pennsylvania's Alien Registration Act, which required certain aliens to report information to the Pennsylvania Department of Labor and Industry; pay a registration fee; receive an alien identification card; and present that card to register a motor vehicle and obtain a license to operate one. 312 U.S. at 59. The Supreme Court struck down Pennsylvania's state statute as preempted by the federal Alien Registration Act.[5] The Supreme Court noted that "the basic subject of the state and federal laws is identical—registration of aliens as a distinct group." *Hines*, 312 U.S. at 61.[6]

In *Hines*, the Supreme Court noted it was the federal government, not the many states, which "is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties." *Id.* at 63. "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Id.* "One of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of

---

[5] The federal Alien Registration Act was enacted in 1940. However, it was repealed by Congress on June 27, 1952. *See* 8 U.S.C. § 451.
[6] Any articulable state interests behind Act 636 are functionally the same as those underpinning the Foreign Investment Risk Review Modernization Act ("FIRRMA") and other federal foreign relations statutes.

a country's own nationals when those nationals are in another country." *Id.* at 63. As the Court noted, "[e]xperience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Id.* at 64.

Turning to the Pennsylvania statute, the Supreme Court noted that "[l]egal imposition of distinct, unusual and extraordinary burdens and obligations upon aliens […] thus bears an inseparable relationship to the welfare and tranquillity of all the states, and not merely the welfare and tranquillity of one." *Id.* at 66. Such state laws "provoke questions in the field of international affairs." *Id.* Where, through federal statute, the federal government "has enacted a complete scheme of regulation and therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Id.* at 66-67.

*Hines* asks whether the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 67. "[I]t is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority." *Id.* "Any concurrent state power that may exist is restricted to the narrowest of limits[.]" *Id.* "[W]hatever power a state may have is subordinate to supreme national law." *Id.* at 68. Because the Pennsylvania law conflicted with the federal statutory scheme, the state law was preempted.

In *Zschernig v. Miller*, the Supreme Court struck down an Oregon probate statute that purported to limit heritability of property based on the nationality of the putative heir. 389 U.S. 429 (1968). At issue was an Oregon statute that provided for escheat of property "where a nonresident alien claims real or personal property" unless three requirements were met:

    (1)     the existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of the foreign country;

    (2)     the right of United States citizens to receive payment here of funds from estates in the foreign country; and

    (3)     the right of the foreign heirs to receive the proceeds of Oregon estates without confiscation.

*Id.* at 430-431 (internal quotations omitted).

The Supreme Court held that "the history and operation of this Oregon statute make clear that [it] is an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432 (citing *Hines*, 312 U.S. at 63). The Supreme Court disfavored the development in which "the probate courts of various States have launched inquiries into the type of governments that obtain in particular foreign nations." *Zschernig*, 389 U.S. at 433-434. The Supreme Court rejected Oregon's attempt to inject "state involvement in foreign affairs and international relations," as "matters which the Constitution entrusts solely to the Federal Government." *Id.* at 436. The Supreme Court noted that "foreign policy attitudes" are "matters for the Federal Government, not for local probate courts." *Id.* at 437-438. Oregon's attempts to regulate in the foreign affairs field "must give way if they impair the effective exercise of the Nation's foreign policy." *Id.* at 440. The Supreme Court struck down the Oregon statute as having "a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems." *Id.* at 441. And the Supreme Court reasoned, "[t]he Oregon law does, indeed, illustrate the dangers which are involved if each State, speaking through its probate courts, is permitted to establish its own foreign policy." *Id.*

More recently, the Supreme Court has applied *Hines* and *Zschernig* to reiterate the primacy of the federal government's role to regulate foreign affairs, foreign relations, and national defense. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-88 (2000) (finding conflict preemption where state law "undermines the intended purpose and 'natural effect' of federal statute

imposing sanctions on Myanmar); *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419-27 (2003) (finding conflict preemption applied to foreclose California's Holocaust Victim Insurance Relief Act).

