**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JONES EAGLE LLC**                                                                          **PLAINTIFF**

v.                                          **Case No. 4:24-cv-00990-KGB**

**WES WARD, in his official capacity**
**as Secretary of the Arkansas Department of Agriculture,** *et al.*          **DEFENDANTS**

### REDACTED PRELIMINARY INJUNCTION ORDER

Before the Court are two pending motions. First, there is a motion for temporary restraining order and preliminary injunction filed by plaintiff Jones Eagle, LLC ("Jones Eagle") (Dkt. No. 7). Jones Eagle requests that the Court enjoin defendants Wes Ward ("Secretary Ward"), in his official capacity as Secretary of the Arkansas Department of Agriculture, Tim Griffin ("Attorney General Griffin"), in his official capacity as Attorney General of Arkansas, and the State of Arkansas (collectively "Defendants"), from enforcing Arkansas Act 636 of 2023 ("Act 636"), Arkansas Code Annotated §§ 18-11-110 and 18-11-801, *et seq.*, and Arkansas Act 174 of 2024 ("Act 174"), Arkansas Code Annotated § 14-1-606. Second, there is a motion to dismiss filed by Defendants (Dkt. No. 16). This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

On November 21, 2024, the Court held a hearing on the pending motion for temporary restraining order and preliminary injunction at which counsel for all parties were present. Although the November 21, 2024, hearing was adversarial rather than *ex parte*, the Court concluded that it was not the sort of adversarial hearing that included an opportunity to present sufficient evidence, testimony, and argument so as to allow the basis of the relief requested to be strongly challenged. Therefore, the Court considered only Jones Eagle's request for a temporary restraining order at that time. On the basis of evidence and arguments presented at the November

21, 2024, hearing, the Court issued a temporary restraining order on November 25, 2024, enjoining Defendants, and all those acting in concert with them, from enforcing any provision of Act 636 or Act 174 against Jones Eagle or its principal Qimin "Jimmy" Chen within the time permitted by Federal Rule of Civil Procedure 65(b)(2) (Dkt. No. 20).

On December 4, 2024, the Court held a contested evidentiary hearing on Jones Eagle's request for a preliminary injunction and Defendants' motion to dismiss at which counsel for all parties were present. The parties presented evidence and arguments at the hearing, and the issues have been fully briefed. The pending motions are ripe for adjudication.

Accordingly, for the following reasons, the Court grants Jones Eagle's request for a preliminary injunction (Dkt. No. 7) and denies Defendants' motion to dismiss (Dkt. No. 16). The Court enjoins defendant Secretary Ward and defendant Attorney General Griffin, and all those acting in concert with them, from enforcing any provision of Act 636 or Act 174 against Jones Eagle until further Order from this Court.

## I.    Factual Background

These facts are taken from the testimony and exhibits presented at the November 21, 2024, and December 4, 2024, hearings, as well as the other exhibits in the record.

### Arkansas Act 636 Of 2023

1.      On or about March 14, 2023, the Arkansas Senate Agriculture, Forestry, and Economic Development Committee first considered SB 383 of 2003 ("SB 383"), which ultimately became enacted into law as Act 636 of 2023 ("Act 636") (*See* Dkt. No. 1, ¶ 45).

2.      SB 383 was sponsored by Arkansas State Senator Blake Johnson who spoke in support of the bill, saying in part, "[W]e have recently seen a balloon fly over our land and there is great concern over that, and I think the concern as well should be on the land that's below where

that balloon was that's in Arkansas, and I feel like it's a defense—I mean if we can't feed or clothe ourselves as a nation, it's a defense issue for our nation and for Arkansas." (Dkt. No. 30-2; *see also* Dkt. No. 1, ¶ 46).

3.    The Arkansas Senate Agriculture, Forestry, and Economic Development Committee passed SB 383 by voice vote to be submitted for consideration on the floor of the Arkansas Senate (*See* Dkt. No. 1, ¶ 50).

4.    On March 27, 2023, Senator Johnson introduced SB 383 on the floor of the Arkansas Senate and spoke in support of the bill, stating: "I'm gonna read a few of those nations: China, Iran, North Korea, Syria, Venezuela, Afghanistan, Haiti, Iraq, Lebanon, Libya, Russia, Somalia, that's just a few of those nations, there's 24 in all. This limits those nations. We had a balloon fly over. And everybody was worried about the balloon taking pictures of the land below it. If we don't want a balloon flying over our nation, we shouldn't want them owning land. We can't go over there and buy property, so this is what this bill does" (Dkt. No. 30-2).

5.    On April 11, 2023, SB 383, which included certain previously made amendments, was enacted as Act 636, codified as Arkansas Code Annotated §§ 18-11-110 and 18-11-801, *et seq.* (*See* Dkt. No. 1, ¶ 56).

6.    In pertinent part, Act 636:

(a)    Prohibits a "prohibited foreign-party-controlled business" from acquiring any interest in public or private land in Arkansas pursuant to Arkansas Code Annotated § 18-11-110, with certain exceptions as set forth in Arkansas Code Annotated § 18-11-110(e), and subjects those violating the statute to penalties pursuant to Arkansas Code Annotated § 18-11-110(c)(2)-(4) and criminal penalties pursuant to Arkansas Code Annotated § 18-11-110(d).

(b)     Prohibits foreign ownership of an "interest in agricultural land," as defined by Arkansas Code Annotated § 18-11-802(1)(A).

(c)     Criminalizes ownership of agricultural land by a "prohibited foreign party," as defined by Arkansas Code Annotated § 18-11-802(5), with reference to the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 126.1.

(d)     Prohibits any "prohibited foreign party," with certain exceptions set forth in Arkansas Code Annotated § 18-11-804(f), from holding "significant interest" or "substantial control" in an interest as set forth in the statute.  Ark. Code Ann. § 18-11-802(8).

(e)     Subjects those violating the statute with respect to agricultural lands to penalties pursuant to Arkansas Code Annotated § 18-11-804(b)(2), (b)(3), (c)(3), (c)(4), and (d), and criminal penalties pursuant to Arkansas Code Annotated § 18-11-804(e).

7.     Act 636 creates the Office of Agricultural Intelligence within the Arkansas Department of Agriculture, which is "authorized and directed to collect and analyze information concerning the unlawful sale or possession of agricultural land by prohibited foreign parties; and administer and enforce the provisions of this subchapter, including without limitation the reporting of a violation of this subchapter to the Attorney General under § 18-11-804(c)."  Ark. Code Ann. § 18-11-805.

8.     Act 636 provides that "the office shall operate under the direction of" the Arkansas Secretary of Agriculture.  Ark. Code Ann. § 18-11-805(d).

9.     Defendant Secretary Ward testified at the preliminary injunction hearing and described his understanding that, if his agency receives inquiries related to potential violations of Act 636 and his agency feels like there is something there, he refers the matter to the Arkansas

Attorney General to make the Arkansas Attorney General aware or for the Arkansas Attorney General to take a closer look.

10.    Act 636 provides the Arkansas Attorney General, if led to believe a violation of Act 636 may exist at least as to agricultural lands, shall have subpoena power. Ark. Code Ann. § 18-11-804(c)(2).

11.    Act 636 contemplates enforcement action by the Arkansas Attorney General. Ark. Code Ann. §§ 18-11-110(c)(2); 18-11-804(c)(3).

**Arkansas Act 174 Of 2024**

12.    On April 18, 2024, the Arkansas Senate City, County – Local Affairs committee first considered SB 78 and SB 79, which were sponsored by Arkansas State Senators Josh Bryant and Missy Irvin, respectively (*See* Dkt. No. 1, ¶ 72).

13.    During discussions regarding SB 78 and SB 79, Senator Bryant made the following comments: "The last piece deals with foreign ownership. I think a commonality of the industry that is not playing well in Arkansas is the fact that they are not Arkansas-owned or American-owned. . . . Those that do not, we're going to ask them to leave our state and that includes all foreign adversarially owned facilities and business models for this crypto-mining industry. . . . On those particular examples, if they're foreign-owned, they'll have to divest to become American-owned at least and hopefully Arkansan-owned" (Dkt. No. 30-3).

14.    On or about May 3, 2024, the Arkansas General Assembly passed Act 174, which effectuated amendments to Act 851 of 2023, known as the Arkansas Data Centers Act of 2023 ("Act 851") (*See* Dkt. No. 1, ¶ 83).

