**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**JONES EAGLE, LLC *f/k/a* JONES DIGITAL, LLC** — **PLAINTIFF**

**CASE NO.: 4:24-CV-00990-KGB**

**WES WARD, in his official capacity as the Secretary of the Arkansas Department of Agriculture; TIM GRIFFIN in his official capacity as the Attorney General of Arkansas; and STATE OF ARKANSAS** — **DEFENDANT**

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jones Eagle's response does not identify a single genuine dispute of material fact. Instead, it attempts to recharacterize settled legal standards as fact-intensive inquiries and to transform disagreement with lawful regulation, investigation, or enforcement into constitutional injury. That approach misapprehends both Rule 56 and the governing law. As Defendants explained in their opening summary-judgment briefing, Jones Eagle's claims fail as a matter of law under every theory advanced. ECF 176. The challenged statutes are not facially discriminatory, were not enacted or enforced with discriminatory purpose, and do not regulate interstate commerce. Jones Eagle has suffered no deprivation sufficient to support a due-process or takings claim, and sovereign immunity independently bars Jones Eagle's effort to obtain relief against the State. Nor has Jones Eagle shown any basis for federal preemption, conflict, or field displacement of traditional state authority. Because Jones Eagle bears the burden of proof and has failed to produce evidence creating a triable issue on any essential element of its claims, Defendants are entitled to judgment as a matter of law.

## ARGUMENT

### I. JONES EAGLE FAILS TO OFFER DISPUTED MATERIALS FACTS THAT WOULD WARRANT DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON JONES EAGLE'S EQUAL PROTECTION CLAIM

**A. Jones Eagle fails to establish any facial discrimination triggering strict scrutiny**

Jones Eagle's threshold equal-protection argument rests on the assertion that Acts 636 and 174 facially discriminate in a manner that triggers strict scrutiny. That assertion fails at the outset—not because of factual disputes, but because Jones Eagle's own description of the statutes forecloses strict scrutiny as a matter of law.

To begin, Jones Eagle effectively concedes that neither Act classifies on the basis of race or national origin. Instead, Jones Eagle describes Act 636 as targeting a limited group tied to specified foreign jurisdictions through regulatory criteria. *See* ECF 197, at 5. Jones Eagle repeatedly emphasizes that the Acts do not apply to "all aliens," but rather to a particular subset defined by connections to ITAR-listed countries. Id. This concession is dispositive as to the applicable standard of review.

Jones Eagle goes further, expressly arguing that Act 636 "discriminate[s] against a sub-class of aliens based on their status as aliens." Id. (emphasis added). That admission is fatal to Jones Eagle's effort to invoke strict scrutiny. Classifications affecting only certain categories of non-citizens—rather than resident aliens as a class—are not subject to strict scrutiny and are instead reviewed under rational-basis scrutiny. *Foley v. Connelie*, 435 U.S. 291, 294 (1978); *see also Shen*, 158 F.4th at 1254–55 (quoting *LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005) (The Supreme Court "has applied strict scrutiny to 'invalidate state laws affecting resident aliens or permanent resident aliens,' but it 'has never applied strict scrutiny to a state law affecting any other

alienage classification.'"). Jones Eagle does not meaningfully engage with these controlling cases, nor does it grapple with the Eleventh Circuit's recent decision in *Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, which applied rational-basis review to a materially similar statutory scheme. Instead, Jones Eagle simply skips past the standard-of-review analysis and announces that strict scrutiny applies. That leap is unsupported and legally incorrect.

This failure matters. The level of scrutiny is not a rhetorical choice; it is the central legal question governing Jones Eagle's claim. Because rational-basis review applies, Jones Eagle—not the State—bears the burden of demonstrating that the Acts are not rationally related to any legitimate governmental interest. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Jones Eagle does not carry this burden. It does not meaningfully confront the General Assembly's stated legislative purposes, which were enacted by overwhelming majorities and are facially legitimate. Instead, Jones Eagle dismisses those interests as "plainly overbroad." But even assuming overbreadth, that allegation does not defeat rational-basis review. An "overbroad" statute may still survive rational-basis scrutiny so long as the classification is plausibly related to a legitimate governmental purpose. *See Gallagher v. City of Clayton*, 699 F.3d 1013 (8th Cir. 2012) (quoting *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (""Even if a classification is to some extent both underinclusive and overinclusive, and hence the line drawn imperfect, it is nevertheless the rule that perfection is by no means required." (cleaned up)).

Jones Eagle's failure is thus not evidentiary but legal. Having conceded the nature of the classification, Jones Eagle cannot evade rational-basis review—and having refused to engage with that standard, it necessarily fails to establish any facial equal protection violation.

Finally, Jones Eagle's reliance on cases applying strict scrutiny to alienage classifications is misplaced for an additional, independent reason: every Supreme Court case applying strict scrutiny has involved resident aliens. *See Nyquist v. Mauclet*, 432 U.S. 1, 12 (1977) ("Resident aliens are obligated to pay their full share of the taxes that support the assistance programs. There thus is no real unfairness in allowing resident aliens an equal right to participate in programs to which they contribute on an equal basis. And although an alien may be barred from full involvement in the political arena, he may play a role perhaps even a leadership role in other areas of import to the community. The State surely is not harmed by providing resident aliens the same educational opportunity it offers to others."). Courts have consistently declined to extend strict scrutiny beyond that context. *See also Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227 (11th Cir. 2025) (distinguishing Supreme Court precedent and declining to apply strict scrutiny to an alienage classification because it applied to non-resident aliens).

In short, Jones Eagle's own framing of the statutes forecloses strict scrutiny, triggers rational-basis review, and leaves Jones Eagle with a burden it has not even attempted to satisfy.

### B. Jones Eagle fails to create a genuine dispute of material fact as to discriminatory purpose.

Jones Eagle's effort to establish discriminatory purpose fares no better than its facial-discrimination argument. While Jones Eagle now attempts to invoke the *Village of Arlington Heights* framework, it does so in a way that misunderstands both the governing legal standards and its evidentiary burden. None of Jones Eagle's proffered evidence—whether viewed individually or cumulatively—creates a genuine dispute of material fact sufficient to survive summary judgment.

#### *1. Jones Eagle misstates the summary-judgment standard for Equal Protection claims*

Jones Eagle begins by asserting that summary judgment is "rare" in Equal Protection cases because discriminatory purpose is a "fact-intensive inquiry." That framing is incorrect and misleading. The case Jones Eagle cites actually states the opposite of what Jones Eagle claims: "summary judgment is rarely granted in *Plaintiff's* favor in cases where the issue is a defendant's racial motivation." *Hunt v. Cromartie*, 526 U.S. 541, 553 n.9 (1999) (emphasis added). Jones Eagle not only misquotes the case, but flips its holding.

*Hunt* underscores precisely why Jones Eagle's claim fails here. Discriminatory purpose is an extraordinarily high burden. It cannot be established through vague references to post-enactment conduct, statements by non-legislative actors, selective excerpts of legislative debate, or speculation about motive. Jones Eagle's evidence—at best—falls squarely within those impermissible categories.

*2. Jones Eagle cannot overcome the presumption of legislative good faith*

Jones Eagle next contends that the Arkansas General Assembly is not entitled to a presumption of good faith outside the redistricting context. That argument is contrary to binding Eighth Circuit precedent.

Courts in this Circuit routinely apply a presumption of good faith to legislative enactments in Equal Protection cases. *See Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 899 (8th Cir. 2020) ("The amended complaint alleged Equal Protection violations based on racial discrimination. Because state officials are presumed to act in good faith, the plaintiff has the burden of establishing the presence of discrimination."); *Walls v. Sanders*, 760 F. Supp. 3d 766, 798 (E.D. Ark. 2024) ("Plausibly alleging a discriminatory intent or purpose on the part of democratically elected

lawmakers is not a trifling thing—especially in light of the presumption of good faith to which such lawmakers are entitled.").

The burden therefore rests squarely on Jones Eagle. As the Eighth Circuit has explained, "[t]he good faith of [state] officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party." *Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (quoting *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 353 (1918)). And "[w]ithout more, 'opprobrious epithets' like 'willful' and 'malicious' and characterizations of an officer's conduct 'as an unequal, unjust, and oppressive administration of the laws' are not enough." *Id.* (quoting *Snowden v. Hughes*, 321 U.S. 1, 10 (1944)). Jones Eagle's purported "factual disputes" fall well short of this standard. They do not rebut the presumption of good faith, and they do not create a triable issue for a jury.