In *Crosby*, the Supreme Court struck down a Massachusetts statute that sought to impose sanctions against the government of Burma (Myanmar). 530 U.S. at 373 ("[W]e see the state Burma law as an obstacle to the accomplish of Congress's full objectives under the federal Act."). The Supreme Court found "if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Id.* at 377. Thus, the state law was void as it created "inconsistency of sanctions" which "undermines the congressional calibration of force." *Id.* at 380. And the conflicting Massachusetts law threatened to "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments," as Congress had delegated to the President. *Id.* at 381.

Similarly, in *Garamendi*, preemption was required even in the absence of express preemption through a federal statute; it was enough that the California law unduly constrained the President's ability to exercise authority in foreign affairs. "The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two." 539 U.S. at 420. *Garamendi* stands for the proposition that any doubt must be resolved in favor of the federal government's foreign affairs powers, "given the weakness of the State's interest[.]" *Id.* at 425.

*Hines*, *Zschernig*, *Crosby*, and *Garamendi* are decisive in this case. Federal law preempts Acts 636 and 174. The Acts interfere with careful and delicate balances struck between Congress and the President in regulating foreign direct investment, foreign asset controls, and the traffic in arms and defense-sensitive items. The long-standing patterns and practices of federal activity in

the field of foreign relations shows that Congress and the President, not the several States, have regulatory authority over foreign direct investment and assets and trade restrictions in the United States. *See Crosby*, 530 U.S. at 372-88.

The Committee on Foreign Investment in the United States ("CFIUS") and the Office of Foreign Assets Control ("OFAC") have been empowered by Congress and the President to undertake primary responsibility for overseeing issues of national security with respect to direct foreign investment. In 2018, Congress enacted and President Trump signed the Foreign Investment Risk Review Modernization Act ("FIRRMA") into law, which formalized the process by which CFIUS regulated the acquisition of real property by foreign persons. FIRRMA preempts any minimal interest Arkansas may have in regulating foreign affairs, foreign relations, and national security, with respect to review of transactions and ownership of real property by foreign nationals.

The 2018 amendments expanded CFIUS's authority to review specific real estate purchases. But in doing so, Congress found that "foreign investment provides substantial economic benefits to the United States, including the promotion of economic growth, productivity, competitiveness, and job creation, thereby enhancing national security[.]" FIRRMA, 132 Stat. 1636 § 1702. But the CFIUS transaction-review regime is targeted, not scattershot.

Congress delegated to the President the final decision about whether to block any specific transaction under FIRRMA. 50 U.S.C. § 4565(d)(4); 31 C.F.R. § 802.701. But not all transactions: only those near maritime ports or near U.S. military bases. *See* 50 U.S.C. § 4565(a)(4)(B)(ii). And certain real estate transactions are expressly exempted from such review: single "housing units" and "real estate in urbanized areas" as defined by the Census Bureau. 50 U.S.C. § 4565(a)(4)(C)(i). And criminal liability is limited too, attaching only where a person has made a false statement to CFIUS. 31 C.F.R. § 802.901(a)-(c), (g).

Act 636 imposes heightened criminal sanctions above and beyond any imposed under the federal regulatory regime. *See* Ark. Code Ann. § 18-11-804(e). It confers investigative and review powers on the Arkansas Secretary of Agriculture that interfere with the authorities lawfully vested in CFIUS and OFAC by Congress and the President. S*ee* Ark. Code Ann. § 18-11-805. Act 636 also affords heightened protections for resident aliens within Arkansas as opposed to resident aliens located elsewhere within the United States. Thus, Act 636 narrows the ability for Congress and the President to effectuate the delicate balance required in the exercise of foreign affairs powers as embodied by FIRRMA.

Acts 636 and 174 employ certain definitions of foreign ownership and foreign control which conflict with those set by federal law under the International Traffic in Arms Regulations ("ITAR"). Those regulations have been promulgated by the State Department pursuant to lawful authority vested by Congress through enactment of the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. §§ 2278, *et seq.* and by the President through executive order, Exec. Order No. 13637, 78 Fed. Reg. 16129. Because those state statutory definitions are inconsistent with federal law, classifications made by Acts 636 and 174 by applying those definitions are preempted.