15.    Act 174, in pertinent part:

(a)    Created a new section entitled "Ownership of digital asset mining business by prohibited foreign-party-controlled business prohibited—Definitions—Penalty—Reporting." Ark. Code Ann. § 14-1-606.

(b)    Defines "interest" as "an ownership interest of greater than zero percent (0%)." Ark. Code Ann. § 14-1-606(a)(1).

(c)    Prohibits any interest in a "digital asset mining business" being held by a "prohibited foreign party." Ark. Code Ann. § 14-1-606(a)(2).

(d)    Provides that an otherwise lawful digital asset mining business is transformed by virtue of any ownership by a "prohibited foreign party" into a "prohibited foreign-party-controlled business." Ark. Code Ann. §§ 14-1-606(a)(2); 14-1-606(a)(3).

(e)    Sets out a four-part definition of "prohibited foreign party," which in turn is defined "subject to § 126.1 of the International Traffic in Arms Regulations ('ITAR'), 22 C.F.R. § 120.1 et seq., as existing on January 1, 2024." Ark. Code Ann. § 14-1-606(a)(2).

(f)    Grants the Arkansas Attorney General discretion to "conduct an investigation" provided that "a person" makes a "request" or "upon receipt of information that leads the Attorney General to believe that a violation of this section may exist." Ark. Code Ann. § 14-1-606(d).

(g)    Authorizes the Arkansas Attorney General to "order" a "prohibited foreign party to divest all interest in the digital asset mining business within three hundred sixty-five (365) calendar days." Ark. Code Ann. § 14-1-606(e)(1).

(h)    Provides that, if the "prohibited foreign party: "fails to divest all interest in the digital asset mining business within three hundred sixty five (365) calendar days," then

6

the Arkansas Attorney General has a right of action to proceed in circuit court. Ark. Code Ann. § 14-1-606(e)(2).

       (i)      Subjects those violating the statute to penalties pursuant to Arkansas Code Annotated § 14-1-606(e)(3), (e)(4), and (e)(5).

16.      Arkansas Act 174's definitions of "interest" and "foreign party" are inconsistent with the federal definitions under ITAR.

### Investigation Into Jones Eagle

17.      On December 13, 2023, the Arkansas Governor issued a press release entitled "Sanders Administration Holds China Accountable." (Dkt. No. 30-1). That press release publicly identified Jones Eagle's predecessor, Jones Digital, and another Arkansas entity and stated that the Arkansas Governor's "Administration today alerted Attorney General Tim Griffin's office of two companies that may be in violation of Act 636, which prohibits foreign-party-controlled businesses from owning Arkansas land." (Dkt. No. 30-1).

18.      In December 2023, defendant Secretary Ward sent a letter to defendant Attorney General Griffin making a referral for an investigation under Act 636 of 2023 (Dkt. No. 30-24). That letter was directed to Jones Eagle's predecessor-in-interest, stating "[a] review of Jones Digital's ownership indicates that the entity may have significant ties to China." (Dkt. No. 30-24). Defendant Secretary Ward stated, "[t]he Arkansas Department of Agriculture believes that Jones Digital LLC and potentially other similarly situated digital asset or crypto-mining operations may be operating in violation of Act 636." (Dkt. No. 30-24). Defendant Secretary Ward referred "potential violations" of Act 636 and requested that defendant Attorney General Griffin "utilize the authority granted under A.C.A. 18-11-704(c)(2) to determine if a violation of Act 636 has in fact occurred, and if so, commence appropriate legal action." (Dkt. No. 30-24).

7

19.    Defendant Secretary Ward testified that his agency wanted to announce and make public the referral of Jones Eagle to the Arkansas Attorney General; his agency was not trying to hide that referral.

20.    Defendant Secretary Ward acknowledged that his referral letter to the Arkansas Attorney General was a part of the Arkansas Governor's press release regarding the referral of Jones Eagle to the Arkansas Attorney General.

21.    Jones Eagle sought information from Defendants about the reasonable suspicion or probable cause that would show a violation of Act 636 and specifically on what Defendants relied to state that Jones Eagle "may have significant ties to China" (Dkt. Nos. 19-4; 30-4).

22.    Defendant Attorney General Griffin requested documentation from Jones Eagle to show that its parcel was less than 10 acres, as relevant to the statutory definition of "agricultural land" under Act 636 (Dkt. Nos. 19-7; 30-7).

23.    Jones Eagle voluntarily provided that proof the next day (Dkt. Nos. 19-8; 30-8). According to Mr. Chen, Jones Eagle's lease occupies around two acres of land based on a lease with its landlord (Dkt. No. 7-1, ¶ 12). Mr. Chen voluntarily provided copies of publicly available records to defendant Attorney General Griffin to show the acreage of the lease, including a third-party survey (Dkt. No. 7-1, ¶ 13). Based on that showing, Jones Eagle requested that Defendants conclude their investigation under Act 636, but Defendants refused to conclude the investigation (Dkt. Nos. 19-8; 30-8).

24.    On September 10, 2024, defendant Attorney General Griffin issued an investigative subpoena seeking documents from Jones Eagle (Dkt. Nos. 17-1; 30-9). Jones Eagle received service of the subpoena on September 24, 2024 (*Id.*). The subpoena directed a response deadline of September 25, 2024 (*Id.*). Jones Eagle sought to meet and confer with defendant Attorney

General Griffin about the scope of the investigation, but defendant Attorney General Griffin refused (Dkt. Nos. 19-10; 19-11; 30-10; 30-11).

25.     Defendant Attorney General Griffin filed a petition for citation of contempt and order to appear and show cause in Baxter County, Arkansas, Circuit Court on November 8, 2024, concerning the investigative subpoena that remains pending in Baxter County, Arkansas, state court (Dkt. No. 17-1).

26.     Jones Eagle filed this lawsuit on November 13, 2024 (Dkt. No. 1).

**Jimmy Chen**

27.     Jimmy Chen is a United States citizen currently residing in New York who was born in China, immigrated to the United States in 2003 as a child, and became a United States citizen (Dkt. Nos. 7-1, ¶¶ 2-3; 30-13).  He graduated from the University of Illinois and worked for Wal-Mart in Bentonville, Arkansas, for several years after graduating (Dkt. No. 7-1, ¶¶ 4-5).

28.     Mr. Chen is the manager of Jones Eagle and the sole owner of Eagle Asset Holding, Inc., which has a controlling interest in Jones Eagle (Dkt. No. 7-1, ¶¶ 6-7).

**Jones Eagle**

29.     Arkansas passed Act 851 known as the Arkansas Data Centers Act of 2023, Ark. Code Ann. § 14-1-601, *et seq.*, in April 2023, which aims to regulate the digital asset mining business and which Mr. Chen understood as the State of Arkansas welcoming investment in the state for crypto mining businesses.

30.     From November 1, 2023, to on or about May 20, 2024, Jones Digital, LLC, was involved in prior litigation in the United States District Court of the Eastern District of Arkansas with Arkansas County, Arkansas, and officials associated with Arkansas County, in Case No. 2:23-cv-00220-LPR, resulting in the court in that case granting, in part, and denying, in part, a motion

for temporary restraining order and preliminary injunction on November 20, 2023, and entering on May 1, 2024, an amended consent decree based on the parties' joint proposal for a consent decree. Mr. Chen testified that, after Jones Digital began operating in Arkansas County, amendments were made to ordinances that Jones Digital filed suit to challenge.

31.    On October 12, 2023, Jones Digital, LLC, entered into an Operating Agreement (Defs.' Ex. 2, JE Subpoena 183-212). Mr. Chen testified that he has no documentation reflecting ownership of Jones Digital, LLC, prior to developing the operating agreement.

32.    On December 27, 2023, Jones Digital, LLC, amended its operating agreement (Dkt. No. 30-17).

33.    According to Mr. Chen, the December 27, 2023, amended operating agreement reflects the ownership of Jones Eagle, and there are no other members of Jones Eagle other than those reflected on the document (Dkt. No. 30-17).

34.    Mr. Chen testified that, prior to this December 27, 2023, amendment, 

Mr. Chen believed at the time of this December 27, 2023, amendment that ███████████

35.    However, Mr. Chen testified that ████████████████████████████████

████████████████████████████████ Based on the December 27, 2023, operating agreement, Alpha Digital One, LLC has a ████ ownership interest in Jones Eagle; Mr. Chen's company, Eagle Asset Holding, Inc., has a ████ ownership interest in Jones Eagle; and Taoyi Maintenance, LLC, another minority member, has a ████ interest in Jones Eagle (*Id.*).