*3. Jones Eagle's claimed admissions of discriminatory pretext are false*

Jones Eagle again asserts that Defendants have "admitted" to pretextual and discriminatory investigations. That claim is patently false. As Defendants have explained in other briefing, Defendants have denied this legal allegation throughout this case, and Jones Eagle attempts to ignore all surrounding context and opt for relying on a clear scriveners' error in Defendants' answer. *See* ECF 198, at 2-3. Defendants denied this verbatim statement in every other portion of the Complaint it is mentioned. *See* ECF 41, at 3 (denying ¶ 36 of Plaintiff's Complaint that is identical to ¶ 121 of Plaintiff's Complaint); *id.* at 17 (denying ¶ 123 of Plaintiff's Complaint that mentions an alleged "pretextual investigation" again); *id.* at 23 (denying ¶ 151 of Plaintiff's Complaint that is identical to ¶ 121 of Plaintiff's Complaint). In addition to the denial in its original Answer, Defendants' actions in this case make clear their denial that any investigation was

pretextual or discriminatory. The parties have engaged in contentious discovery. The parties have been deeply adversarial, and the issues have been heavily disputed through motion practice. Defendants have aggressively defended their actions under Act 636. *See*, *e.g.*, Dkt. No. 24, at 22-24; Dkt. No. 176, at 18-45; Dkt. No. 177, at 9-14. Therefore, there is no admission in this case, and if Jones Eagle truly believed there was, the parties would not have continued through extensive discovery and summary judgment briefing.

*4. Jones Eagle's* Alington Heights *analysis fails at every factor*

For the first time in this case, Jones Eagle purports to walk through the *Arlington Heights* factors. That effort does not cure its deficiencies.

***Impact of the Official Action.*** Jones Eagle still offers no statistical evidence of disparate impact. Instead, it relies on the same four Act 636 investigations and attempts to conflate disparate impact with discriminatory enforcement. These are analytically distinct inquiries. Evidence that might be relevant to enforcement (which it is not) does not establish that the law *as written* disparately impacts a protected class.

Jones Eagle's reliance on an internal text-message thread concerning a single entity fares no better. Disparate impact requires more than one entity, and more than anecdote. Any dispute as to whether those text messages accurately reflect what occurred or what motivated an investigation is not material because (1) Act 636 was never enforced against 4811 S. Zero Street, which continues to operate freely in Arkansas, and (2) even if the opposite were true, one entity cannot serve as the basis for a disparate-impact claim. *See Shen*, 158 F.4th at 1257 (quoting *Hallmark Devs., Inc. v. Fulton County*, 466 F.3d 1276, 1286 (11th Cir. 2006)) (the inquiry for disparate impact is "into the impact on the total group to which a policy or decision applies").

Jones Eagle again admits that the statute lists "ITAR lists countries other than China," yet attempts to prove disparate impact through allegations about enforcement. That is not how disparate impact is determined. *See Hallmark Devs.*, 466 F.3d at 1286 ("Typically, a disparate impact is demonstrated by statistics."). Just like the Jones Eagles in *Shen*, Jones Eagle fails to show that persons of Asian descent are disproportionately impacted as to the community as a whole. *See Shen*, 158 F.4th at 1259 ("The Plaintiff assume that any impact on those domiciled in China must also impact those of Chinese national origin, but they have not offered any evidence to back up that assumption, and speculation is no substitute for evidence.").

***Historical Background.*** Jones Eagle relies almost exclusively on Dr. Jay Barth's expert report to claim that Arkansas, as a state, has a history of discrimination against Asian Americans. ECF 197, at 12. To reach that conclusion, Jones Eagle points to legislation passed by the General Assembly more than a century ago and *federal* concentration camps located in Arkansas during World War II.

This argument collapses under its own weight. Jones Eagle concedes that Arkansas's Alien Land Act was enjoined just two years after its passage by the Arkansas Supreme Court, and that subsequent attempts at similar legislation failed or were quickly repealed. Even setting the admissibility aside, the evidence is far too attenuated to be relevant.

Arlington Heights contemplates historical evidence that is proximate and connected to the challenged decision, not isolated events from decades—or centuries—earlier. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). No case has ever inferred discriminatory legislative intent from such remote historical material. Any alleged dispute on this point is therefore immaterial.

As explained in Defendants' summary-judgment briefing, the relevant historical background here is exactly what the General Assembly stated: food-security concerns driven by annual reports on foreign land ownership (Act 636), and concrete concerns about unregulated crypto-mining operations in Arkansas (Act 174).

***Sequence of Events.*** Jones Eagle next invokes the "sequence of events" factor, which examines "[t]he specific sequence of events leading up to the challenged decision." *Arlington Heights*, 429 U.S. at 267. But Jones Eagle points only to events that occurred *after* the passage and effective date of Act 636—internal communications within the Attorney General's Office, post-enactment investigations, and litigation involving Jones Digital.

Post-enactment conduct cannot illuminate the intent of legislators who voted months earlier. Nor does Jones Eagle meaningfully address Act 174 at all, instead lumping the two Acts together as if no distinction matters. As Defendants have explained throughout this litigation, that distinction is critical. Discriminatory purpose must be shown separately for each Act.

Because Jones Eagle provides no evidence concerning events leading up to the passage of either Act, any dispute over the characterization of post-passage discovery materials is immaterial. Internal emails written after enactment could not have influenced the General Assembly's intent before enactment. They therefore cannot create a genuine dispute under *Arlington Heights*.

***Departures from Regular Procedure.*** Jones Eagle again fails to establish any departure from regular procedure. It makes no argument at all regarding Act 636—because it cannot. As explained in Defendants' briefing, the type of procedural departure discussed in Arlington Heights is largely inapplicable to legislative enactments because "[t]he Arkansas Legislature is not a municipality or a department of the executive branch" and "does not follow any standardized procedure to

determine what legislation to pass." *Walls*, 760 F. Supp. 3d at 810. Accordingly, "it is probably impossible for a legislature to substantively depart in the way that Arlington Heights uses that phrase." *Id.*

Jones Eagle's reliance on *Perkins v. City of West Helena*, 675 F.2d 201 (8th Cir. 1982), is misplaced. Perkins involved a city's at-large system for electing aldermen—precisely the type of municipal decisionmaking at issue in Arlington Heights, not a state legislative enactment. *Id*. at 202.

As to Act 174, Jones Eagle asks the Court to credit Dr. Barth's opinion that passage during a fiscal session constituted a procedural departure. But Dr. Barth concedes that substantive non-budget legislation has been passed in nearly 40% of the last eight fiscal sessions. ECF 197, at 26. Introducing such legislation requires a two-thirds vote of each chamber. ECF 172-1, at 24. That supermajority requirement explains why the practice is uncommon, not why it is suspicious.

Here, Act 174 passed after significant public outcry regarding crypto-mining facilities and even included an emergency clause. *See* Section 8 of Act 174 of 2024.[1] There is nothing procedurally irregular about overwhelming democratic consensus.

***Legislative and Administrative History***. Finally, Jones Eagle again refuses to grapple with the most probative legislative history in the record: the General Assembly's express legislative findings and statements of intent for both Acts. Instead, Jones Eagle isolates stray remarks, strips them of context, and aggregates them to create a veneer of racial animus.

That approach is legally insufficient. Defendants addressed those remarks in their entirety, not as soundbites. When viewed in context, they do not evince racial animus. Jones Eagle's

[1] A copy of this Act can be found at:
https://arkleg.state.ar.us/Home/FTPDocument?path=%2FACTS%2F2024F%2FPublic%2FACT174.pdf

recurring error is equating policy concerns about China with discriminatory intent toward persons of Asian descent. They are not the same. *See Walls*, 760 F. Supp. 3d at 806 (reasoning that criticism of critical race theory was not synonymous with animus against African Americans).

Jones Eagle then pivots to post-enactment conduct by Defendants and other state officials. That evidence is irrelevant to legislative intent and improperly collapses distinct theories of liability. Enforcement considerations—even if they existed—do not retroactively infect the motives of lawmakers.