The ITAR sets the controlling definitions of foreign ownership and foreign control, with foreign control "presumed to exist when foreign persons own 25 percent or more of the outstanding voting securities unless one U.S. person controls an equal or larger percentage." 22 C.F.R. § 120.65. Those definitions set by the ITAR preempt the contrary state-law definitions of Acts 636 and 174. And the State Department retains the authority to determine which nations are classified for restriction "for defense articles and defense services," under 22 C.F.R. § 126.1(d)(1). Act 174 attempts to lock in the State Department's ITAR classification list to a particular date in time: January 1, 2024, even as Act 174 attempts to supplant the ITAR's contrary definition of "foreign

party." *See* Ark. Code Ann. § 14-1-606(a)(3). But Arkansas cannot trammel the State Department's authority to modify ITAR and the "bargaining chips" that authority represents.

Through CFIUS, OFAC, and ITAR, Congress and the President have created a framework of regulation "so persuasive […] that Congress left no room for the States to supplement it" and where there is a "federal interest […] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Rice*, 331 U.S. at 230; *English v. General Elec. Co.*, 496 U.S. 72 (1990)). Acts 636 and 174 "reduce[] the value of the chips created by the federal statute[s]" and the executive branch entities the President has empowered to foreign affairs powers. *Crosby*, 530 U.S. at 377 (citing *Dames & Moore v. Regan*, 453 U.S. 654, 656 (1981)).

Through enactment of a sequence of statutes regulating the impact of private transactions on foreign affairs, as well as delegations of executive authority over individual transactions and classifications of defense-sensitive nations, Congress and the President have developed a carefully calibrated regulatory scheme over foreign affairs, foreign relations, and national security, which state laws cannot disturb. Congress and the President occupy those fields. Enforcement of Acts 636 and 174 would disrupt the federal government's carefully-crafted balance. Acts 636 and 174 "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in fields where Arkansas's lawful authority is "restricted to the narrowest of limits." *Hines*, 312 U.S. at 67. Thus, Enforcement of Acts 636 or 174 upends and interferes with Congress's specific judgments about national security and foreign affairs, through authority delegated to CFIUS, OFAC, and the State Department through ITAR. *See Crosby*, 530 U.S. at 381.

Arkansas has no legitimate governmental interest in crafting its own foreign policy. Yet Acts 636 and 174 undermine the prerogatives of CFIUS, OFAC, and the State Department.

27

Permitting state-by-state foreign policy, as would be embodied by Acts 636 and 174, would undermine the federal government's supremacy in that field. For the Congress and President to retain their supremacy over foreign affairs, the various states cannot exercise 50 independent and potentially conflicting foreign policy judgments. Accordingly, Acts 636 and 174 are unenforceable as preempted by federal statute and as intrusions by Arkansas "into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig*, 389 U.S. at 432. Accordingly, Jones Eagle requests prospective injunctive relief against their enforcement.

***

Jones Eagle is more likely than not to succeed on the merits of its claims. Acts 636 and 174 violate the U.S. Constitution and federal law. Thus, Jones Eagle meets the first *Dataphase* factor, which is the most significant of the four. *See Barrett*, 705 F.3d at 320.

**B.    If Acts 636 and 174 are enforced, Jones Eagle will sustain irreparable harm and will have no adequate remedy at law.**

The second *Dataphase* factor concerns the potential for irreparable harm. *See* 640 F.2d at 114. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Planned Parenthood Minnesota v. Rounds*, 530 F.3d 724, at n.5 (8th Cir. 2008). Absent preliminary injunctive relief, Jones Eagle has no adequate remedy at law.

First, the imminently threatened deprivation of Jones Eagle's constitutional rights is irreparable harm. *See Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011 (8th Cir. 2023) ("In most instances, constitutional violations constitute irreparable harm.") (citing *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017) (en banc)). The Chen Declaration shows irreparable harm is "more than just a 'mere possibility.'" *Id.* (citing *Sessler v. City of Davenport, Iowa*, 990 F.3d 1150, 1156 (8th Cir. 2021). Defendants actively maintain their pretextual investigation of Jones Eagle under Act 636. Jones Eagle anticipates Defendants will

seek to employ Act 174 to effectuate essentially the same goal: to chill and disrupt Jones Eagle's lawful business operations in Arkansas. Acts 636 and 174's multiple, independent constitutional violations against Jones Eagle are each sufficient to show irreparable harm.