36.      ████████████████████████████████████████████████

37.      On October 4, 2024, Jones Eagle formally changed its name from Jones Digital, LLC, by a filing submitted to the Delaware Secretary of State (Dkt. No. 1, ¶ 9). Jones Eagle is a limited liability company formed under Delaware law as Jones Digital, LLC (Dkt. No. 1, ¶ 11).

38.      On March 24, 2023, Jones Eagle, through its predecessor-in-interest, entered into a commercial lease for real property in Arkansas County, Arkansas, for the purpose of engaging in the business of operating a data center, including mining digital assets such as cryptocurrency (Dkt. Nos. 1, ¶ 31; 30-44). The commercial lease included two amendments (Dkt. No. 30-44).

39.      Jones Eagle is in the business of providing crypto mining hosting services to its upstream customers (Dkt. Nos. 7-1, ¶ 27; 30-16).

40.      Jones Eagle has a written contract with ██████████ that was executed in December 2023 (Dkt. No. 30-16). ████████████████████████████████████████████
██████.

41.      ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████.

42.      According to Mr. Chen's testimony, Jones Eagle pays county, state, and federal taxes, paying over $10,000.00 monthly for the state and local taxes with federal taxes to be assessed after the first of the calendar year.

43.      Along with the lease, and among other investments for the business, Jones Eagle made construction investments, asset investments, energy construction fee sharing, and hired a general contractor to handle the construction, presenting proof of these arrangements and the payments for them (Dkt. No. 30-14).

44.     Jones Eagle is required to provide, among other things, physical space, heating and cooling, water, stable electric service, and stable internet service to its customer to ensure its customer's computers are operational, as its business model essentially entails hosting computers that are owned by the customer.

45.     Jones Eagle has a written contract with Entergy for the power capacity Jones Eagle requires and uses, which includes Jones Eagle keeping a monetary deposit with Entergy (Dkt. No. 30-15).

46.     Mr. Chen testified as to how Jones Eagle generates a profit from its customer contract and as to the anticipated profit.

47.     Mr. Chen testified that investigation into Jones Eagle related to Acts 636 and 174 has been all over the news; has impacted Jones Eagle's clients and potential clients and impacted investors and potential investors; and a lot of individuals have inquired as to the investigation.

48.     Mr. Chen maintains that enforcement of Acts 636 and 174 could threaten Jones Eagle from being able to operate and service its customers at its data center in Arkansas County, Arkansas (Dkt. No. 7-1, ¶¶ 29-30).

49.     Mr. Chen testified that Jones Eagle has no other use for the facility it leases other than as a data center.

50.     Mr. Chen testified that the investigation has caused individuals not to want to purchase Jones Eagle and the Arkansas County site or to offer a much lower than market price for Jones Eagle and the Arkansas County site, upwards of 50 to 60% less than the market price.

51.     Mr. Chen maintains that Acts 636 and 174 limit his ability to grow his business; make it harder to attract investors, customers, and other business partners; and cause loss of goodwill to an incalculable but substantial degree (Dkt. No. 7-1, ¶¶ 24-26, 31).

52.     Mr. Chen avers that Jones Eagle's relationships with its customers are critical for the company to thrive (Dkt. No. 7-1, ¶ 28).

53.     Currently, Jones Eagle contracts with a dominant customer in this market, and if Jones Eagle were required to cease operations, Jones Eagle would lose its reputation and goodwill. Jones Eagle's current contracts would be broken; existing customers would leave and not be expected to return at future sites; potential future customers would be chilled from hiring Jones Eagle; Jones Eagle's ability to expand its business would suffer; and Jones Eagle would be unable to bid on larger service contracts or to accept projects on short notice, all of which would impact Jones Eagle's reputation, goodwill, and commercial viability (Dkt. No. 7-1, ¶¶ 32-36).

## II.    Motion To Dismiss

Defendants move to dismiss Jones Eagle's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim (Dkt. No. 16). Further, Defendants assert that dismissal is warranted because the case is unripe for judicial review (*Id.*). Alternatively, Defendants seek to have the case dismissed on *Younger* abstention grounds (*Id.*). Jones Eagle responded in opposition to Defendants' motion (Dkt. No. 25). The Court examines each of Defendants' arguments for dismissal.

### A.    Legal Standard

A Rule 12(b)(6) motion tests the legal sufficiency of the claim or claims stated in the complaint. *See Peck v. Hoff*, 660 F.2d 371, 374 (8th Cir. 1981). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, the allegations pleaded must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

A court considering a motion to dismiss must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences from those facts in favor of the non-moving party. *See Farm Credit Servs. of Am., FLCA v. Haun*, 734 F.3d 800, 804 (8th Cir. 2013); *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005); *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 914 (8th Cir. 2001). However, a court need not credit conclusory allegations or "naked assertion[s] devoid of further factual enhancement." *Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768 (8th Cir. 2012) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

### B.    Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Standing doctrine includes both prudential and constitutional considerations, but "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. A party invoking federal jurisdiction must "demonstrate standing . . . for each form of relief that they seek," *Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024) (alteration in original) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)), and each claim brought, *TransUnion*, 594 U.S. at 431. As such, the burden lies with the plaintiff to establish every element of the Article III standing inquiry. *Animal Legal*

*Def. Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024) (quoting *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 720 (8th Cir. 2021)).

Where, as here, an injunction is sought:

> [T]o seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (alteration in original) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). This mirrors the requirements for Article III standing more generally. *See, e.g.*, *Becker*, 112 F.4th at 595. The Supreme Court has emphasized that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (quoting *TransUnion*, 594 U.S. at 435)). "If the risk is too speculative, Article III standing is lacking." *Id.* at 11.

When it comes to prudential standing—that is, the aspects of standing doctrine that go beyond Article III's requirements—the Eighth Circuit has expressly declined to decide whether it is a jurisdictional issue, *Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 938–39 (8th Cir. 2013), and, following the Supreme Court, seems to question the continued viability of the doctrine. *See Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). The Supreme Court has provided no clear articulation of the requirements for prudential standing, but has stated that it encompasses at least three broad principles: (1) the general prohibition on a litigant's raising another person's legal rights; (2) the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches; and (3) the requirement that a plaintiff's complaint fall within the zone

of interests protected by the law invoked. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

In the present case, Defendants argue that Jones Eagle has suffered no injury in fact because "there has been no enforcement action taken against Plaintiff" under Act 636 or Act 174 (Dkt. No. 17, at 6). Defendants emphasize that "there has been no determination as to whether Plaintiff is a 'prohibited foreign party' as defined in the statutes, and therefore, there has been no action taken by any government actor . . . to commence an action against Plaintiff for violating either act," and that "this is not a case where the plaintiff argues an intention to engage in conduct that would be prohibited" (*Id.*, at 9). Defendants liken this case to *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), in which the Supreme Court found that no injury in fact existed in a challenge to the Foreign Intelligence Surveillance Act of 1978 because the plaintiffs' belief that they would be targeted for surveillance under the Act was too speculative for Article III purposes. *Id.* at 410–20.

On the factual record before the Court at this stage, Defendants' argument is unconvincing. As Defendants themselves note, for purposes of establishing an Article III injury in fact, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (Dkt. No. 17, at 6). *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409, 414 n.5). Supreme Court and Eighth Circuit precedent make clear that "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1072 (8th Cir.), *cert. denied*, 143 S. Ct. 304 (2022) (quoting *Susan B. Anthony List*, 573 U.S. at 159). The Eighth Circuit has further emphasized that this is a

"forgiving standard" for plaintiffs. *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021)).  As such, so long as Jones Eagle's conduct is *arguably* proscribed by the challenged statutes and Jones Eagle faces a "credible threat of prosecution," it has suffered an injury in fact sufficient for constitutional purposes.