Jones Eagle's reliance on *Gearhart v. Uniden Corp. of Am.*, 781 F.2d 147 (8th Cir. 1986), is similarly misplaced. *Gearhart* addressed the admissibility of references during a closing argument in a products-liability jury trial. It does not concern Equal Protection, legislative purpose, or *Arlington Heights* analysis. The same is true of *Boyle* and *McKiver*, which deal exclusively with evidentiary issues in jury trials. Jones Eagle cannot cite a single authority holding that mere references to a country's name suffice to impute discriminatory purpose to an entire legislature—because none exists.

### C. Jones Eagle fails to create a genuine dispute of material fact as to discriminatory enforcement

Jones Eagle's discriminatory-enforcement theory collapses under even minimal scrutiny. The claim rests on conflation: investigation is treated as enforcement; timing is treated as retaliation; speculation is substituted for evidence; and isolated events are offered in place of similarly situated comparators. None of this creates a genuine dispute of material fact under governing Equal Protection standards.

#### 1. *The lack of enforcement and comparators is fatal to a selective-enforcement claim*

A discriminatory-enforcement claim does not arise from disagreement with enforcement judgment or dissatisfaction with investigatory scrutiny. It requires proof of two independent elements: a discriminatory effect—meaning that similarly situated parties who violated the law were treated more favorably—and a discriminatory purpose—meaning that enforcement decisions were motivated by impermissible considerations such as race or national origin. *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996). Absent proof of both, the claim fails as a matter of law. Throughout this section, Jones Eagle never meaningfully attempts to satisfy either element. Instead, it presents a narrative untethered from the governing standard, relying on timing, speculation, and characterizations of motive rather than evidence of disparate treatment or unconstitutional intent.

At the outset, Jones Eagle's theory fails because it treats the Attorney General's investigation as if it were enforcement or prosecution. Jones Eagle argues that the timeline of the investigation "amounted to bad faith targeting of Jones Eagle for exercising its constitutional rights," pointing to the fact that the Attorney General reviewed Jones Digital's filings in its Arkansas County lawsuit "while devising an unlawful and discriminatory investigation." ECF 197, at 32.

That assertion ignores a dispositive distinction. Investigatory steps—reviewing public filings, issuing subpoenas, seeking information—are not enforcement actions, let alone prosecutions. Jones Eagle provides no case law holding that an investigation alone constitutes discriminatory enforcement under the Equal Protection Clause. Nor could it. Courts consistently require actual or impending enforcement action before a selective-enforcement claim can proceed. Jones Eagle identifies none.

Jones Eagle also relies heavily on enforcement timing, suggesting that the Attorney General's investigation followed protected activity and therefore must be retaliatory or discriminatory. But temporal proximity, without more, does not establish unconstitutional motive—particularly where the timing aligns with statutory enactment, public referrals, transaction notifications, and emerging compliance issues. ECF 177, at 4–10. Jones Eagle identifies no deviation from ordinary enforcement practices, no "but-for" causal link, and no evidence that investigatory decisions were atypical or targeted because of protected characteristics rather than legitimate regulatory concerns.

Unable to identify actual enforcement, Jones Eagle attempts to recast its claim as one of retaliatory prosecution, relying on *Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988). That case is inapposite. *Lewellen* involved a criminal prosecution allegedly brought to suppress First Amendment activity. Here, there was no prosecution, no enforcement action, and no deprivation imposed by the State. Attempting to convert *Lewellen* into a rule barring civil investigations that follow lawsuits would effectively immunize regulated entities from oversight the moment litigation is filed. That is not—and has never been—the law.

Jones Eagle's theory would constitutionalize enforcement discretion by collapsing investigation into enforcement[2] and treating scrutiny itself as a constitutional injury. That is not the law. Discriminatory effect requires unequal outcomes or burdens—not mere attention by regulators. Here, no divestiture was ordered, no penalty was imposed, no foreclosure was pursued,

---

[2] To the extent Jones Eagle leans on the Court's earlier standing determinations to imply discriminatory enforcement, that reliance is misplaced. Standing addresses whether a plaintiff may invoke jurisdiction—not whether it can prove constitutional violation. *See Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990) ("The threshold inquiry into standing in no way depends on the merits of the petitioner's contention that particular conduct is illegal."). A plausible fear of enforcement sufficient for standing does not relieve Jones Eagle of its burden to establish the elements of a selective-enforcement claim on the merits. The two inquiries are distinct, and Jones Eagle's attempt to conflate them cannot defeat summary judgment.

no prosecution was initiated, and business operations continued. Even if investigatory steps were inconvenient or unwelcome, they do not amount to disparate treatment under the Equal Protection Clause. Without enforcement consequences, there is no discriminatory effect to measure.

Jones Eagle's claim independently fails because it identifies no similarly situated comparators. A selective-enforcement claim requires proof that similarly situated persons outside the protected class violated the law and were treated differently. *Bell*, 86 F.3d at 823 ("To establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them."). Jones Eagle identifies none. It does not point to a single non-ITAR-linked entity that violated Act 636 and escaped investigation or scrutiny. Without identifying a comparator—let alone demonstrating materially identical circumstances—Jones Eagle cannot establish discriminatory effect, regardless of how it characterizes Defendants' motivations. Courts routinely grant summary judgment where, as here, a plaintiff points only to its own investigation and substitutes anecdote for comparative proof. *See Ah Sin v. Wittman*, 198 U.S. 500, 507–08 (1905).

*2. Jones Eagle offers no proof of discriminatory purpose or pretext*

Jones Eagle also repeatedly asserts—incorrectly—that Defendants "admitted" to a pretextual or discriminatory investigation. That claim is false and has been addressed repeatedly, including in Defendants' filings clarifying that no such admission was made. *See* supra at 5.

Jones Eagle's reliance on the Sharp County transaction only underscores the absence of discriminatory purpose. Jones Eagle accuses the Attorney General of "employ[ing] Act 636 subpoenas as pretexts to shut down 'suspicious' private-party transactions," allegedly based solely on names of persons with Chinese origins. ECF 197, at 32. Yet after conducting three depositions

devoted to that transaction, Jones Eagle cites not a single piece of testimony supporting that accusation. Baseless assertions do not create genuine disputes of material fact.

The undisputed record shows:

- The Attorney General issued subpoenas to Sharp County Title and to Matt Reynolds after being notified of the transaction by Representative Bart Schultz. ECF 81, at 9; ECF 81-2, at 10.
- Pamela Welch and Matt Reynolds identified multiple, independent concerns about the transaction, including disagreement regarding the property's location, the proximity of a crypto mine to Mr. Reynolds's home, refusal to extend the closing date, and repeated changes in buyers. Welch Depo. 43:15-44:6; 80:16-85:11; 87:14-89:6; 109:6-136:18 139:3-142:24; 149:20-153:17; 156:11-160:2; 167:5-168:16, attached as Exhibit A.
- The buyers in the transaction had changed three separate times all before closing. Welch Depo, at 31.
- Ms. Reynolds found one of the buyer representatives on LinkedIn, which said that they worked for Bitmain that was located in Bejing, China. Reynolds Depo. 22:3-24:7, attached as Exhibit B.
- The Attorney General issued subpoenas to Sharp County Title and to Matt Reynolds after being notified of the transaction by Representative Bart Schultz. ECF 81, at 9; ECF 81-2, at 10.
- The subpoenas resulted in a delay of the closing—not termination of the contract. Donahoe Depo. 26:18-25, attached as Exhibit C.
- Termination required mutual consent under the contract. Welch Depo at 177:18-178:11.
- Mr. Chen did not own the buyer entities, and Jones Eagle had no interest in the transaction. Chen Depo. 134:25-135:10; 136:18-143:22; 147:8-148:14, attached as Exhibit D.
- Buyers were required to sign affidavits confirming they were not foreign-owned in violation of Act 636. Donahoe Depo. 30:7-31:12; 50:5-51:2; 52:7-53:7; 58:12-60:7; 129:5-132:19; 136:17-140:21. *See also* Chen Depo. 136:18-143:22; 147:8-148:14.
- The individuals selected to sign those affidavits could not truthfully do so because they were not naturalized citizens at the time. *Id.*

These facts undermine—rather than support—any inference of discriminatory intent. The Attorney General exercised subpoena authority for its intended purpose: determining whether an imminent transaction would violate Act 636. Even assuming arguendo that the subpoenas influenced the transaction timeline, Jones Eagle never explains what is unconstitutional about using lawful investigatory tools to prevent a statutory violation. Instead, it speculates—without

evidence—that the subpoenas were "premised on class-based invidiously discriminatory animus." ECF 197, at 34. Speculation cannot defeat summary judgment.