*Second*, the foreseeable business injury from the ongoing cloud of investigation under unconstitutional statutes threatens Jones Eagle's goodwill, which is an independent basis of irreparable harm. As found in *Rogers Group v. City of Fayetteville*, undue regulation and restrictions on Jones Eagle threaten its ability to expand its business operations. 629 F.3d 784 (8th Cir. 2010). In *Rogers Group*, a local rock quarry business filed suit for an injunction against enforcement of a municipal regulation of the quarry. There, as here, the government sought to impose criminal penalties and fines for alleged violations. The quarry alleged that it faced irreparable harm from the ordinance. The trial court agreed, holding that application of the new ordinance would adversely affect the quarry's ongoing and future operations. Both the district court and the Eighth Circuit rejected the city's arguments that the lack of *immediate* change to the quarry's volume of business undermined a finding of irreparable harm. Rather, both the district court and the Eighth Circuit agreed that the ordinance's impact on business operations in the future and the potential loss of goodwill constituted irreparable harm.

As set forth by the declaration of Mr. Chen, enforcement of Acts 636 and 174 would cause immediate and irreparable injury to Jones Eagle's business expectancies and goodwill. Chen Decl. ¶¶ 24-36; *Rogers Group*, 629 F.3d at 789. Threatened enforcement of Acts 636 and 174 hinders future growth of Jones Eagle and disrupts its existing business relationships with its customers. Jones Eagle's ability to grow and accommodate its customers' demands is critical to its commercial viability. Threatened enforcement of Acts 636 and 174 chills Jones Eagle's capacity to develop relationships with customers, investors, and other potential business. Even if Jones Eagle prevails

in this action, any customers lost during the pendency of this action would be unlikely to return once the clouds of Acts 636 and 174 are lifted.

*Third*, the forced-divestiture components of Acts 636 and 174 threatens to deprive Jones Eagle of its property rights on a permanent basis, without any possibility of obtaining just compensation. As the Supreme Court held in *Knick v. Township of Scott, Pennsylvania*, the right to bring a claim for an uncompensated taking accrues directly from the taking itself. 588 U.S. 180, 194 (2019) ("because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time.").

Jones Eagle has a clearly established right to seek equitable relief to prevent the government from unlawful interference with its property. *See DeVillier v. Texas*, 601 U.S. 285, 292 (2024); *Delaware, L. & W.R. Co. v. Town of Morristown*, 276 U.S. 182, 193 (1928); *Cuyahoga River Power Co. v. City of Akron*, 240 U.S. 462, 463 (1916). However, Jones Eagle does not have an adequate right of action for damages under Arkansas law. *Austin v. Ark. State Highway Comm.*, 320 Ark. 292, 294, 895 S.W.2d 941 (1995) (contrasting availability of prospective injunctive relief with the unavailability of damages "where the landowner stands by and permits the Commission to take, occupy, and damage his lands […] for such a coercive proceeding will constitute a suit against the state") (citing *Ark. State Highway Comm. v. Bush*, 195 Ark. 920, 114 S.W.2d 1061 (1938)); *Federal Land Bank of St. Louis v. Ark. State Highway Comm.*, 194 Ark. 616, 108 S.W.2d 1077) (1937)). Here, such takings are threatened remedies potentially available under enforcement actions authorized under Acts 636 and 174. Because damages would likely be unavailable in a post-deprivation posture, Jones Eagle will suffer irreparable harm in the absence of preliminary injunctive relief.

In sum, Jones Eagle will sustain irreparable injury in the absence of preliminary injunctive relief. Deprivations of its constitutional rights and business goodwill independently warrant injunctive relief. And Jones Eagle has the right to enjoin the wrongful seizure of its property, given the absence of any available just compensation. Thus, Jones Eagle has met the second *Dataphase* factor by showing irreparable harm in the absence of preliminary injunctive relief.