First, with respect to Act 636, it strains credulity to characterize this action as merely anticipating a future injury.  Defendant Secretary Ward publicly referred Jones Eagle to the Attorney General's Office for investigation for potential violation of Act 636, and Jones Eagle has been under public investigation by the Attorney General Griffin ever since (Dkt. Nos. 1, ¶¶ 104–09, 112–18; 30-1).  The Attorney General brought an action against Jones Eagle in Baxter County Circuit Court to enforce a subpoena issued as a part of that investigation (Dkt. No. 17-1).  The subpoena covers a wide range of sensitive business documents, including virtually any communication between anyone associated with Jones Eagle and any person or entity associated with China or a whole host of other countries (Dkt. Nos. 17-1, at 7–8; 30-9).  Under these circumstances, whether or not Jones Eagle is actually in violation of Act 636's terms, it has suffered real, concrete harm under the enforcement regime created by the statute.  Defendants' contention that being publicly singled out and subjected to a broad, indefinite government investigation backed by court-enforced subpoenas is insufficient to establish an injury in fact for Article III purposes with respect to the authorizing statute is simply irreconcilable with longstanding precedent.  Indeed, even if this action is regarded as a pre-enforcement challenge, Jones Eagle has shown that it faces a credible threat of prosecution, and the actions of Defendants sufficiently indicate that Jones Eagle's land at least arguably falls under the statute's terms— whether or not Jones Eagle is correct in arguing that the statute should not apply to it.  This is a

far cry from the speculation about potential future application of the statute in *Clapper*; Jones Eagle has been publicly targeted for investigation and subjected to a subpoena and legal proceedings. *See Clapper*, 568 U.S. at 411–14; *cf. Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (finding a sufficiently "credible threat of enforcement" if wineries disregarded a state statute prohibiting use of out-of-state ingredients). The Court finds that Jones Eagle has suffered a sufficient injury in fact so as to challenge Act 636.

Second, with respect to Act 174, ██████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ it is at least arguable that the statute applies to Jones Eagle. In any case, the threat of enforcement is far from speculative.

Further, it is Defendants who state unequivocally in this action that "violations of Act 636 may constitute violations under [Act 174] as well" and that Defendants have initiated a state court proceeding against Jones Eagle "pursuant to an investigation into . . . potential violations of Act 636 of 2023 and Act 174 of 2024" (Dkt. No. 17, at 3, 12). Given that Jones Eagle is actively under investigation for potential violations of both Act 174 and Act 636—which Defendants admit

overlaps with Act 174—and faces subpoena enforcement proceedings related to this investigation, Jones Eagle has shown that it faces a more-than-credible threat of enforcement with respect to Act 174. For these reasons, the Court finds that Jones Eagle has suffered a sufficient injury in fact so as to challenge Act 174.

Defendants make no argument that Jones Eagle fails to satisfy the other elements of the standing analysis. Jones Eagle's injury is fairly traceable to Defendants, who are responsible for enforcing the challenged statutes and have initiated an investigation and state court proceedings against Jones Eagle. Likewise, a favorable judicial decision would provide Jones Eagle with sufficient redress in the form of an injunction prohibiting enforcement of the allegedly unconstitutional statutes and a declaratory judgment that the statutes are unconstitutional. None of the prudential standing factors counsel against allowing Jones Eagle to proceed in this action. The Court therefore finds that Jones Eagle has established that it has Article III and prudential standing at this stage to seek a preliminary injunction against Defendants.

For the foregoing reasons, the Court determines at this stage of the litigation that Jones Eagle has standing to proceed with this action and seek a preliminary injunction against Defendants and that the matter is ripe for adjudication.[1]

### C.    *Younger* Abstention

A federal district court with jurisdiction "has a virtually unflagging obligation to hear and resolve questions properly before it." *FBI v. Fikre*, 601 U.S. 234, 240 (2024) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). However, in *Younger*

---

[1] For purposes of their ripeness challenge, Defendants state that "[i]n this case, the standing and ripeness issues 'essentially boil down to the same question,' so the analysis collapses together" (Dkt. No. 17, at 10 (quoting *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022))). As such, the Court finds ripeness for the reasons explained in the Court's standing analysis.

*v. Harris*, 401 U.S. 37 (1971), the Supreme Court recognized a limited exception—grounded in the principles of comity and federalism—to this general obligation for cases in which there is a "parallel, pending state criminal proceeding." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 69–70 (2013). Specifically, *Younger* held that "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it." *Younger*, 401 U.S. at 55. The Court later expanded the application of *Younger* beyond criminal proceedings to two categories of state civil proceedings: (1) civil enforcement proceedings; and (2) civil proceedings "involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," such as civil contempt orders and requirements for posting of bond pending appeal. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*"). *Younger* abstention does not apply outside these categories of cases. *Sprint*, 571 U.S. at 70.

In determining whether *Younger* applies, the Supreme Court has identified three factors that district courts should consider: (1) whether there is an "ongoing state judicial proceeding"; (2) whether the proceedings "implicate important state interests"; and (3) whether there is "an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). These are "additional" factors that are to be considered only if the case fits into one of the categories identified in *NOPSI*. *Sprint*, 571 U.S. at 81.

The Eighth Circuit has distilled the entire *Younger* analysis into a three-part inquiry:

First, does the underlying state proceeding fall within one of the three "exceptional circumstances" where *Younger* abstention is appropriate? Second, if the underlying proceeding fits within a *Younger* category, does the state proceeding satisfy what are known as the "*Middlesex*" factors? And third, even if the underlying state proceeding satisfies the first two inquiries, is abstention nevertheless inappropriate because an exception to abstention applies?

*Wassef v. Tibben*, 68 F.4th 1083, 1087 (8th Cir. 2023) (quoting *375 Slane Chapel Rd., LLC v. Stone Cnty., Mo.*, 53 F.4th 1122, 1127 (8th Cir. 2022)).

There are at least four potential "exceptions" to *Younger*. The first, outlined in *Younger* itself, is where there is a showing of "bad faith, harassment, or any other unusual circumstance that would call for equitable relief" in the state court proceeding. *Younger*, 401 U.S. at 55. Second, there is an exception for the rare circumstance in which the plaintiff does not have the opportunity to press the federal claim in the state court proceeding. *See Moore v. Sims*, 442 U.S. 415, 432 (1979) (discussing the holding of *Gerstein v. Pugh*, 420 U.S. 103 (1975)). Third, there is an "extremely narrow" exception for statutes that are "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 613–14 (8th Cir. 2018) (first quoting *Plouffe v. Ligon*, 606 F.3d 890, 894 (8th Cir. 2010); then quoting *Younger*, 401 U.S. at 53–54); *see also Wassef*, 68 F.4th at 1087 (quoting *Younger*, 401 U.S. at 53–54) (noting *Younger* exception where a criminal statute is "flagrantly and patently" unconstitutional on its face). Finally, a number of courts have recognized a fourth exception for "facially conclusive" federal preemption claims. *Minn. Living Assistance, Inc. v. Peterson*, 899 F.3d 548, 554–55 (8th Cir. 2018). Although the Eighth Circuit has declined to decide whether such an exception is a "required part of the abstention analysis," *see id.* at 554 n.5, at least three circuits apply this exception as part of their abstention analysis. *See Colonial Life & Accident Ins. Co. v. Medley*, 572 F.3d 22, 27–28 (1st Cir. 2009); *Woodfeathers, Inc. v. Washington Cnty.*, 180 F.3d 1017, 1021–22 (9th Cir. 1999); *GTE Mobilnet of Ohio v. Johnson*, 111 F.3d 469, 478 (6th Cir. 1997).

Defendants argue that the Attorney General's petition for citation of contempt and order to appear and show cause, filed in Baxter County, Arkansas, Circuit Court on November 8, 2024, falls within the category of "civil enforcement proceedings" to which *Younger* applies under *NOPSI* (Dkt. Nos. 17, at 11–12; 17-1, at 1–3). In *Sprint*, the Supreme Court emphasized that this category refers to enforcement actions that are "'akin to a criminal prosecution' in 'important respects.'" *Sprint*, 571 U.S. at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). For purposes of determining whether a civil proceeding is sufficiently "akin to a criminal prosecution," the Eighth Circuit, following *Sprint*, has pointed to three factors: (1) whether the action was commenced by the State in its sovereign capacity; (2) whether the proceeding was initiated to sanction the federal plaintiff for some wrongful act; and (3) whether there are other similarities to criminal actions, such as a preliminary investigation culminating in the filing of formal charges. *375 Slane Chapel Rd.*, 53 F.4th at 1128. Defendants argue that the Baxter County proceeding satisfies all of these factors (Dkt. No. 17, at 12).