3. *Jones Eagle's claim shifting and legal mischaracterizations cannot save the discriminatory enforcement claim.*

Jones Eagle further attempts to introduce new federal statutory theories for the first time in its summary-judgment response. ECF 197, at 34. That effort is improper. Summary judgment is not an opportunity to amend pleadings or pivot to new claims, and these statutory references are red herrings that do nothing to establish selective enforcement under the Equal Protection Clause.

Jones Eagle's argument also continues to conflate distinct theories—retaliation, discriminatory purpose, preemption, and conspiracy—without satisfying the elements of any. This blurring of doctrines cannot manufacture a genuine dispute where none exists.

4. *Rational-basis review independently defeats the claim.*

Finally, and independently, Jones Eagle's discriminatory-enforcement claim fails under rational-basis review. Binding Supreme Court and circuit precedent remain controlling, notwithstanding Jones Eagle's repeated assertion that they have been "clearly abrogated." ECF 197, at 35. A sister circuit recently reaffirmed and applied the *Terrace* line of cases to a materially similar statutory framework. *Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1253 (11th Cir. 2025).

Jones Eagle largely ignores *Shen*, despite its direct applicability. Indeed, Jones Eagle admits that the Acts classify "among sub-classes of aliens"—precisely the feature that led the Eleventh Circuit to apply rational-basis review. *Id.* at 1254. Under that standard, Act 636 is constitutional "if there is any reasonably conceivable state of facts that could provide a rational basis for the

classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Jones Eagle bears the burden of showing otherwise.

Its sole attempt is to argue that the Arkansas Constitution "provides that restrict[ing] property rights based on alienage is not a legitimate governmental interest." ECF 197, at 36. That misstates the Constitution, which prohibits distinctions between *resident* aliens and citizens, not all regulation of alien land ownership. Ark. Const. art. 2, § 20 (emphasis added). More importantly, Jones Eagle does not even attempt to explain how the General Assembly's express legislative purposes—food security, land protection, and regulation of crypto-mining impacts—are irrational. *See* Ark. Code Ann. § 18-11-801 (Act 636); Ark. Code Ann. § 23-119-101(b) (Act 174).

Having failed to identify enforcement, comparators, discriminatory intent, or irrationality, Jones Eagle's discriminatory-enforcement claim cannot survive summary judgment.

## II. JONES EAGLE'S FEDERAL PREEMPTION CLAIMS FAIL AS A MATTER OF LAW

Jones Eagle identifies no conflict with federal law, no federally protected right abridged by state law, and no basis for field or foreign-affairs preemption. Rather, Congress deliberately regulated only discrete national-security risks while leaving the historically state-governed field of alien property ownership intact. Under settled preemption principles and binding precedent, that choice forecloses Jones Eagle's theory as a matter of law.

### A. Jones Eagle fails to establish a conflict with federal law necessary for its federal preemption claim.

The crux of Jones Eagle's preemption argument is that "FIRRMA's preemptive effect should be interpreted as *allowing* foreign investment except where CFIUS or the President determines it should be reviewed or potentially barred—after having decided upon review of the facts that no mitigation measures could be introduced to safeguard national security." ECF 197, at

41 (emphasis added). But as Defendants already explained, federal law is silent "on the bulk of real-estate and commercial foreign investment," ECF 176, at 46, and what this silence shows is that "Congress left the traditional field of regulating alien ownership of real estate and personal property to States, deeming only investments that affected national security appropriate subjects for federal regulation," *id.* at 46–47. And Jones Eagle's argument reflects a broader flaw in their preemption theory. In their view, any time a covered transaction does not fail CFIUS's review, it must necessarily be permitted by state law. But this ignores the long history of State regulation of alien property ownership. *See* ECF 176, at 49–56. And it assumes that CFIUS review and ITAR export controls "confer[] rights on private actors" to engage in the sorts of transactions that CFIUS permits or CFIUS and ITAR do not regulate at all. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018) (explaining that "all" laws that preempt state law either "impose[] restrictions" countermanded by federal law or "confer[] rights on private actors" that state law abridges); *Bio Gen LLC v. Sanders*, 142 F.4th 591, 603 (8th Cir. 2025) (asking whether Congress merely sought to legalize hemp federally, or "coercively mandate nationwide legality"). That question is fundamental. Whether federal non-regulation is intended to confer rights is how courts decide whether non-regulation is preemptive. Absent that limit, States could never regulate what the federal government does not; the outer bounds of federal regulation would mark the outer bounds of state regulation. That makes no sense. For state regulation to conflict with federal nonregulation, courts must find a federal right, not just a regulatory void.

Applying that logic to CFIUS and ITAR, then, this Court must decide whether CFIUS was drawn to confer a right on foreigners to acquire American businesses absent national-security concerns; whether CFIUS was drawn to confer a right on foreigners to purchase any American real

estate outside the security perimeter of a military base; or whether ITAR was drawn to confer a right on nationals of countries like China and North Korea to engage in unfettered trade with America so long as it does not involve arms exports.

Those questions all but answer themselves, which is why Jones Eagle simply denies their relevance. CFIUS's jurisdiction runs out at national security because national security was all that, as far as CFIUS went, Congress deemed a proper subject of federal regulation—not because Congress meant to create, purely by negative implication, a free trade regime for foreign investments that do not threaten the nation's security as a whole. Likewise, CFIUS's jurisdiction over real estate runs out at military bases' security perimeters because purchases within those perimeters were all that Congress deemed a proper subject of federal regulation—not because Congress meant to create, by negative implication, a free-trade regime for foreign real estate investments outside those perimeters. We know this because in spite of two centuries of States' regulating and often banning alien real and personal property ownership, Congress did nothing to preempt that regulation when it created CFIUS or ITAR. Instead, it left standing its own century-old blanket ban on alien land ownership on federal territories and enclaves, *see* 48 U.S.C. § 1501, which both is starkly inconsistent with the notion that Congress intended to broadly permit foreign land ownership absent national-security concerns, and, given its limitation to federal territory, strongly implies that Congress left the field of foreign property ownership in States to States.

Left with neither interference with CFIUS's and ITAR's objectives, nor a federal right to engage in free trade that Act 174 or 636 restricts, Jones Eagle points to mere regulatory differences. *See, e.g.*, ECF 197, at 45–48. But those differences do not establish any sort of preemption. Consider for instance the law the state laws in *Crosby* and *Garamendi*, which sought to achieve "the same

goals" and "same objective" as federal law, *Crosby*, 530 U.S. at 379; *Garamendi*, 539 U.S. at 426—democratizing Burma, obtaining payment on Holocaust-era insurance claims to Holocaust victims' families—but differed from, and undermined, federal judgments about how best to achieve those aims. Arkansas's laws, by contrast, are not about national security in the first place, so it makes no sense to claim they depart from Congress's judgments in FIRRMA and ITAR about how best to promote it. Instead, they address local concerns about foreign farmland ownership and utility usage on which Congress has made no policy at all.

Apart from Jones Eagle's affirmative arguments for conflict preemption, it makes a few responses to Defendants' arguments worth comment. The first is that this Court should ignore practically everything the Supreme Court has said about why state laws were preempted by federal foreign policy, or other federal law that the Supreme Court found preemptive on an analogous theory, because those cases "did not establish a rule." ECF 197, at 51. That is incorrect and would not help Jones Eagle in any event.

Starting with *Williamson*, which considered when federal regulations that expressly authorize conduct preempt state law that prohibits it—a theory of preemption quite close to the one presented by this case—it very much did announce a rule. The second paragraph of *Williamson* explains that because "providing manufacturers with [a] seatbelt choice [wa]s not a significant objective of the federal regulation," the regulation "*[c]onsequently* . . . d[id] not pre-empt the state tort suit." 562 U.S. at 326 (emphasis added). The Court then proceeded to restate that necessary condition for preemption, which it found in Geier, throughout its opinion, *see, e.g., id.* at 330 ("At the heart of Geier lies our determination that giving auto manufacturers a choice . . . was a

significant objective of the federal regulation."), and apply it, *see id*. at 332 ("But unlike *Geier*, we do not believe here that choice is a significant regulatory objective.").