**C.    The balance of harms favors Jones Eagle.**

In balancing the harms, the court examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties. *Dataphase*, 640 F.2d at 114; *see also Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991). To determine what must be weighed, the court must consider the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994). Also relevant is the potential economic harm. *Id.*

Here, the balance of the harms favors Jones Eagle. Jones Eagle has the right to conduct lawful business activities without fear of unconstitutional, pretextual, and potentially retaliatory governmental overreach. Jones Eagle has faced unconstitutional and pretextual investigations for months. Jones Eagle has attempted to confer in good faith with Defendants to allow the Act 636 referral to conclude without the need for litigation. Those efforts have failed. Thus, entry of the preliminary injunction would preserve the status quo ante, allowing Jones Eagle to continue to pursue its lawful business operations.

By contrast, Defendants will suffer no substantial harm from a preliminary injunction preserving the status quo ante. Defendants have no legitimate state interest in effectuating discrimination based on race, alienage, or national origin with respect to private property rights. Defendants have no right to regulate conduct in a manner that violates individual due process rights. Defendants have no right to discriminate against interstate or foreign commerce in favor of

local protectionism. Defendants have no legitimate state interest in regulating in the fields of foreign affairs, foreign investment, and national security. And Defendants have no legitimate state interest in taking Jones Eagle's private property in the absence of just compensation.

In short, the balance of the harms favors Jones Eagle and promotes preserving the status quo ante. By contrast, Defendants' legitimate governmental interests would be substantially unburdened by preliminary injunctive relief. The third *Dataphase* factor favors Jones Eagle.

**D.        Granting the preliminary injunction is in the public's interest.**

The public's interest supports preventing Defendants from violating federal law. It is axiomatic that the public interest is served by preventing the enforcement of illegal laws. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."), *overruled on other grounds by Phelps—Roper v. City of Manchester, Mo.*, 697 F.3d 687 (8th Cir. 2012). Thus, protecting Jones Eagle from illegal restrictions is a *per se* public interest. Because Acts 636 and 174 are unconstitutional under federal law, the public interest will be served by preliminary injunctive relief. Additionally, continued business operations will allow Jones Eagle to continue paying state and local taxes and contributing to the state and local economies. The fourth *Dataphase* factor favors Jones Eagle.

**E.        There is no need for Jones Eagle to provide security.**

While a bond is sometimes required as a condition for entry of a preliminary injunction, that would not be appropriate here. There is no legitimate danger that Defendants will incur costs or monetary damages from the issuance of a preliminary injunction. As the Eighth Circuit has instructed, a district court may waive the requirement of an injunction bond "where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

This case challenges the constitutionality of state laws. It is not a case where Defendants risk incurring damages. A preliminary injunction will not cause Defendants to incur costs or damages apart from the costs of defending this suit generally, which do not increase through entry of a preliminary injunction. Jones Eagle should not be required to provide security.

## V.  CONCLUSION

For these reasons, Jones Eagle respectfully requests that the Court enter a temporary restraining order until such time as the Court can convene a hearing on Jones Eagle's motion for preliminary injunction. Jones Eagle requests that the Court grant its motion for a preliminary injunction to restrain Defendants and all persons acting in concert with Defendants from any action to enforce Acts 636 and 174; and for all other proper relief.

Dated:  November 19, 2024          Respectfully submitted,

Frederick H. Davis, Ark. Bar No. 2012271
Alexander T. Jones, Ark. Bar No. 2015246
KUTAK ROCK LLP
124 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
frederick.davis@kutakrock.com
alex.jones@kutakrock.com

*and*

Robert S. Chang*
Executive Director
Fred T. Korematsu Center for Law and Equality
UC Irvine School of Law
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: (949) 824-3034
rchang@law.uci.edu

*Attorneys for Plaintiff Jones Eagle, LLC*

*\*Pro hac vice application pending*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2024, Jones Eagle made service of the foregoing under Fed. R. Civ. P. 5(b) by filing it through the court's electronic-filing system and by hand-delivery of a copy of this paper on Defendants at each of their office addresses.

*/s/ Alexander T. Jones*
Alexander T. Jones