There is no binding precedent in the Eighth Circuit as to whether a petition to enforce a subpoena filed before the initiation of formal criminal proceedings qualifies as a civil enforcement proceeding "akin to a criminal prosecution" for purposes of *Younger* abstention. On the one hand, a line of cases from the Southern District of New York holds that the issuance of investigative subpoenas by a state attorney general pursuant to an investigation into potentially illegal activities qualifies for abstention under *Younger* and *NOPSI*. *See Cuomo v. Dreamland Amusements, Inc.*, Nos. 08 Civ. 7100(JGK), 08 Civ. 6321(JGK), 2008 WL 4369270, at *9 (S.D.N.Y. Sept. 22, 2008) (quoting *J. & W. Seligman & Co. Inc. v. Spitzer*, No. 05 Civ. 7781(KMW), 2007 WL 2822208, at *5 (S.D.N.Y. Sept. 27, 2007)). The Southern District of New York has continued to use this standard even after the Supreme Court's most recent articulation of the *Younger* doctrine in *Sprint*.

*See Trump v. Vance*, 395 F. Supp. 3d 283, 295 (S.D.N.Y.), *aff'd in part, vacated in part on other grounds, remanded*, 941 F.3d 631 (2d Cir. 2019), *aff'd and remanded*, 591 U.S. 786 (2020). The Second Circuit itself has made no definitive pronouncement on the matter. *See id.*

However, the weight of authority indicates otherwise. Other circuits that have examined similar issues have concluded that mere investigations and civil investigative proceedings, including subpoenas issued before the grand jury or prosecutorial information stage, categorically do not qualify for *Younger* abstention. *See Google, Inc. v. Hood*, 822 F.3d 212, 223–24 & n.7 (5th Cir. 2016); *Guillemard–Ginorio v. Contreras–Gomez*, 585 F.3d 508, 519 (1st Cir. 2009); *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1227 (4th Cir. 1989). More to the point in this case, however, is a pair of recent Third Circuit cases holding that petitions to enforce subpoenas filed by a state in state court are not qualifying civil enforcement proceedings under *Sprint* and *NOPSI*.

In *TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230, 235–37 (3d Cir.), *cert. denied sub nom. TitleMax of Delaware, Inc. v. Vague*, 142 S. Ct. 2870 (2022), the Third Circuit found that a petition filed by the Pennsylvania Department of Banking and Securities in Pennsylvania Commonwealth Court to enforce an investigative subpoena did not qualify under *Younger* because it failed the second *Sprint* factor—it was filed to "enforce a subpoena, not to sanction TitleMax." The petition action was "'not retributive in nature' or 'imposed to punish . . . some wrongful act.'" *Id.* at 237 (alteration in original) (quoting *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 140 (3d Cir. 2014)). The Third Circuit went on to emphasize that "threat of contempt for noncompliance with an order that the state court may enter in the future is insufficient to convert the Petition Action as it currently stands into a quasi-criminal case." *Id.*

The Third Circuit expanded on its holding in *TitleMax* in *Smith & Wesson Brands, Inc. v. Attorney General of New Jersey*, 27 F.4th 886 (3d Cir. 2022). In *Smith & Wesson*, the New Jersey

Attorney General issued a subpoena seeking documents from Smith & Wesson as part of an investigation into potential violations of the New Jersey Consumer Fraud Act. *Id.* at 889. Instead of complying with the subpoena, Smith & Wesson filed a complaint in federal court alleging the subpoena violated its constitutional rights. *Id.*. The New Jersey Attorney General subsequently filed a petition in state court to enforce the subpoena, and the state court issued a show cause order and threatened Smith & Wesson with contempt. *Id.* at 890. The state court, as well as the New Jersey Supreme Court on appeal, rejected Smith & Wesson's constitutional objections and forced Smith & Wesson to produce the documents. *Id.* Smith & Wesson then amended its federal complaint to include a First Amendment retaliation claim. *Id.*

The Third Circuit found that *Younger* abstention was not appropriate. *Id.* at 893. Specifically, it found that the petition action did not fall into the *Younger* category of civil enforcement proceedings "akin to a criminal prosecution" because the second and third *Sprint* factors were not satisfied. *Id.* at 892. The petition action did not implicate the second *Sprint* factor because the subpoena enforcement action did not concern a violation of the underlying law, the New Jersey Consumer Fraud Act. *Id.*. The petition action alleged a violation of a "procedural rule" rather than a substantive duty. *Id.* Likewise, the third *Sprint* factor was not implicated because there was no "preliminary investigation culminating in the filing of a formal complaint or charges," because the state court petition did not arise from the substantive investigation but rather from the failure to comply with the subpoena. *Id.* at 892–93. The Third Circuit also emphasized that the penalties for failure to comply with a subpoena are not "self-executing; a court will impose them only after the subpoenaed party violates a court order," which, in this case, never happened. *Id.* at 893.

The Third Circuit likewise found that the subpoena enforcement action did not fall into the final *Younger* category of "orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions" because "no substantive outcome had occurred" in the form of a court order. *Id.* at 893–94. In the case at issue there was only "a possibility of contempt." *Id.* at 894–95. As such, *Younger* abstention categorically did not apply to the subpoena enforcement proceeding. Two district courts outside of the Third Circuit have adopted the reasoning in *Smith & Wesson. See Media Matters for Am. v. Bailey*, Case No. 24-cv-147 (APM), 2024 WL3924573, at *5–7 (D.D.C. Aug. 23, 2024); *Trump v. James*, Case No. 1:21-cv-1352 (BKS/CFH), 2022 WL 1718951, at *9 (N.D.N.Y. May 27, 2022).

Notably, in *Kaylor v. Fields*, 661 F.2d 1177 (8th Cir. 1981), the Eighth Circuit found that subpoenas issued by an Arkansas prosecuting attorney who was acting in place of a grand jury pursuant to Arkansas law qualified for *Younger* abstention. *Id.* at 1182. However, as the Fifth Circuit noted in *Google*, *Kaylor* is distinguishable from subpoenas issued pursuant to civil investigations because the *Kaylor* subpoenas were issued pursuant to an ongoing criminal proceeding—the prosecutor's investigation was the legal equivalent of a grand jury proceeding under Arkansas law.[2] *Google*, 822 F.2d at 224 n.7. The Fifth Circuit also emphasized that *Kaylor* was decided before the Supreme Court clearly delimited *Younger*'s scope in *Sprint*, a case which notably overturned the Eighth Circuit's hitherto more expansive application of abstention doctrine. *Id.*

---

[2] It is likewise worth noting that the prosecutorial subpoena power under Arkansas law applies specifically to criminal proceedings and is codified at Arkansas Code Annotated § 16-43-212. *See Anderson v. State*, 163 S.W.3d 333, 349–50 (Ark. 2004) (describing prosecutorial subpoena power under Arkansas law). By contrast, the subpoena power upon which Defendants rely in this case applies more broadly to civil and criminal investigations and is not tethered to the formal criminal process. *See* Ark. Code Ann. §§ 14-1-606(d); 18-11-804(c)(2); 25-16-705.

For all of these reasons, this Court determines that the Baxter County case does not fall into one of the *Younger* categories and therefore categorically does not qualify for abstention.

### D.    Conclusion On Motion To Dismiss

Based on this analysis, having considered the arguments of the parties, the Court denies Defendants' motion to dismiss (Dkt. No. 16).

### III.    Preliminary Injunction

### A.    Legal Standard

District courts in the Eighth Circuit must consider four factors in deciding whether to grant a preliminary injunction:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest.

*Wilbur-Ellis Co., LLC v. Erikson*, 103 F.4th 1352, 1355–56 (8th Cir. 2024) (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Id.* at 1356 (quoting *Home Instead*, 721 F.3d at 497). Furthermore, in the Eighth Circuit, laws passed through the democratic process are entitled to a "higher degree of deference." *Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 299 (8th Cir. 2020) (quoting *Rodgers v. Bryant*, 942 F.3d 451, 455–56 (8th Cir. 2019)). In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024) (quoting *id.*). Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *Rounds*, 530 F.3d at 732.

A preliminary injunction "is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant," here, Jones Eagle. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The Eighth Circuit has noted that a movant carries a "heavier" burden when the granting of a preliminary injunction "has the effect of awarding the movant substantially the relief it could obtain after a trial on the merits." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023). At the end of the day, however, "[a] district court has broad discretion when ruling on a request for preliminary injunction." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 669 (8th Cir. 2024) (quoting *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013)).