Jones Eagle next says that even if *Williamson* announced that rule, *Williamson* did not "involve[] foreign affairs preemption." ECF 197, at 50. But foreign-affairs preemption is no different. *Crosby* reasoned in the same way that Congress's Burma sanctions preempted state sanctions of what they excluded because the federal sanctions were "drawn not only to bar what they prohibit but to allow what they permit." *Crosby*, 530 U.S. at 380.

Jones Eagle protests that that was merely an observation about "the nature of sanctions," not "a general rule." ECF 197, at 51. And of course it is not the sole rationale on which a court might find a law preempted. But it is the reason the Supreme Court found preemption in *Crosby*, the central case on which Jones Eagle relies. And insofar as Jones Eagle's claim is that the limits on CFIUS's jurisdiction or on ITAR's export controls preempt state regulations beyond those limits, whether those limits were drawn "to allow what they permit" is indeed the test. Otherwise, the State's power to regulate would always run out wherever Congress chose to stop. Jones Eagle, by contrast, offers no rule or limiting principle for preemption, instead denying that any of the rationales the Court has given for preemption need be satisfied to find it.

Jones Eagle also argues this Court should draw no inference from the fact that in adding a small handful of real estate transactions to CFIUS's ambit, Congress did not expressly preempt the dozens of state statutes regulating alien property ownership dating back centuries. It notes that in *Crosby*, the Court found preemption despite the lack of an express preemption clause in the Burma law. But Congress's failure to expressly preempt state sanctions on Burma when at the time only one State and a number of municipalities had their own Burma sanctions, *see Crosby*, 530 U.S. at

371 & n.5, can hardly be compared to congressional silence on the centuries-old tradition of state alien property ownership restrictions, particularly where Congress has its own century-old statute of the kind for federal lands. Given that context, congressional "silence . . . coupled with . . . awareness of the prevalence of state" regulation is indeed "powerful evidence" that Congress did not intend for preemption. *Wyeth v. Levine*, 555 U.S. 555, 575 (2000).

**B. Jones Eagle's appeal to field preemption likewise fails.**

Jones Eagle also has a theory of foreign-affairs field preemption; States may not regulate foreign affairs, whether or not their regulation is preempted by any positive federal law. Br. 32. But it lacks law to support that theory. The Supreme Court has found so-called foreign-affairs field preemption in only one case, *Zschernig v. Miller*, 389 U.S. 429 (1968). That case held invalid as-applied an alien inheritance law that was identical to one the Court had previously held valid on its face. In upholding that law in the earlier case, the Court said the argument that, "in [the] absence of a treaty" preempting state law, a State could not "ent[er] into foreign affairs" was "extraordinary" and "far fetched." *Clark v. Allen*, 331 U.S. 503, 517 (1947). *Zschernig* did not overrule *Clark*; it reaffirmed that "the words of [the] statute on its face" there were proper. *Zschernig*, 389 U.S. at 433. It held only that the "statute as applied" had devolved into a regime of judicial "minute inquiries . . . into the credibility of foreign diplomatic statements," "the type of governments that obtain in particular foreign nations," or "the 'democracy quotient' of a foreign regime as opposed to the Marxist theory." *Id.* at 434–35.

Given the Court's dual holdings that state laws may regulate alien property ownership without running afoul of foreign-affairs field preemption but may not, in their application, turn on individual judgments about the virtues or vices of foreign governments, the rule of *Zschernig* and

foreign-affairs field preemption generally is simple: state laws regulating foreign affairs are field preempted by the foreign-affairs power if and only if in application they invite judicial criticism of foreign governments. *See Shames v. Nebraska*, 323 F. Supp. 1321, 1332 (D. Neb. 1971) ("[E]very court which has considered *Zschernig*, has interpreted it to mean that judicial criticism of foreign governments is constitutionally impermissible, and the decision extends no further than that."), aff'd, 408 U.S. 901 (1972); *Garamendi*, 539 U.S. at 439 (Ginsburg, J., dissenting, joined by Stevens, Scalia, and Thomas, JJ.) ("*Zschernig* . . . resonates most audibly when a state action 'reflects a state policy critical of foreign governments and involves sitting in judgment on them.'") (alterations omitted) (quoting Louis Henkin, *Foreign Affairs and the United States Constitution* 164 (2d ed. 1996)).

Not only is that the logical upshot of the distinction *Zschernig* drew between its facts and *Clark*, it is the upshot of the Court's summary affirmance in *Shames*. There, the district court upheld Nebraska's blanket ban of alien land ownership more than three miles outside any city or town, *see Shames*, 323 F. Supp. at 1325, a far more draconian prohibition than that imposed by Act 636. The court reasoned that Nebraska's ban passed muster under *Zschernig* because it left "no room for judicial comment of any kind about foreign governments," *id*. at 1332, as courts needed only enforce the ban, and the Supreme Court summarily affirmed.

Nevertheless, Jones Eagle insists that *Zschernig* is not limited to judicial scrutiny of foreign governments, but instead established some much broader principle of field preemption of state foreign-policy making or state foreign-relations disturbance. Then, ultimately admitting a "clear standard" to that effect is "absen[t]" from *Zschernig*, it says this Court should endorse a Ninth

Circuit decision crafting that court's own rule. ECF 197, at 54. None of this can be squared with stare decisis.

To start, Jones Eagle entirely ignores the critical role that *Clark* plays in understanding *Zschernig*, or that decision's own binding force. But *Clark* rejected the very rule Jones Eagle wants—that a statute itself, not its selective application, can mark "a forbidden entry into foreign affairs," *Clark*, 331 U.S. at 517—and *Zschernig* distinguished that holding because essentially the same statute as the one upheld in *Clark*, as applied, had resulted in judicial criticism of foreign governments. *Zschernig*, then, is logically limited to statutes that as applied result in judicial criticism of foreign governments, and cannot be read to extend further without disobeying *Clark*. Jones Eagle next asks this Court to ignore *Shames*, a decision upholding a law much like (but harsher than) Act 636 on the ground that *Zschernig* is limited to laws that in application result in judicial criticism of foreign governments. Summary affirmances, it says, are not binding on this Court; the Supreme Court's own cases saying that they are merely addressed summary affirmances within the same litigation, and whatever "precedential value" they have is "considerably less . . . than an opinion on the merits," ECF 197, at 56 (quoting *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 559–60 (2015)).

Jones Eagle is simply wrong about the context in which the Supreme Court has said summary affirmances bind lower courts. In *Hicks v. Miranda*, 422 U.S. 332 (1975), the Court held a lower court "was not free to disregard" a summary affirmance in *Miller v. California*, 418 U.S. 915 (1974). *Hicks*, 422 U.S. at 344. *Hicks* and *Miller* were not decisions "within the same litigation." As for summary affirmances' supposedly lesser precedential value, the Supreme Court has said they have less. But it has said so with regard to whether those decisions bind the Supreme Court. *See*

*Wynne*, 575 U.S. at 559–60. When addressing lower courts, the Court has said that they "are bound by summary decisions by this Court 'until such time as the Court informs them that they are not.'" *Hicks*, 422 U.S. at 344–45 (alterations omitted) (quoting *Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir. 1973)).

Finally, Jones Eagle suggests this Court chart its own course and borrow a field-preemption test far exceeding *Zschernig* from the Ninth Circuit. This at least admits that *Zschernig* has very little to say about field preemption beyond "the Court's reaction to [the] particular regulatory statute" there. *Garamendi*, 539 U.S. at 440 (Ginsburg, J., dissenting) (quoting 10 Op. O.L.C. 49, 50 (1986)). But it too fails as a matter of stare decisis, as Defendants have already explained. *See* ECF 176, at 60–61. And even under the Ninth Circuit's test, Jones Eagle's argument still fails. *Id.* at 61–62.

Therefore, based on the applicable precedent, the Court should grant Defendants' motion for summary judgment on preemption.