### B.    Likelihood Of Success On The Merits

#### 1.    Facial Versus As-Applied Challenge

Jones Eagle attacks Acts 636 and 174 both facially and as applied (Dkt. Nos. 1, ¶ 2; 7, ¶ 3). Facial challenges are "to be discouraged." *United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010) (quoting *Sabri v. United States*, 541 U.S. 600, 608–09 (2004)). This is because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008)). As such, facial challenges are "hard to win," *id.*, and indeed are "the most difficult challenge to mount successfully" against a statute. *Stephens*, 594 F.3d at 1037 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). When it comes to the legal standard to be applied, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications. So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the

challenged law must be demonstrated and the corresponding 'breadth of the remedy.'" *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010)).  To succeed on a facial challenge, a plaintiff must "establish that no set of circumstances exists under which the [law] would be valid." *Moody*, 144 S. Ct. at 2397 (alteration in original) (quoting *Salerno*, 481 U.S. at 745).  For these reasons and given the preliminary nature of the record, the Court considers only Jones Eagle's as-applied challenge to Acts 636 and 174 at this time.

### 2.    *Ex Parte Young* Analysis

The Court finds that Jones Eagle's suit is proper under the *Ex Parte Young*, 209 U.S. 123 (1908), exception to Eleventh Amendment immunity and rejects Defendants' argument on this point.  The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state.  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984).  However, there are exceptions to this rule.  Relevant here, a suit against a state official may go forward in the limited circumstances identified by the Supreme Court in *Ex Parte Young*.  Under the *Ex Parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law. In determining whether this exception applies, a court conducts "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part)).  Here, there is no dispute that the relief Jones Eagle seeks is prospective.

28

Further, to be amenable for suit challenging a particular statute, the state actor must have "some connection with the enforcement of the act." *Reprod. Health Servs. v. Nixon,* 428 F.3d 1139, 1145–46 (8th Cir.2005). Here, Jones Eagle has demonstrated a sufficient connection between Defendants and the enforcement of Acts 636 and 174 to satisfy this standard.

To the extent Defendants maintain that the Supremacy Clause alters this analysis, the Court rejects that position in reliance on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). The *Armstrong* Court observed that, based upon precedents, "in a proper case, relief may be given in a court of equity. . . to prevent an injurious act by a public officer." *Id.* (quoting *Carroll v. Safford,* 44 U.S. 441, 463 (1845)). The Court explained:

> The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England. *See Jaffe & Henderson, Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956). It is a judge-made remedy, and we have never held or even suggested that, in its application to state officers, it rests upon an implied right of action contained in the Supremacy Clause.

*Id.*

### 3.    Avoidance Of Constitutional Adjudications

Jones Eagle attacks Acts 636 and 174 as preempted by federal law and as violative of the Equal Protection Clause, the Fourteenth Amendment Due Process Clause, the Commerce Clause, and the Takings Clause of the United States Constitution (Dkt. No. 1, ¶¶ 2–8, 147–205). The allegations also seem to hint at a Fourth Amendment claim (*See* Dkt. Nos. 1, ¶¶ 6, 66–68, 95–99, 168; 8, at 25–26; 27, at 38–39). Although the constitutional issues presented in this case are serious, the Court notes that the Supreme Court has "'often stressed' that it is 'importan[t to] avoi[d] the premature adjudication of constitutional questions.'" *Matal v. Tam*, 582 U.S. 218, 230–31 (2017) (alterations in original) (quoting *Clinton v. Jones*, 520 U.S. 681, 690 (1997)). Thus,

federal courts "ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Id.* at 231 (alteration in original) (quoting *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)); *see also Clinton*, 520 U.S. at 690, n.11 (noting that this requirement applies to the "entire Federal Judiciary" and listing cases in footnote). The Supreme Court has further stated that, although "basically constitutional in nature" because they "deriv[e their] force from the operation of the Supremacy Clause," federal preemption claims are "'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Prod., Inc.*, 431 U.S. 265, 272, n.6 (1977); *see also North Dakota v. Heydinger*, 825 F.3d 912, 927 (8th Cir. 2016) (Colloton, J., concurring in the judgment); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 971, n.5 (9th Cir. 2017); *Colo. Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States*, 693 F.3d 1214, 1222 (10th Cir. 2012); *C.E.R. 1988, Inc. v. Aetna Casualty & Surety Co.*, 386 F.3d 263, 272 n.13 (3d Cir. 2004). The Court will therefore examine Jones Eagle's federal preemption claims first as a threshold issue before turning to its constitutional claims.

### 4.    Foreign Affairs Preemption

Two fundamental constitutional issues underlie the federal preemption issues presented in this case. The first is the Supremacy Clause of Article VI, which undergirds federal preemption doctrine generally. It provides that the "Constitution," "Laws," and "Treaties" of the United States "shall be the supreme Law of the Land . . . any thing in the Constitution or Laws of any State notwithstanding." U.S. Const. art. VI, cl. 2. As such, under federal preemption doctrine, any "state law that conflicts with federal law is 'without effect,'" whether that conflict be express or implied. *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). In this regard, "'[t]he purpose of

Congress is the ultimate touchstone' of pre-emption analysis." *Id.* (alteration in original) (quoting

*Cipollone*, 505 U.S. at 516). The moving party has the burden of showing preemption. *Pharm.*

*Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967 (8th Cir. 2021).[3]

The second issue is the exclusive authority over foreign affairs that the Constitution vests

in the federal government, evinced in an array of constitutional provisions. *See* U.S. Const. art. I,

§ 8, cl. 3 (power to regulate foreign commerce); *id.* cl. 4 (power over naturalization); *id.* cl. 10

(power to define offenses against the law of nations); *id.* cl. 11 (power to declare war); *id.* § 10

(placing various restrictions on state actions that implicate foreign affairs); *id.* art. II, § 2, cl. 2

(power to negotiate treaties, appoint ambassadors, ministers, and consuls). The Supreme Court

accordingly has long recognized that "[n]o State can rewrite our foreign policy to conform to its

own domestic policies. Power over external affairs is not shared by the States; it is vested in the

national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). "[F]or

national purposes, embracing our relations with foreign nations, we are but one people, one nation,

one power." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) (quoting *Ping v. United States*, 130 U.S.

581, 606 (1889)). The legal implications of this federal exclusivity are straightforward. In the

words of the Supreme Court, "[o]ur system of government . . . imperatively requires that federal

power in the field affecting foreign relations be left entirely free from local interference." *Id.*

"[C]omplete power over international affairs is in the national government and is not and cannot

be subject to any curtailment or interference on the part of the several states." *Am. Ins. Ass'n v.*

*Garamendi*, 539 U.S. 396, 418 (2003) (alteration in original) (quoting *United States v. Belmont*,

301 U.S. 324, 331 (1937)). The Founders themselves were emphatic on this point. *See Nat'l*

---

[3] Defendants make the offhanded observation that "the Supremacy Clause does not provide
a cause of action" (Dkt. No. 24, at 31). As noted above, Jones Eagle brings its claims pursuant to
*Ex Parte Young*, not an implied right of action under the Supremacy Clause.

*Foreign Trade Council v. Natsios*, 181 F.3d 38, 49 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (quoting *The Federalist* Nos. 22, 42, and 45); *Hines*, 312 U.S. at 63 n.11 (quoting Thomas Jefferson).

At the intersection of these two constitutional issues is the foreign affairs doctrine. "Under the foreign affairs doctrine, state laws that intrude on this exclusively federal power are preempted." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 213 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023) (quoting *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012)); *see Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016). This may occur through either conflict preemption or field preemption. *Mayor & City Council of Baltimore*, 31 F.4th at 213; *Gingery*, 831 F.3d at 1228; *A.O.A. v. Rennert*, Case No. 4:11-cv-44-CDP, 2023 WL 346001, at *28 (E.D. Mo. Jan. 20, 2023), *aff'd sub nom. Reid v. Doe Run Res. Corp.*, 110 F.4th 1049 (8th Cir. 2024). Jones Eagle argues that Acts 636 and 174 fall afoul of both foreign affairs conflict preemption and field preemption (Dkt. No. 27, at 8–19).[4] The Court will examine each in turn.

### a.    Conflict Preemption

Foreign affairs conflict preemption occurs when there is a "'sufficiently clear conflict' between the state law and an express foreign policy" of the federal government. *Mayor & City Council of Baltimore*, 31 F.4th at 213 (quoting *Garamendi*, 539 U.S. at 420–24); *Gingery*, 831 F.3d at 1229 ("[A] state action must yield to federal executive authority where 'there is clear evidence of conflict between the policies adopted by the two.'") (quoting *Garamendi*, 539 U.S. at

---

[4] Although Jones Eagle does not invoke the foreign affairs doctrine by name, its conflict and field preemption arguments rely almost entirely on the body of Supreme Court case law associated with the doctrine (*See* Dkt. Nos. 8, at 27–36; 27, at 4–19). The Court therefore examines the preemption issues raised by Jones Eagle under the rubric of the foreign affairs doctrine.