## III. JONES EAGLE'S DUE PROCESS CLAIM FAILS AS A MATTER OF LAW.

Jones Eagle's due process challenge rests on a fundamental misapprehension of the governing standards. Stripped of rhetoric, Jones Eagle argues that Act 636 and Act 174 are unconstitutionally vague and invite arbitrary enforcement. Neither contention withstands scrutiny under settled Supreme Court and Eighth Circuit precedent.

### A. Jones Eagle misstates the vagueness standard.

"A statute is unconstitutionally vague only if it (1) fails to provide a person of ordinary intelligence fair notice of what is prohibited, or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S.

1, 18 (2010). Vagueness doctrine is concerned with fair notice and enforcement standards—not with whether a regulated party finds compliance inconvenient or enforcement disagreeable.

Jones Eagle incorrectly asserts that Act 636 and Act 174 must be evaluated under a "heightened vagueness standard" because they implicate property interests that are "constitutionally protected rights." ECF 197, at 61. Jones Eagle further claims that Act 636's potential for criminal penalties automatically triggers heightened scrutiny. That assertion is contrary to binding Eighth Circuit law.

As the Eighth Circuit explained in *Garner v. White*, "regardless of the severity of a law's criminal sanctions, a law regulating business behavior which does not restrict constitutionally protected conduct is not void for vagueness if it is sufficiently clear as applied to the conduct of the complaining party." 726 F.2d 1274, 1278 (8th Cir. 1984). The court further recognized that "[i]n a vagueness challenge, both the degree of clarity required and the relative importance of fair warning and discriminatory enforcement depend on the nature of the law in question." *Id.*

Here, Act 636 and Act 174 regulate business behavior. They provide clear notice of prohibited conduct, delineate regulatory consequences, and afford multiple procedural safeguards before any divestment, foreclosure, or criminal penalty can occur. Entities are given time to divest before judicial foreclosure may be pursued, and any criminal enforcement proceeds through ordinary prosecutorial processes in which defenses may be asserted. Jones Eagle cannot plausibly claim a lack of fair notice under this framework.

Jones Eagle assumes that any law affecting a property interest must satisfy a heightened vagueness standard. No authority supports that proposition. To the contrary, laws frequently affect

property interests while remaining subject to the ordinary vagueness standard applicable to regulations of business conduct.

Indeed, regulations of business behavior "are subject to a lesser standard of definiteness because businesses can be expected to consult relevant legislation in advance of action." *Garner*, 726 F.2d at 1278. That reasoning applies fully here. Jones Eagle and similarly situated entities were fully capable of consulting the statutory text and assessing compliance obligations before acquiring or maintaining regulated interests.

**B. Jones Eagle fails to address Defendants' retroactivity argument and mischaracterizes the plain language of the Acts.**

Jones Eagle further compounds its error by refusing to analyze Act 636 and Act 174 separately, despite their materially different regulatory scopes and enforcement mechanisms. The Acts impose different obligations, regulate different conduct, and authorize different remedies. These distinctions matter. As Defendants explained in their motion for summary judgment, when the Acts are properly separated and the correct standards applied, Jones Eagle's due process claim fails as to each. ECF 196, at 3–9.

Jones Eagle also fails to meaningfully respond to Defendants' arguments concerning retroactivity. ECF 196, at 5–6. Despite the plain text of Act 174 expressly addressing existing interests, Jones Eagle claims Defendants offered no evidence of legislative intent. The legislative intent, however, is placed directly in the statute itself. *See* ECF 196, at 5–7. No extrinsic evidence is required. Ark. Code Ann. § 14-1-606(c)(1).

The text of Act 636 demonstrates a weak retroactive application that is constitutionally permissible. *See* Ark. Code Ann. §§ 18-11-110(b)(2); 18-11-803(a)(2). And even where prior conduct is implicated, regulating continuing conduct after a statute's effective date does not constitute

impermissible retroactivity. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 32 (2006); *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726 (8th Cir. 1986) (emphasis in original).

### C. Act 636 and Act 174 do not invite arbitrary enforcement through subpoena authority.

Jones Eagle contends that Act 636 and Act 174 invite arbitrary enforcement because they authorize subpoenas by the Attorney General. Jones Eagle concedes that administrative subpoenas are governed by a reasonableness standard, not probable cause or reasonable suspicion. ECF 197, at 67. It nevertheless argues that due process is violated because the statutes do not prospectively delineate subpoena limits.

That argument proves too much. Administrative subpoenas are routinely authorized by statute without exhaustively defining their scope. To be enforceable, such subpoenas must meet established constitutional criteria: they must be "(1) issued pursuant to lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the lawful purpose, and (4) not unreasonable." *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008). Parties subject to subpoenas have a mechanism to challenge them as unreasonable. Jones Eagle could have availed itself of that process.

The Due Process Clause does not require legislatures to pre-define every investigatory parameter in the statutory text. *See id.* Act 636 and Act 174 lawfully confer subpoena authority as part of an enforcement regime, and no further specificity is constitutionally required.

Jones Eagle repeatedly conflates dissatisfaction with enforcement decisions into a constitutional claim. But disagreement with enforcement does not transform an otherwise valid statute into a due process violation. *See Langford v. City of St. Louis*, 3 F.4th 1054, 1060 (8th Cir.

2021) (rejecting attempt to "conflate the lawfulness of her arrest with the constitutionality of the ordinance").

Jones Eagle repeated and contested accusations regarding the enforcement is an attempt to create a dispute of material facts on an issue that is not material to a vagueness claim. Here, whether an investigation continued after Jones Eagle claims it provided exculpatory information is immaterial to the vagueness inquiry. Enforcement disputes do not establish that a statute fails to give fair notice or invites arbitrary enforcement by its plain language. In fact, any challenge as to the enforcement can occur in the various settings set forth in the statue, and in that manner, it is not a violation of procedural due process at all. *See supra*.

Jones Eagle incorrectly asserts that "discovery confirmed that Defendants had no lawful motivation in targeting Jones Eagle for investigation." ECF 197, at 68. The opposite is true. The Attorney General acted pursuant to statutory authority upon referral from the Department of Agriculture. Subpoenas were necessary to determine Jones Eagle's corporate structure and whether Act 636 applied to its possible leasehold interest—information that was not publicly available and not voluntarily provided by Jones Eagle. ECF 177, at 6, 9-10. Record evidence further shows that Jones Eagle restructured its corporate organization to divest majority foreign ownership that would have violated Act 636 or Act 174—the very information the investigation sought to confirm. *Id.* at 6–8.

**D. The definition of agricultural land is not unconstitutionally vague.**

Jones Eagle argues that Act 636's definition of agricultural land is vague because it is purportedly unclear how to determine "annual gross receipts" from agricultural products. But "[t]he Constitution does not require legislatures to define every term in a statute." *Adam & Eve*

*Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019). Where a term is undefined, courts apply its ordinary meaning, and "perfect clarity and precise guidance have never been required." *Id.* (quoting *Holder*, 561 U.S. 1). Jones Eagle's purported confusion—whether gross receipts are measured per-acre or in the aggregate—does not arise from the statute. The statute refers to receipts from products "on the land." If the land consists of multiple acres, the receipts are determined for "the land" as a whole. The statute need not anticipate or resolve every hypothetical ambiguity conjured by a regulated party.

Jones Eagle also asserts that Defendants cannot argue clarity because they "present no competent record evidence of the past gross receipts" from Jones Eagle's leasehold. ECF 197, at 65. That argument ignores the procedural posture. Determining those receipts was precisely the purpose of the subpoena served on Jones Eagle, and shortly thereafter Defendants were enjoined from further investigation at Jones Eagle's request. Jones Eagle cannot claim a failure to investigate when it sought and obtained an order barring investigation.

## IV. JONES EAGLE'S TAKING CLAUSE CLAIM FAILS AS A MATTER OF LAW.

Jones Eagle's Takings Clause claim rests on speculation, doctrinal confusion, and hypothetical future events. When evaluated under the proper legal framework—and in light of Defendants' summary judgment briefing—the claim fails at multiple independent thresholds and should be rejected outright.

### A. Jones Eagle's Takings claim is not ripe.

Jones Eagle does not address Defendants' argument that its Takings Clause claim is not ripe. ECF 176, at 76–77. This omission is dispositive. A Fifth Amendment claim is premature until the Government has actually taken property. *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013).