421); *Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1, 11 (1st Cir. 2010) (noting the Supreme Court's holding in *Garamendi*). Notably for present purposes, such conflicts may occur when the basic policy objectives of the state and federal regimes are the same. As the Supreme Court emphasized in *Garamendi*, "the fact of a common end hardly neutralizes conflicting means." *Garamendi*, 539 U.S. at 399; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000). Simply put, where state and federal policy differ in their "means," the state policy inevitably compromises the federal government's ability to "to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 381.

Jones Eagle points to the comprehensive and complex federal regulatory regime governing foreign investment evinced in support of its conflict preemption arguments. Jones Eagle argues that Acts 636 and 174 conflict with at least two sets of federal regulations in this regard. First, there is the regime for screening foreign investment transactions associated with the interagency Committee on Foreign Investment in the United States ("CFIUS"), as statutorily codified by the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. 115-232, 132 Stat. 2174, and the Office of Foreign Assets Control of the United States Department of the Treasury (Dkt. No. 8, at 27–34). Second, Jones Eagle argues that the classifications made by Acts 636 and 174 also conflict with the statutory definitions of foreign ownership and foreign control set forth in the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 120.1 *et seq.*, issued by the United States Department of State pursuant to the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. § 2278, *et seq.*, and by the President of the United States through executive order, Executive Order Number 13637, 78 Fed. Reg. 16129 (*Id.*, at 34).

The Court turns first to FIRRMA. FIRRMA's regulatory regime subjects a wide array of private business transactions involving "foreign persons" to national security review,

investigation, and approval or disapproval at the discretion of the President, acting through CFIUS. 50 U.S.C. § 4565. Among these, the CFIUS regime specifically covers "the purchase or lease by, or a concession to, a foreign person of private or public real estate" that is sensitive for national security reasons with respect to federal installations, facilities, or properties. *Id.* § 4565(a)(4)(B)(ii). Real estate transactions in urbanized areas and involving single housing units are specifically exempted from review. *Id.* § 4565(a)(4)(C)(i).

Arkansas law takes a different view as to what sort of foreign investment ought to be prohibited. Act 636 provides that "prohibited foreign parties"—defined to include, among others, any citizen, resident, or entity of a country subject to ITAR, Arkansas Code Annotated § 18-11-802(5)—shall not acquire "any interest in agricultural land in this state." Ark. Code Ann. § 18-11-804. Act 174 provides that "prohibited foreign parties" shall not acquire or hold by grant "any interest in a digital asset mining business in this state." Ark. Code Ann. § 14-1-606. Acts 636 and 174 thus appear on their face to conflict with FIRRMA's comprehensive regulatory scheme for security review of foreign investment. Not only do Acts 636 and 174 infringe upon Congress's carefully considered calibration as to when foreign ownership interests in American real estate and businesses ought or ought not to be subject to scrutiny, they also purport to deprive the President of the discretion to approve or deny specific foreign investments based on the criteria that Congress judged to be relevant in making such determinations—the very discretion which lies at the heart of the CFIUS regime. Arkansas's blanket ban on certain categories of foreign ownership in Acts 636 and 174 thus clearly conflicts with the cautious, transaction-specific approach taken by Congress to foreign investment in FIRRMA.

Beyond the conflict in their regulatory approaches, Acts 636 and 174 also conflict with FIRRMA's regime in terms of how they define foreign ownership. FIRRMA subjects to review

transactions involving the acquisition of certain interests by "foreign persons." A "foreign person" is defined as: "(1) Any foreign national, foreign government, or foreign entity; or (2) Any entity over which control is exercised or exercisable by a foreign national, foreign government, or foreign entity." 31 C.F.R . § 800.224. By contrast, a "prohibited foreign party" under Acts 636 and 174 would include by their terms a United States citizen who is a resident of an ITAR country, such as, for instance, an American citizen who is a resident of Hong Kong or Cyprus. Ark. Code Ann. §§ 14-1-606, 18-11-802. The foreign investment restrictions of FIRRMA and Acts 636 and 174 are thus in conflict both in terms of what investments they prohibit and to whom their prohibitions apply. Even leaving aside the fact that Congress has deliberately chosen not to subject the categories of foreign investment prohibited by Acts 636 and 174 to special scrutiny, it is not hard to imagine a scenario in which a foreign investment transaction specifically approved by the President through the CFIUS review process would nevertheless run afoul of Act 636 or Act 174, rendering the President's express approval nugatory.[5] This would conflict with federal foreign affairs policy—and the same conflict occurs here, where the foreign investment regime carefully crafted by Congress and the President has deliberately excluded the sorts of transactions and interests at issue in this case from even the possibility of heightened security review. *See Yifan Shen, et al. v. Comm'r, Fla. Dep't of Agric., et al.*, Case No. 23-12737, 2024 U.S. App. LEXIS 2346 (11th Cir. Feb. 1, 2024) (enjoining pending appeal Florida's restrictions on real estate ownership by Chinese domiciliaries on grounds of FIRRMA preemption).

ITAR adds another wrinkle to the regulatory puzzle, given that Acts 636 and 174 piggyback off its list of countries for which the United States has a policy "to deny licenses and other

---

[5] This could happen, for instance, if the President were to approve after CFIUS review the purchase of Arkansas farmland (or a digital asset mining business) adjacent to a military facility by a "prohibited foreign party" under Act 636 or Act 174.

approvals for exports and imports of defense articles and defense services, destined for or originating in certain countries." 22 C.F.R. § 126.1. The ITAR list of countries has no apparent legal import for federal policy outside of this specific defense export-control context. Acts 636 and 174's attempt to expand the list of prohibitions against these countries is thus plainly in conflict with the determination of Congress and the State Department as to the breadth and depth of restrictions to be placed upon them. Even were this not the case, as Jones Eagle points out (Dkt. No. 7, at 14), the requisite levels of foreign ownership and control that trigger Acts 636 and 174 conflict with the relevant thresholds for foreign ownership and foreign control employed by the State Department for ITAR purposes. *Compare* Ark. Code Ann. §§ 18-11-110(a), 803(a), 14-1-606(a), *with* 22 C.F.R. § 120.65. This, of course, is entirely aside from the abovementioned conflict between the State Department's definition of "foreign person" for ITAR purposes and Acts 636 and 174's definitions of "prohibited foreign party."

To add one final layer of conflict to this regulatory maze, Act 636 and Act 174 do not even employ consistent definitions of "prohibited foreign party," since the definition in Act 636 is pegged to 22 C.F.R. § 126.1, whereas Act 174's definition is pegged to 22 C.F.R. § 126.1 "as existing on January 1, 2024." *Compare* Ark. Code Ann. § 18-11-802(5) *with* § 14-1-606(a)(2). Thus, a situation could easily arise where the list of countries to which ITAR (and Act 636) applies differs from the list of countries to which Act 174 applies. In any case, on the record before the Court, no aspect of Jones Eagle's business runs afoul of ITAR, so Act 636 and Act 174's imposition of restrictions on Jones Eagle based upon a tenuous link with an ITAR country is plainly in conflict with federal policy as to the purpose and scope of the ITAR list and its associated restrictions.

In the face of these rather straightforward conflicts between federal policy and Acts 636 and 174, Defendants point to general presumption against preemption where states are legislating in areas within their "historic police powers." *Pharm. Rsch. & Mfrs.*, 95 F.4th at 1140. However, Defendants fail to note that, on the contrary, "when Congress legislates in an area of foreign relations, there is a strong presumption that it intended to preempt the field, in particular where the federal legislation does not touch on a traditional area of state concern." *Natsios*, 181 F.3d at 76; *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 740 (N.D. Ill. 2007) (accord). Indeed, even in areas traditionally regulated by the state, the Supreme Court has indicated that "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption." *Garamendi*, 539 U.S. at 419 n.11 (alteration in original) (quoting *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507–508 (1988)). This is particularly the case where the state regulation targets specific foreign countries. *See id.* at 399 (noting the "weakness of the State's interest, when evaluated in terms of traditional state legislative subject matter, in regulating disclosure of European Holocaust-era insurance policies"). Even in areas at the core of state police power, "regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Zschernig v. Miller*, 389 U.S. 429, 441 (1968).