Here, Defendants have not taken Jones Eagle's property and no taking in any form has been effectuated. Even Jones Eagle's attempts to manufacture a "threatened" essentially admits that no taking has actually occurred. Accordingly, Jones Eagle's as-applied Takings Clause claim is not ripe and should be rejected on that basis alone.

**B. Jones Eagle fails to demonstrate a taking within the meaning of the Fifth Amendment**

*1. Jones Eagle fails to engage the required regulatory Takings Clause analysis*

Jones Eagle, despite opposing summary judgment on its Takings Clause claim, does not meaningfully assess the statutes under the regulatory takings framework. Defendants stand by their briefing explaining that proper delineation of the applicable legal analysis forecloses Jones Eagle's claims. ECF 176, at 76–83.

The failure to rebut the regulatory takings analysis—whether categorical or under *Penn Central*—is fatal. A party resisting summary judgment cannot prevail by ignoring the controlling legal framework altogether.

*2. Alleged government interference does not constitute a taking.*

Jones Eagle argues that "a direct interference or disturbance of property rights" is sufficient to constitute a taking. ECF 197, at 69 (citing *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784 (8th Cir. 1979)). But Jones Eagle omits the critical limiting principle from that case. As the Eighth Circuit explained, "governmental action short of acquisition or occupancy may constitute a constructive or de facto taking if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter." *Garland*, 596 F.2d at 787 (emphasis added). The Court further clarified that "mere declaration of blight and other initial steps authorizing condemnation, even if they result in a decline in property values, do not constitute a taking requiring compensation." *Id.*

Thus, Jones Eagle bears the burden of showing that referral for investigation under Act 636 deprived it of all—or at least most—of its property interest. It cannot do so. *See Amen v. City of Dearborn*, 718 F.2d 789, 795 (6th Cir. 1983) ("[A] taking does not occur merely because governmental action burdens or restricts some particular right or interest in a parcel of land. Rather, before a taking occurs the government must deny the owner all or an essential use of his property."). Jones Eagle undeniably retained its leasehold (even prior to this Court's injunction), continued operations, and received no divestment order or enforcement letter. Its Takings Clause claim therefore fails as a matter of law.

*3. Public referrals, controversy, and independent federal investigations are not takings*

Jones Eagle next claims that a public referral generating controversy is enough to constitute a taking. ECF 197, at 70. That contention is unsupported by law and contradicted by the record.

Jones Eagle faced public controversy long before the December 11, 2023 referral, including extensive media coverage in October and November 2023 over its operations in general and its placement in Arkansas County.[3] In fact, the Attorney General's office had Jones Digital on its radar before Jones Digital even filed its Arkansas County lawsuit. ECF 197, at 19 (citing OAG-004104).

That the Attorney General reviewed public court filings to gather information related to a lawful investigation does not transform publicity into a taking. ECF 197, at 24-25 (citing OAG-

[3] *See e.g.*, Arkansas Business, "Plans for Dewitt Bitcoin Mine Taking Shpre Amidst Foreign Ownership Concerns, (Oct. 30, 2023), https://www.arkansasbusiness.com/article/plans-for-dewitt-bitcoin-mine-taking-shape-amidst-foreign-ownership-concerns/; Andrew Mobley, *Arkansas County fights crypto-mine lawsuit, urges special session and issues rallying cry to entire state*, KATV (Nov. 15, 2023), https://katv.com/news/local/arkansas-county-fights-crypto-mine-lawsuit-urges-special-session-and-issues-rallying-cry-to-entire-state-say-no-to-crypto-bitcoin-dewitt-thomas-e-best-tami-hornbeck-quorum-court-jones-digital-cryptomining-environmental-quality-jeremiah-moore; Andrew Mobley, *Natural State or 'Bitcoin State?' Rurual Arkansas County passionately fights against introduction of cryptomines*, KATV (Oct. 11, 2023), https://katv.com/news/local/natural-state-or-bitcoin-state-rural-arkansas-county-fights-introduction-of-crypto-mine-quorum-court-dewitt-tim-blair-prosecuting-attorney-noise-ordinance-act-851-cryptomining-cryptocurrency-tami-hornbeck-jones-digital-computing-kenneth-graves-governor, Kyle Massey, *Dewitt Bitcoin Mine gets court victory as judge strikes noise ordinance*, Arkansas Business (Nov. 21, 2023).

004108-9). Courts have consistently rejected the notion that reputational harm, market reactions, or public controversy constitute a compensable taking.

Jones Eagle further asserts that the State's coordination with federal agencies constitutes "coordinated efforts to target Jones Eagle" amounting to an "unconstitutional course of conduct [that] is a de facto taking." ECF 197, at 71. Yet Jones Eagle cites no authority for the proposition that investigation—whether coordinated or not—can constitute a taking.

Investigating a regulated entity does not become unconstitutional merely because a state official serves on a federal task force. This theory has no foundation in Takings Clause jurisprudence and is a red herring devoid of legal merit.

*4. The Sharp County transaction cannot support a Takings Clause claim*

Jones Eagle, despite identifying no deprivation of its own property, points to a separate transaction in Sharp County as evidence of a taking. That argument fails for multiple reasons.

Jones Eagle was not involved in the Sharp County transaction—an undisputed fact supported by record evidence. Chen Depo. 134:25-135:10; 136:18-143:22; 147:8-148:14. Even Jimmy Chen, acting in his personal capacity, was not the buyer. *Id.* Accordingly, the Sharp County transaction cannot serve as the basis for a Takings Clause claim by Jones Eagle, the plaintiff here.

Moreover, even if the transaction were somehow imputed to Jones Eagle, Jones Eagle held no property interest in that transaction. Without a cognizable property interest, there can be no taking. To the extent Jones Eagle attempts to recast this argument as interference with contract formation, it has pled no such claim and may not retrofit an entirely different constitutional theory at summary judgment.

**C. Jones Eagle is unable to rebut the clear viable options for compensation under the law that defeat a Takings Clause claim**

Finally, Jones Eagle argues that although the Acts provide methods of compensation, the proceeds of judicial foreclosure "shall be disbursed to lienholders, not to Jones Eagle as the owner." ECF 197, at 71. This argument reflects a fundamental misunderstanding of both foreclosure mechanics and takings law.

The Takings Clause guarantees compensation for the property interest taken—not immunity from lien priority or entitlement to proceeds ahead of secured creditors. Judicial foreclosure distributes fair-market proceeds first to lienholders and then to the interest holder to the extent any equity remains. That distribution scheme is not a constitutional defect; it is the ordinary operation of property law. Jones Eagle would fare no differently if it voluntarily sold its leasehold, paid its lenders, and retained the surplus. The Fifth Amendment does not entitle a regulated party to be paid as though its interest were unencumbered.

Moreover, because no foreclosure or divestment ever occurred, Jones Eagle's compensation argument is speculative and premature.

## V. JONES EAGLE FAILS TO ESTABLISH A COMMERCE CLAUSE VIOLATION

Jones Eagle's Commerce Clause argument reprises themes already rejected in Defendants' briefing, relying on inapposite precedent and conflating economic regulation with property ownership. When analyzed under settled dormant Commerce Clause doctrine, neither Act 636 nor Act 174 regulates interstate commerce, discriminates against out-of-state economic actors, or imposes any cognizable burden on a commercial market.

### A. Jones Eagle fails to identify any regulated economic market or industry under Act 636

As a threshold matter, Jones Eagle fails to identify what economic market or class of economic actors is allegedly burdened by Act 636. This omission is fatal. The dormant Commerce

Clause applies to state laws that regulate commerce—that is, the interstate exchange of goods, services, or economic activity. Regulation of property ownership, standing alone, does not trigger Commerce Clause scrutiny. *See Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807–08 (8th Cir. 1993).

Act 636 regulates landownership, not commercial activity. It does not regulate trade, impose conditions on the sale of goods, restrict participation in a particular industry, or erect barriers to market entry. Jones Eagle never explains what interstate market is affected, how commerce flows across state lines are impeded, or how economic competition is distorted. Absent a defined commercial market, there is no Commerce Clause claim to evaluate. Defendants outlined this deficiency in our briefing originally, and Jones Eagle's response does nothing to rectify this missing critical component. *See* ECF 176, at 72-75. Importantly, Defendants separate out Act 636 and act 174 because they regulate and operate differently. Jones Eagle does not do so, which underscores why the analysis is largely incomplete and fails to respond to the arguments made in Defendants' motion for summary judgment. ECF 175.