Even assuming that both Act 636 and Act 174 lie within the scope of Arkansas's "historic police powers," the Supreme Court's decision in *Zschernig* is controlling here. In that case, the Court dealt with an Oregon statute providing for escheat in cases where a nonresident alien claimed real or personal property unless three requirements were satisfied:

> (1) the existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of the foreign country; (2) the right of United States citizens to receive payment here of funds from estates in the foreign country; and (3) the right of the foreign heirs to receive the proceeds of Oregon estates "without confiscation."

*Id.* at 430. The Court found the statute was preempted despite the fact that "[t]he several States, of course, have traditionally regulated the descent and distribution of estates," *id.* at 440, and that the Solicitor General of the United States, acting as *amicus curiae*, "d[id] not contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States' conduct of foreign relations." *Id.* at 434. The statute was preempted, even in the absence of a conflicting treaty or statute, *see id.* at 441, because it "affect[ed] international relations in a persistent and subtle way" by inviting Oregon courts to scrutinize foreign regimes in its application. *Id.* at 435–40. The Supreme Court found that this carried "more than 'some incidental or indirect effect in foreign countries'" for purposes of foreign affairs field preemption. *Id.* at 434. The reasoning of *Zschernig* applies even more strongly in this case, where Acts 636 and 174 go so far as to target specific foreign countries for economic restrictions and conflict with the express foreign policy of the federal government as represented by the FIRRMA and ITAR regimes.

For these reasons, the Court finds that Jones Eagle is likely to prevail on its conflict preemption claim with respect to both Acts 636 and 174.

### b.    Field Preemption

Foreign affairs field preemption applies when a "state law or policy 'disturb[s] foreign relations' or if a State attempts to 'establish its own foreign policy.'" *Mayor & City Council of Baltimore*, 31 F.4th at 213 (quoting *Zschernig*, 389 U.S. at 441); *A.O.A.*, 23 WL at \*28 (accord). This occurs when two elements are met: (1) the "real purpose" of the state policy at issue does not concern an area of traditional state responsibility; and (2) it intrudes on the federal government's foreign affairs power. *Gingery*, 831 F.3d at 1229 (quoting *Movsesian*, 670 F.3d at 1229). The fundamental question with respect to the second element is whether "the state law 'has more than

38

some incidental or indirect effect in foreign countries.'" *Mayor & City Council of Balt.*, 31 F.4th at 213 (alteration in original) (quoting *Zschernig*, 389 U.S. at 434); *A.O.A.*, 23 WL at *28 (accord). There need not be any showing of conflict between state and federal policy in this regard. *Kyocera Document Sols. Am., Inc. v. Div. of Admin.*, 708 F. Supp. 3d 531, 545 (D.N.J. 2023) (quoting *Zschernig*, 389 U.S. at 418).

For the reasons stated above in its analysis of Jones Eagle's conflict preemption claim, the Court also finds that Jones Eagle is likely to succeed on its field preemption claim under the foreign affairs doctrine with respect to both Acts 636 and 174. *See Crosby*, 530 U.S. at 387–88 (affirming injunction against Massachusetts's Burma Act); *Shen*, 2024 U.S. App. LEXIS at *3 (enjoining pending appeal Florida's restrictions on real estate ownership by Chinese domiciliaries); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) (affirming injunction against Florida's Cuba Amendment); *Kyocera*, 708 F. Supp. 3d at 561 (enjoining New Jersey's Russia Act); *Alario v. Knudsen*, 704 F. Supp. 3d 1061, 1088 (D. Mont. 2023) (enjoining Montana's TikTok ban); *Giannoulias*, 523 F. Supp. 2d at 750–51 (enjoining Illinois's Sudan Act).

### 5.    Constitutional Claims

Because the Court determines that Jones Eagle is likely to prevail on its federal preemption claims, the Court, in accordance with the long-established judicial policy of avoiding premature adjudication of constitutional claims, declines to make any ruling on Jones Eagle's other constitutional claims at this time. The Court notes, however, that, on the limited record before it, Jones Eagle has the better of the argument with respect to all of its remaining claims.

For these reasons, the Court finds as a threshold matter that Jones Eagle is likely to succeed on the merits of its as-applied challenge to Acts 636 and 174. The Court now turns to the other preliminary injunction factors.

### C.      Irreparable Harm

To be entitled to a preliminary injunction, the movant must show it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Thus, "[s]peculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) ("[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.") (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996))). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024). Jones Eagle "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) (quoting *Winter*, 555 U.S. at 22). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

Jones Eagle has been publicly targeted by name and subjected to investigation by Defendants for almost a year. Jones Eagle faces irreparable harm from the public investigation and threatened enforcement actions under Acts 636 and 174 in the form of damage to reputation and goodwill. *See Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789–90 (8th Cir.

2010) (finding loss of goodwill among customers sufficient to establish a threat of irreparable harm) (citing *Med. Shoppe Int'l, Inc. v. S.B.S. Bill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003)). Moreover, Jones Eagle and Mr. Chen risk imprisonment, fines, and judicial foreclosure. Jones Eagle has shown that it is likely to sustain irreparable harm absent entry of the preliminary injunction.

Defendants claim that Jones Eagle "delay[ed] in filing" its lawsuit, undermining evidence of irreparable harm (Dkt. No. 24, at 36 (citing *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977))). The Court finds persuasive Jones Eagle's argument that it attempted cooperation with Defendants and that the public investigation recently escalated through a "burst of prosecutorial alacrity." *See Netflix, Inc. v. Babin*, 88 F.4th 1080, 1092 (5th Cir. 2023) (finding "inflection point" of assertions of constitutional rights "difficult to overlook"). The injuries to goodwill and reputational harms associated with prolonged investigation and potential enforcement actions are irreparable injuries. For all of these reasons, Jones Eagle has shown it is likely to sustain irreparable harm absent entry of a preliminary injunction.

### D. Balance Of Harms

This Court "has broad discretion when ruling on a request for preliminary injunction" to balance the four factors to achieve the most equitable result. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1035 (8th Cir. 2016) (quoting *Novus Franchising*, 725 F.3d at 893). Compared to the likely prospect of irreparable harm to Jones Eagle, Defendants will sustain no appreciable harm by entry of a preliminary injunction. Given the Court's preemption analysis, the Court determines Jones Eagle is likely to prevail on its argument that Defendants have no interest in regulating matters of foreign affairs. To the extent Defendants argue that "the State's presumptively reasoned democratic processes" "are entitled to a higher

degree of deference and should not enjoined lightly," (Dkt. No. 24, at 37), the Court agrees with Jones Eagle that this interest is what is protected by the requirement of *Rounds* that Jones Eagle show it is likely to succeed on the merits of this dispute. The balance of the equities factor favors Jones Eagle.

### E.  Public Interest

Defendants are correct that the Court should preserve the status quo. Entry of the preliminary injunction does that by preserving "the relative positions of the parties." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Allowing the temporary restraining order to expire would upend the status quo by allowing Defendants to commence enforcement activities when Defendants have no constitutional interest in regulating matters of foreign affairs, foreign relations, or national security. The public interest factor weighs in favor of Jones Eagle.

### F.  Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, Defendants have neither requested security in the event this Court grants a preliminary injunction nor presented any evidence that Defendants will be financially harmed if they are wrongfully enjoined. For these reasons, the Court declines to require security from Jones Eagle.

### G.  Conclusion On Motion For Preliminary Injunction

For the foregoing reasons, the Court grants Jones Eagle's motion for preliminary injunction (Dkt. No. 7) and enjoins defendant Secretary Ward and defendant Attorney General Griffin, and

all those acting in concert with them, from enforcing any provision of Act 636 or Act 174 against Jones Eagle until further Order from this Court.

## IV.     Severability

Given this Court's analysis and the statutory scheme of Act 636 and Act 174, severability is not appropriate.

## V.     Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss (Dkt. No. 16). The Court grants Jones Eagle's motion for preliminary injunction (Dkt. No. 7) and enjoins defendant Secretary Ward and defendant Attorney General Griffin, and all those acting in concert with them, from enforcing any provision of Act 636 or Act 174 against Jones Eagle until further Order from this Court.

It is so ordered this 9th day of December, 2024.

Kristine G. Baker
Chief United States District Judge