Jones Eagle relies heavily on *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019), but that case bears no resemblance to the statutes at issue here. *Tennessee Wine* involved a durational residency requirement imposed on a specific commercial industry—retail liquor licensing—that directly determined whether a business could operate in the state at all. The Supreme Court invalidated the law because it excluded non-resident economic actors from participating in a defined commercial market. *Id.* at 514–18.

Act 636 does nothing of the sort. It does not regulate any industry, impose residency requirements on commercial participants, or privilege in-state economic actors over out-of-state

competitors. It instead regulates who may hold interests in land, a traditional area of state regulation that does not itself constitute commerce.

Jones Eagle's attempt to analogize a land-ownership statute to a liquor-licensing scheme collapses under scrutiny. A law that determines who may own land is not equivalent to a law that determines who may engage in commerce.

**B. Jones Eagle fails to address the facially neutral application of Act 174**

Jones Eagle's Commerce Clause argument is even weaker as to Act 174. Act 174 imposes no criminal liability at all and contains no resident-alien defense to prosecution. Accordingly, the premise of Jones Eagle's argument—that residency-based distinctions burden interstate commerce—does not apply.

Indeed, Jones Eagle admits that Act 174's provisions "could apply to any person residing in a country listed by the ITAR, including native-born Arkansans." ECF 197, at 77. That admission forecloses any claim of facial discrimination based on residency or geography. A law that applies equally to in-state and out-of-state persons does not discriminate against interstate commerce.

Jones Eagle again invokes *Piazza's Seafood World*, but that case involved state regulation that directly burdened interstate seafood commerce by restricting the importation and sale of out-of-state products. That is not this case. Neither Act 636 nor Act 174 regulates the sale, transport, or production of goods in interstate commerce. There is no commercial stream of goods, no market restriction, and no protectionist effect. As Defendants explained in their response to Jones Eagle's motion for summary judgment, absent an actual commercial market burden, cases like *Piazza's Seafood World* have no application here. ECF 196, at 13.

## VI. THE STATE OF ARKANSAS IS ENTITLED TO SOVEREIGN IMMUNITY ON ALL CLAIMS

Jones Eagle asserts that it has an automatic right to bring a Takings Clause claim directly against the State of Arkansas in federal court. ECF 197, at 71-72. That assertion is incorrect. While plaintiffs may have a cognizable injury when property is taken (even before they pursue available procedures for compensation) under *Knick*, that does not mean the Takings Clause creates a private cause of action. *See, e.g.*, *Devillier*, 601 U.S. at 292 (leaving that question open); *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) ("no cause of action directly under the United States Constitution" for a takings claim) *Brott v. United States*, 858 F.3d 425, 432 (6th Cir. 2017) (similar); *Devillier v. Texas*, 53 F.4th 904 (5th Cir. 2023) (similar), vacated and remanded, 601 U.S. 285 (2024); *but see Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224 (11th Cir. 2025). Regardless, the Takings Clause does not abrogate the sovereign immunity of States and their officials.

Every circuit that has decided that question "has held that the Takings Clause does not override the Eleventh Amendment.'" *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 553 (4th Cir. 2014); *see, e.g.*, *74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023) (collecting cases and explaining courts "have consistently held that sovereign immunity trumps the Takings Clause" when the State provides "its own remedy"). That rule applies in the Eighth Circuit as well. The Eighth Circuit has held that "the Eleventh Amendment bars a claim against the State in federal court as long as state courts remain open." *EEE Mins., LLC v. State of N. Dakota*, 81 F.4th 809, 816 (8th Cir. 2023).

Jones Eagle seizes on language about state courts to suggest that sovereign immunity is abrogated where state courts are closed to takings claims. But courts have seemingly not confronted

a case where state courts were completely closed as they've consistently concluded that states provide adequate procedures. *See, e.g.*, *Hutto*, 773 F.3d at 552 ("[W]e do not decide the question whether a State can close its doors to a takings claim or the question whether the Eleventh Amendment would ban a takings claim in federal court if the State courts were to refuse to hear such a claim."); *EEE Mins.*, 81 F.4th at 816 (concluding that takings claims can be brought in North Dakota courts).

Jones Eagle also misreads *Knick v. Township of Scott*. *Knick* makes clear that takings claims do not receive special procedural treatment, but it does not abrogate sovereign immunity. Indeed, it involved a township, not a State.

The Supreme Court instructed that takings claims against local governments "should be handled the same as other claims under the Bill of Rights." *Knick*, 588 U.S. at 202. Consistent with that principle, courts have recognized that *Knick* merely placed takings claims "on equal footing with claims against the federal government." *Bay Point Props., Inc. v. Mississippi Transportation Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019). And, as Bay Point emphasized, "[n]obody disputes that takings claims against the federal government require the waiver of sovereign immunity contained in the Tucker Act." *Id.*

Thus, *Knick* leaves unchanged the central question here: whether § 1983 or *Ex parte Young* applies to overcome state immunity—not whether state-court remedies exist or whether the Takings Clause is self-executing in the abstract.

This Court need not resolve any hypothetical immunity-abrogation questions because Arkansas provides adequate remedies when property is taken. The Eighth Circuit has held that "Arkansas provides adequate mechanisms for its citizens to be justly compensated for takings."

*Cormack v. Settle-Beshears*, 474 F.3d 528, 531 (8th Cir. 2007); *see Willis Smith & Co. v. Arkansas*, 548 F.3d 638, 640 (8th Cir. 2008) (concluding Arkansas provides an "adequate post deprivation remedy" "through the Arkansas State Claims Commission" (quotation omitted)); *Collier v. City of Springdale*, 733 F.2d 1311, 1317 (8th Cir. 1984).

Arkansas law provides multiple mechanisms for compensation, including statutory remedies, Ark. Code Ann. §§ 18-15-302, 18-15-304, 18-15-404, a cause of action for inverse condemnation, *Pope v. Overton*, 2011 Ark. 11, at 4, 376 S.W.3d 400, 404 (2011), recognized exceptions to sovereign immunity for takings claims, *Ark. Game & Fish Comm'n v. Heslep*, 577 S.W.3d 1, 5–7 (Ark. 2019); *Land v. BAS, LLC*, 713 S.W.3d 1, 6 (Ark. 2025), cert. denied, No. 25-931, 2026 WL 795170 (U.S. Mar. 23, 2026), and a forum for claims otherwise barred by sovereign immunity, Ark. Code Ann. § 25-44-204(a)(2) (Arkansas State Claims Commission).

The Takings Clause guarantees just compensation if a taking occurs; it does waive state sovereign immunity or mandate a federal forum. Here, no taking has occurred and therefore Jones Eagle's Takings Clause is not ripe. However, even if Jones Eagle had a Takings Clause claim to assert (it does not), the State of Arkansas would still be entitled to sovereign immunity. Accordingly, the State of Arkansas's motion for summary judgment on Eleventh Amendment immunity grounds should be granted.

## CONCLUSION

Jones Eagle's response repackages disagreement with lawful regulation into constitutional claims, but it identifies no genuine dispute of material fact. Applying the correct legal standards, the challenged statutes do not violate equal protection, due process, the Takings Clause, or the

Commerce Clause, and sovereign immunity independently bars Jones Eagle's claims against the State. Defendants are therefore entitled to judgment as a matter of law.

Date: April 24, 2026

Respectfully submitted,

TIM GRIFFIN
Attorney General

By:

Jordan Broyles, Ark. Bar No. 2015156
Senior Assistant Attorney General
Madalyn Goolsby, Ark. Bar No. 2024283
Assistant Attorney General
Ryan Hale, Ark. Bar No. 2024310
Senior Assistant Attorney General

Office of the Attorney General
101 W. Capitol Ave
Little Rock, AR 72201
(501) 301-0169
(501) 682-2591 fax
jordan.broyles@arkansasag.gov
maddy.goolsby@arkansasag.gov

*Attorneys for Defendants*